# Roger A. Clark

## Police Procedures Consultant, Inc.

10207 Molino Road. Santee, CA 92071
Phone: (208) 351-2458, Fax: (619) 258-0045
rclark9314@aol.com

### December 9, 2019

Philip B. Davis, Esq.
Nicholas T. Davis, Esq.
Davis Law New Mexico
1000 Lomas Boulevard NW
Albuquerque, New Mexico 87102

**Regarding:** **Dennis Murphy, as Personal Representative of the Estate of Daniel
Turner, Deceased, and Walter and Tamara Turner, v. the City of
Farmington, and James Prince, James Moore, Zack Wood and Jesse
Griggs, in their Individual Capacities, Case No.: 1:19-cv-00639.**

Dear Counsel:

Thank you for retaining me to analyze and render opinions regarding the June 28, 2018,
Law Enforcement Activity Related Death (LEARD) of Mr. Daniel Turner (Mr. Turner),
by Farmington Police Department (FPD) Officers James Prince (Officer Prince), James
Moore (Officer Moore), Zack Wood (Officer Wood), and Jesse Griggs (Segeant Griggs).
Pursuant to the requirement of Rule 26, I have studied, the Investigative FPD reports,
video recordings - including Body Worn Camera (BWC) recordings - audio recordings -
including interviews, - policy and training documents, medical records, photographs, and
other materials (as listed below) regarding this case provided to me thus far. No
Depositions have yet been taken. I am informed that they will occur early next year.
Please be advised that if/when any additional information (including the pending
depositions and transcripts) are submitted, it will be necessary to express additional
opinions and/or refinements of the opinions expressed in this report.

It is also necessary to state at the beginning of this report that I do not make credibility
determinations in expressing my opinions. That is, where there are differences in the
events proffered by the Defendant Officers, and/or witnesses, versus those proffered by
the plaintiffs, and witnesses, I do not opine for the trier of fact regarding who are the

**EXHIBIT 2**

I. P000408 Videos from FPD Officer Wood
(double-click on "AutoPlay" to access videos).

3. Certificate of Service [Doc. 18], filed October 30,
2019.

V. *"Positional Asphyxia - Sudden Death",* Bulletin by the National Law
Enforcement Technology Center, June, 1995.

VI. International Association of Chiefs of Police (IACP)/National Law
Enforcement Policy Center (NLEPC) Article Entitled *"The Prone
Restraint - Still A Bad Idea,"* Spring, 1998.

VII. Custody Death Syndrome Training Key #429, by the International
Association of Chiefs of Police (IACP).

VIII. Training Video produced by the Georgia Bureau of Investigation:
*"Preventing Restraint Asphyxia."*

IX. Training Video produced by the New York Police Department: *"Best
Practices, Positional Asphyxia."*

X. U.S. DOJ: "Investigation of Los Angeles County Sheriffs
Department Stations in Antelope Valley," (Regarding blows to the
head) June 28, 2013, Page 32.

XI. The Americans with Disabilities Act of 1990 (42 US Code 2101 et
seq.) and the Rehabilitation Act of 1973, Section 504.

XII. Images of the incident scene via the internet.

**Brief Overview of Events and Commentary**

In 2018, Mr. Turner moved from San Diego, California to New Mexico, and lived with
his parents, Walter and Tamara Turner, at 1700 N. Carlton Avenue, Farmington, New
Mexico. Mr. Turner was forty years old, grossly overweight, and had been known to
consume alcohol and often demonstrated mental/emotional problems. On the evening of
June 7, 2018, at approximately 11:00 p.m., Mr. Turner began to act in a bizarre way and

eventually left the house and walked the short distance down the street to the intersection of North Carlton Street and East 20th Street and stopped at the parking lot of Durango Joe's Donut Shop located at 1501 East 20th Street where he started banging his head on the asphalt. Walter Turner (Father) called the 911 operator and requested an ambulance. While in the parking lot, Walter and Tamara attempted to mollify their son but were not successful. Mr. Turner continued to bang his head on the asphalt.

The dispatch CAD card referenced psychiatric/abnormal behavior/suicide attempt for a 41 year old, male, conscious and breathing. acting out of character. All responding Officers were privileged to this information through their on-board computer systems and radio traffic and were on notice that the incident involved a person engaged in some type of mental crisis.

Officer Prince arrived at the scene at 11:10. Upon his arrival, Officer Prince parked his patrol car in Durango Joe's parking lot and exited the vehicle. Based on Officer Prince's dashboard camera, he approached Walter, Tamara, and Mr. Turner. As Officer Prince walked toward Tamara, Mr. Turner, and Walter, Mr. Turner, who was facing away from Officer Prince, fell onto his back and hit his head on the asphalt.

After falling backward and hitting his head on the asphalt, Mr. Turner proceeded to bang his head on the asphalt. Officer Prince stood as Walter and Tamara placed a blanket under Mr. Turner's head.

After the blanket was placed under Mr. Turner's head, Officer Prince engaged Mr. Turner, announced his presence, and attempted to calm Mr. Turner down. Mr. Turner continued to bang his head on the blanket and eventually moved the blanket away, so his head made contact with the asphalt.

Officer Prince knelt down, placed the blanket under Mr. Turner's head, and then took control of Mr. Turner's arms - lifting Mr. Turner's arms above his head. Mr. Turner freed his left arm and began to flail that arm. According to Officer Prince, Mr. Turner made momentary contact with Officer Prince's X-26 taser, which was located on Officer Prince's right side.

Officer Prince immediately delivered three, close-fisted, punches to Mr. Turner's face. Walter plead with Officer Prince not strike Mr. Turner in the face or head. Officer Prince replied, "He grabbed my fucking taser man!" It should be noted that Officer Prince's taser weapon, based on video evidence, never moved prior to him striking Mr. Turner.

for approximately one minute and then the medics took over. Officer Moore stated he backed away from Daniel and let the medics work on Daniel. Officer Moore stated he went over to where Daniel's parents were standing and talked with them.

"All three of the Officer's I interviewed had the same recollection of the events that transpired during this call. I was also able to watch the dash cam and lapel cam video from Officer Prince's cameras. The video footage matched the statements given by all the Officer's I interviewed." (Detective John Nyce Interview Summaries, P000059-P000060)

## The Positional or Restraint Asphyxia Occurrence:

Law enforcement officers very frequently encounter situations that require them to restrain persons. As a national standard, police officers are taught that it is imperative that only the force necessary to make an arrest or subdue a combative or resistive person may be used. This is because officers are responsible at all times for the safety and well being of persons they take into their custody, as well as for their own safety and that of bystanders and persons who are improperly restrained can suffer severe injury or death.

Properly trained officers learn how improper restraining techniques can block the flow of air into the individual's lungs contributing to a life-threatening condition known as Positional, or Restraint, Asphyxia. Proper training also covers the multiple effective options available such as side-control techniques which involve control holds of the person's upper arms, avoiding compression of the chest, rolling the subject over on his side, sitting or standing the subject up, proper hobbling methods (which excludes hogtying), sitting the subject in the police unit, summoning EMS to the scene early so that chemical restraints may be employed, etc.

Just restraining someone in a face-down position with their hands handcuffed behind their back is not generally sufficient in and of itself to cause sudden and unexpected death. Key risk factors include all or some of the following conditions:

- Obesity.
- Pre-existing medical conditions such as heart problems or head and neck injuries.
- The length of any struggle.

- The physical environment in which the struggle takes place.
- Whether the suspect suffers from a mental condition.
- Whether the suspect has been drinking alcohol.
- The presence of depressant or stimulant drugs (substances such as cocaine and methamphetamine.

Experts have stated that excessive restraint, combined with one or more of these factors, can wreak havoc on the cardiovascular and respiratory systems.

Properly trained officers know that breathing requires two actions: Increasing the size of the chest by expanding the ribs, and contracting the diaphragm, allowing air to fill the lungs. When a person is lying face down, performing both of these functions can be more difficult. The contents of the abdomen are pressing against the diaphragm. In order to raise the ribs or use the diaphragm when forced into a prone position, the weight of the body must be lifted. An officer kneeling or lying on the individual's back, aggravates the situation (several deputies violated this precept, per video evidence), because the additional weight of the officer(s) must be lifted along with the weight of the persons' body. The greater the weight or more intense the compression, the harder it becomes to breathe. As a result, the suspect struggles more violently, and the untrained or incompetent officers respond by using more force. With no reserve oxygen left and unable to take deep breaths, the individual slips into unconsciousness and in minutes could be dead. This training has been widely used since at least the 1990s and is commonly referred to as the physiology of a struggle.

Competently trained officers know this scenario can be easily avoided by using proper restraint techniques and following simple guidelines that are key to the possibility that a struggling subject could be in danger of death due to positional or restraint asphyxia. One of the most important of these factors is the longer the physical contact, the more fatigued the body will become.

Further, officers are trained that they must act quickly to return the subject to an upright position, especially when risk factors are present because the restraint techniques used could mean the difference between life and death. Basic guidelines include avoiding placing weight on the neck or back, avoiding "straddle" positions and "pile-ons," and immediately positioning the subject so he can breathe.

As a consequence, the law enforcement officer must assume that any person being restrained presents a risk of sudden and unexpected death. The risk that restraint asphyxia and accidental death will occur is only controlled by using proper restraining techniques.

Properly trained officers are trained that excessive restraint, combined with one or more of these factors, several of which were present in this instance, can impair the cardiovascular and respiratory systems.

Based on video evidence, it appears that several officers applied body weight (approximately 600 pounds of body weight) to Mr. Turner' upper torso, neck, shoulders, and legs, while Mr. Turner was handcuffed. It appears that the officers failed to follow policy, and reason when they placed body weight on Mr. Turner while he was handcuffed.

**Consequences of Blows/Kicks to the Head:**

Officers are trained that blows to the head can result in serious injury and death, and are not to use blows to the head absent the protection of life. My review of the BWC videos does not demonstrate any reasonable risk whatsoever that Mr. Turner could acquire Officer Prince's taser. With multiple deputies present, and Mr. Turner on the ground, no officer's life was in danger; therefore, any blows to the head of Mr. Turner were excessive and therefore unnecessary.

**Opinions Thus Far:**

1.  From my review of the materials provided, the use of force and restraint inflicted on Mr. Turner by Officers Prince, Moore, and Wood, and Sergeant Griggs was excessive and unreasonable, and violated FPD policy.

2.  In my opinion, the prolonged application of restraint on a prone Mr. Turner, including three officers on Mr. Turner' back with one officer holding Mr. Turner' head to the ground and one officer pressing Mr. Turner' legs against his buttocks in a figure-four leg lock was excessive, unnecessary, and unjustified. The officers received training regarding the use of handcuffs and restraint devices and received training regarding the risks associated with restraining individuals in a prone position. Specifically, officers are supposed to be trained to be careful regarding their body placement on a prone subject and to not place all their weight on a prone subject. Officers are also supposed to be trained to be

mindful of a prone subject's neck because it may affect the subject's ability to breathing. In my opinion, it was excessive and unreasonable for the officers to apply such restraint and body weight to Mr. Turner due to the dangers associated with this restraint technique and the risk of death by asphyxia.

3. A reasonable officer is trained that the sustained application of pressure or weight on the torso or hips of a subject who is prone on the ground may make it more difficult for the subject to breathe. From my review of the materials, it was unreasonable for the officers to continue to apply pressure and body weight on Mr. Turner after Mr. Turner was handcuffed. It was also was unreasonable for the Officers to continue to apply pressure and body weight on Mr. Turner after Mr. Turner had his legs crossed and bent into his buttocks or after Mr. Turner stopped moving. The officers' application of pressure and body weight (approximately 600 pounds total) on Mr. Turner' legs, back, neck, and head violated their training and a properly trained officer would have known that the this application of pressure and body weight could significantly contribute to a positional asphyxia condition. It is my opinion that a properly trained officer would have known that the application of pressure and body weight on Mr. Turner while he was prone on the ground and handcuffed could lead to a positional asphyxia condition.

4. In my opinion, the officers' actions of rolling Mr. Turner onto his stomach, applying body weight and pressure on his back, neck, head and legs, and then failing to discuss or attempt to move Mr. Turner onto his side or up into a recovery position or check on the position of his face on the ground, his breathing, and his airway during the detention and especially after Mr. Turner appeared to stop moving, showed a reckless indifference to Mr. Turner' safety and is reflective of extremely improper and inadequate training.

5. The Americans with Disabilities Act of 1990 (42 US Code 2101 et seq.) and the Rehabilitation Act of 1973, Section 504, were written to provide clear and comprehensive mandates for the elimination of discrimination against individuals with mental and physical impairments.

"No qualified individual with a disability shall, on the basis of the disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by the public entity."

Accordingly, there are facts in the record supporting the opinion that Mr. Tucker qualified as a protected class under the ADA and was denied the required accommodations necessary when dealing with mentally disabled persons.

6.  From my review of the materials, it appears that the written policies and training of the Farmington Police Department failed to take into consideration the constitutional rights of people like Mr. Turner and can foreseeably lead to the use of excessive force by its officers. This includes the FPD's failure to provide training regarding the known potential risks of keeping a person handcuffed, in a prone position, and particularly with weight being applied to a subject's back, and also failed to have a written policy to address these risks. It is apparent that the defendant officers were not adequately trained regarding the mechanism and dangers of restraint asphyxia. Reasonable officers are provided with proper training and are subject to proper policies regarding the known potential risks of restraint/positional asphyxia, particularly for an individual in the prone position. The FPD policies and training failed to address the use of a recovery position on detained individuals when necessary. The FPD's failure to provide such training amounts to inadequate training for its officers. The department further appeared to ratify the actions unconditionally of all the involved officers.

## My Qualifications To Review This Case:

My opinions are based in part on my training, professional experience and education. I am a twenty seven year veteran of the Los Angeles County Sheriff's Department (LASD). I was hired on December 1, 1965, and I retired from active service on March 31, 1993. My career included six years at the rank of Deputy Sheriff, six years as a