# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

DENNIS MURPHY, as Personal Representative
of the ESTATE OF DANIEL TURNER, deceased,
and WALTER and TAMARA TURNER,

                Plaintiffs,

v.                                           No. 1:19-cv-00639-RB-JFR

THE CITY OF FARMINGTON, et al.,

                Defendants.

## MOTION FOR SUMMARY JUDGMENT ON COUNT III OF THE COMPLAINT

Defendants City of Farmington, James Prince, Mark Moore, incorrectly identified in Plaintiffs' Complaint as James Moore, Zach Wood and Jesse Griggs (collectively "Defendants") hereby move for summary judgment on the loss of consortium claim made in Count III of the Complaint, which should be dismissed because the relationship between Daniel Turner ("Daniel") and his parents was not sufficiently close for them to sustain a loss of consortium claim.

Counsel for Plaintiffs oppose this Motion.

## I.     UNDISPUTED MATERIAL FACTS

1.     Daniel was born on October 15, 1977.

2.     Daniel died on June 28, 2018 at the age of 40.

3.     Plaintiffs Walter and Tamara Turner are Daniel's parents.  Complaint, ¶ 2.

4.     At the time of his death, Daniel was living in Farmington, New Mexico in his parents' home.  Exhibit A, relevant portions of deposition of Tamara Turner, 16:1-4.

5.     Daniel did not have day-to-day chores in the household.  *Id.*, 61:21-22.

6.      Daniel did not pay rent to his parents.  Exhibit B, relevant portions of the deposition of Walter Turner, 127:14-15.

7.      Daniel sometimes cooked for himself and his parents and did his own shopping. Exhibit A, 96:16 to 97-3.

8.      Daniel cleaned and did other tasks if asked.  *Id.*

9.      At the time of his death, he sometimes cleaned the floors, bathrooms and his own bedroom, took out the trash, did some landscaping, and weeding and took care of a pond.  Exhibit B, 112:11-19.

10.     Daniel and his father sometimes went fishing.  *Id.*, 37:8-11;

11.     The family went to Comic Con several times over the years, watched movies together and talked.  *Id.*, 38:1-23.

12.     Daniel moved from California to New Mexico in 2016 to live with his parents, after Daniel's sister, whom he had been living with, told their parents that Daniel had exhibited strange behavior and he was hospitalized after police were called.  Exhibit A, 45:12 to 46:18.

13.     His parents did not know what he was hospitalized for.  They did not go to visit him when he was in the hospital.  They did not know how long he stayed in the hospital.  *Id.*

14.     Tamara did not read the medical records regarding Daniel's hospitalization in California.  Those records stated that Daniel "was screaming and yelling today.  The police were called and found that the patient was agitated and belligerent and tried to attack him." until she read those reports after Daniel died.  *Id.*, 191:1-14.

15.     Daniel did not have a driver's license as a result of an issue that arose in California; his parents were not aware of the issue or why he did not have a driver's license.  *Id.*, 100:20 to

101:5; Exhibit B, 49:17-22.

16.     His parents were aware that Daniel had been "arrested for -- he was in a place where the people inside were arrested for meth" while he was in California.  Exhibit B, 50:9-12.

17.   Daniel's parents were unaware he was incarcerated in California; they did not visit him when he was in prison.

18.     In New Mexico, Daniel did odd jobs and was paid under the table.   He worked numerous odd jobs, but he never got a pay check.  *Id.*, 65:2-25 to 66:2, and 66:15-17.

19.     Daniel did not pay federal or state income taxes.  His parents did not claim him on their taxes.  *Id.,* 68:10-15.

20.     After his death, his parents learned Daniel had a bank account with approximately $5.00 to $10.00 in it at the time of his death.  Exhibit A, 65:14-17.

21.     The family, including those who live in California, took trips together.  In 2016, they went to Telluride to hike and to just enjoy the experience.  In November of 2017, the family went to a bed-and-breakfast in Colorado.  *Id.,* 88:5-10; 89:10-11.

22.     His parents believed Daniel had a problem with alcohol and was an alcoholic and they suggested that he receive treatment or went to rehab; they do not know whether he sought treatment.  Exhibit A, 72:2-13, 73:16-17 and Exhibit B, 146:14-15, 24-25.

23.     Tamara was not aware that Daniel was diagnosed as having chronic paranoid schizophrenia or with polysubstance abuse in 2016.  Exhibit A, 102:13-18.

24.     Tamara is aware that chronic paranoid schizophrenia is a serious mental condition.  *Id.*, 102:24 to 103:3.

25.     Until he died, Walter was not aware that Daniel had been diagnosed with chronic paranoid schizophrenia or polysubstance abuse.  Exhibit B, 172:13-19.

26.     Walter was not aware that Daniel had been proscribed lorazepam, Haldol, Risperdal or Zolpidem.  *Id.*, 173:23 to 174:18.

27.     His parents did not know much about Daniel's friends.  *Id.*, 105:16-17.

28.     Daniel's parents did not know if Daniel ever had a girlfriend or boyfriend.

29.     Tamara was not aware that Daniel used or was using illegal drugs.  Exhibit A, 74:18-20; 185:1-3.

30.     Walter did not believe Daniel used methamphetamines.  Exhibit B, 166:4-6. However, in Walter's call to 911, he reported he suspected Daniel was high on meth.

31.     At the time of his death, amphetamine and methamphetamine were found in Daniel's system.  Exhibit C, toxicology report.

32.     Amphetamine is a Schedule II phenethylamine CNS-stimulant.  Methamphetamine is a DEA schedule II stimulant drug capable of causing hallucinations, aggressive behavior and irrational reactions.  *Id.*

33.     Neither Walter nor Tamara was aware of any medical care that Daniel sought or received as an adult.

34.     Tamara was not aware that Daniel had been diagnosed with sleep apnea but she and Walter were aware that Daniel was obese.  Exhibit A, 105:14-18; 23-24 and Exhibit B, 176:7-9.

35.     Neither Walter nor Tamara was not aware that Daniel had an enlarged heart until after his death. Exhibit A, 241:19-21; Exhibit B, 314:14-16.

36.     Neither Walter nor Tamara was aware that Daniel suffered from pulmonary edema. Exhibit B, 314:17-18; Exhibit A, 242:2-3.

## II.     POINTS AND AUTHORITIES

### A.     Standard for Summary Judgment.

"Summary judgment is appropriate 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" Seegmiller v. LaVerkin City, 528 F.3d 762, 766 (10th Cir. 2008) (*quoting* Fed. R. Civ. P. 56(c)).  The non-moving party may not "rely solely on its pleadings," to defeat summary judgment, Mincin v. Vail Holdings, Inc., 308 F.3d 1105, 1108 (10th Cir. 2002), but rather must "present facts such that a reasonable jury could find in [its] favor," Carpenter v. Boeing Co., 456 F.3d 1183, 1192 (10th Cir. 2006).  In applying this standard, the court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." Sigmon v. CommunityCare HMO, Inc., 234 F.3d 1121, 1124-25 (10th Cir. 2007) (*quotations omitted*).  The party moving for summary judgment bears the burden of establishing that there is no genuine issue of material fact for trial. *See* Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Once the movant meets its burden, the burden shifts to the non-movant to demonstrate a genuine issue for trial on a material matter.  *See* Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d. 887, 891 (10th Cir. 1991).  Celotex, 477 U.S. at 324.  The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  "However, 'once a properly supported summary judgment motion is made, the opposing

party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'" Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980) (*citation omitted*).   Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. 07–2123, 2008 WL 2309005, at *11 (D.Kan. June 2, 2008) (*citing* Fed.R.Civ.P. 56(e)).   "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (*quoting* Conaway v. Smith, 853 F.2d 789, 794 (10th Cir.1988)).   If the non-movant cannot make such a showing, summary judgment is appropriate.   Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986).

**B.     The Relationship Between Tamara and Walter Turner and Daniel Turner is not Sufficiently Close to be Protected as Loss of Consortium.**

Tamara and Walter Turner were the parents of Daniel Turner.   Statement of Material Facts ("SMF") 3.   At the time of his death, Daniel had been living with them for approximately two years.   He was 40 years old.   SMF 2.   Daniel was not consistently employed.   SMF 18.   He had never paid taxes.   SMF 19.

Daniel had a long history of mental illness.   When he was living in California, he was hospitalized when he exhibited strange behavior.   SMF 12.   Although Tamara and Walter knew about his hospitalization, they did not know why he was hospitalized and were not aware of his strange behavior while there.   SMF 12.   They did not visit him in the hospital and did not inquire about why he was hospitalized. SMF 12.   While in California, Daniel was also arrested for methamphetamines.   SMF 16.   His parents understood he did not have a driver's license as a result

of an issue that arose in California; his parents were not aware of the issue. SMF 15. They were aware that Daniel had been "arrested for -- he was in a place where the people inside were arrested for meth." *Id.* Daniel's parents were unaware he was incarcerated in California; they did not visit him when he was in prison. SMF 30.

Neither Tamara nor Walter was aware that Daniel used methamphetamines when he was living with them although meth was in his system upon his death. SMF 29, 30 & 31. They were not aware that he was using amphetamines although these substances, too, were in his system at the time of his death. *Id.* However, in Walter's call to 911 on the day of Daniel's death, he reported he suspected Daniel was high on meth. SMF 30.

Both Tamara and Walter believed that Daniel was an alcoholic and they recommended he seek help but neither of them was aware that he had sought or receiving assistance for his alcoholism. SMF 22. Neither Tamara nor Walter was not aware that Daniel was diagnosed as having chronic paranoid schizophrenia in 2016 or was diagnosed with polysubstance abuse in 2016 at the time of his death, although she was aware that these conditions were serious mental diseases. SMF 23-25. Tamara was also not aware that Daniel had been diagnosed with sleep apnea but she was aware that Daniel was obese. SMF 34. Neither Walter nor Tamara was aware that Daniel suffered from an enlarged heart or pulmonary edema until after his death. SMF 35 & 36. Because neither Tamara nor Walter was aware of Daniel's multiple diagnoses, neither could offer any support, or comfort to assist Daniel with coping with his various illnesses.

In <u>Wachocki v. Bernalillo Cnty. Sheriff's Dep't</u>, 2010-NMCA-021, ¶ 57, 147 N.M. 720, 228 P.3d 504, the court addressed claims that requested damages for loss of consortium and defined the elements necessary to establish a claim for loss of consortium in New Mexico:

Finally, even after adding facts that the two shared legal status as brothers, shared friendship, and socialized, the lost relational interest does not rise to the level of what is required to prove a claim for loss of consortium. These facts do not describe significant mutual dependence in the form of emotional reliance on each other, the qualities of their day-to-day relationship, or the manner in which they related to each other in attending to life's mundane requirements in the same sense as the life-defining types of relationships previously recognized. To hold otherwise would be to open up broad liability based essentially exclusively on familial relationship rather than other qualities exemplified by the "mutual dependence" factors described in Lozoya. This opinion should not be construed as a retreat from current New Mexico law on who may recover for loss of consortium. We recognize that under some set of facts, recovery by a sibling may be proper, but this is not that case. The factual basis simply falls short.

Wachhocki involved a loss of consortium claim brought by one adult brother, Bill, for the death of his adult brother, Jason. Jason was 15 months older than Bill and as children they shared a bedroom together. At the time of Jason's death, they had been sharing an apartment for approximately eight months. Jason and Bill split the rent, utilities, and grocery bills and shared household chores and cooking. The brothers enjoyed a close relationship. They spent their free time together, socializing, playing basketball, and going to the movies and the racetrack. Bill considered his older brother his role model and best friend, and he relied on Jason for advice and emotional support. These facts did not establish a sufficiently close relationship between the brothers and Bill's loss of consortium claim was dismissed and the dismissal was affirmed. Bill and Jason's relationship was much closer that the relationship between Daniel and his parents.

In Silva v. Lovelace Health Sys., Inc., 2014-NMCA-086, ¶ 37, the Court expounded further on the requirements to demonstrate loss of consortium:

To establish a loss of consortium claim, Plaintiffs were required to demonstrate two elements: (1) that they had a "sufficiently close relationship" with Decedent, and (2) that Defendants owed them a duty of care. Wachocki v. Bernalillo Cnty. Sheriff's Dep't, 2011-NMSC-039, ¶ 5, 150 N.M. 650, 265 P.3d 701. Defendants do not challenge the second element. The factors to be considered when determining whether Plaintiffs shared a sufficiently close relationship with Decedent include:

the duration of the relationship, the degree of mutual dependence, the extent of common contributions to a life together, the extent and quality of shared experience, and . . . whether the plaintiff and the injured person were members of the same household, their emotional reliance on each other, the particulars of their day[-]to[-]day relationship, and the manner in which they related to each other in attending to life's mundane requirements.

*Id.* (omission in original) (internal quotation marks and citations omitted); see Fitzjerrell v. City of Gallup ex rel. Gallup Police Dep't, 2003-NMCA-125, ¶ 12, 134 N.M. 492, 79 P.3d 836 (listing "mutual dependence" factors, including "common contributions to a life together; shared experience; living in the same household; financial support and dependence; emotional reliance on each other; . . . and the manner in which they related to each other in attending to life's mundane requirements").

To show a "sufficiently close relationship," the Supreme Court determined that "mutual dependence" is the key element to be applied to relationships of all types. *Id*., ¶ 38.

In Silva, plaintiffs presented evidence that the decedent's relationship with her parents was extremely close, that she had breakfast with her father twice a week, and that she kept a bedroom at her parents' house and stayed there every weekend. Plaintiffs also presented evidence that decedent's family was very tight-knit, that when decedent had free time she spent it with her parents, and that decedent was loving and protective of her parents. *Id*., ¶ 41. The Silva court found this evidence is not sufficient to demonstrate the most important factor under Wachocki, that the relationship between the decedent and her parents was based on "mutual dependence" and although decedent was provided with significant support from her parents as well as the enjoyment of frequent meals and visits, but those things do not qualify as mutual dependence. *Id.,* ¶ 42. Since the appellate court found the degree of mutual dependence, if any, was not sufficient to meet the test established by the Supreme Court in Wachocki and held it was error for the district court to deny defendants' motion for directed verdict on this issue in that case. *Id.*, ¶ 44.

In <u>Fernandez v. Walgreen Hastings Co</u>., 1998-NMSC-039, 126 N.M. 263, 968 P.2d 774, the New Mexico Supreme Court determined that

> a sufficient level of mutual dependence is foreseeable in a relationship between a toddler and her primary care giver. Clearly, a small child depends almost entirely on her primary care giver to provide for her needs. Similarly, it can be expected that one who assumes such a role in the life of a small child is largely consumed by the responsibility and that the obligation to the child becomes a defining component in one's life.

In <u>Fernandez</u>, the Court also held that two of the factors to be considered in whether a family member could prosecute a loss of consortium claim were whether "(1) the victim was a minor; (2) the plaintiff was a familial care-taker, such as a parent or grandparent, who lived with and cared for the child for a significant period of time prior to the injury or death;" *Id.,* ¶ 31.

The second element Plaintiffs must establish to prosecute loss of consortium claim is that defendants owed them a duty of care. <u>Lozoya v. Sanchez</u>, 2003-NMSC-009, ¶ 15, 133 N.M. 579, 66 P.3d 948. The tortfeasor owes a duty of care to the claimant where it is foreseeable that the harm inflicted upon the injured party would damage the relationship between the injured party and the claimant. *Id.* In this case the Court can decide this Motion based on the lack of the first element, a sufficiently close relationship, without addressing foreseeability. Even if the Court considers the second element, the Motion should be granted. A duty to an individual is closely intertwined with the foreseeability of injury to that individual resulting from an activity conducted with less than reasonable care by the alleged tort-feasor. <u>Calkins v. Cox Estates</u>, 1990-NMSC-044, ¶ 11, 110 N.M. 59, 792 P.2d 36. "Duty and foreseeability have been closely integrated concepts in tort law since the court in <u>Palsgraf v. Long Island Railroad Co</u>., 162 N.E. 99 (N.Y. 1928) stated the issue of foreseeability in terms of duty." <u>Ramirez v. Armstrong</u>, 1983-NMSC-104, ¶ 8, 100 N.M. 538, 673 P.2d 822, *overruled on other grounds by* <u>Folz v. State</u>, 1990-NMSC-

075, ¶ 3, 110 N.M. 457, 797 P.2d 2460. "Foreseeability is a critical and essential component of New Mexico's duty analysis because no one is bound to guard against or take measures to avert that which [she] would not reasonably anticipate as likely to happen. [T]here can be no duty in relation to another person absent foreseeability[.]" <u>Herrera v. Quality Pontiac</u>, 2003-NMSC-018, ¶ 20, 134 N.M. 43, 73 P.3d 181 *citing* <u>Bogart v. Hester</u>, 1959-NMSC-098, 66 N.M. 311, 316, 347 P.2d 327, 330. In a case directly on point, <u>Solon v. WEK Drilling Co.</u>, 1992-NMSC-023, ¶ 16, 113 N.M. 566, 829 P.2d 645, the New Mexico Supreme Court concluded that it was not foreseeable to the defendant that a twenty-five-year-old man would live with his parents, enjoy a close relationship with them, and contribute to their economic support and denied the parents' motion to intervene in a wrongful death case to assert a loss of consortium claim. *Id.*, ¶ 20.

It was not foreseeable to the Defendants that Daniel, a forty year old man would be living with his parents at the time of his death.

> There is no question that losing a family member can be emotionally difficult, no matter the circumstances, but the courts must take care not to throw the doors open to "broad liability based essentially exclusively on [a] familial relationship rather than other qualities exemplified by the 'mutual dependence' factors."

<u>Wachocki</u> at ¶ 57.

In the present case, there is no sufficiently close relationship to support a lack of consortium claim. Daniel was not a minor and Walter and Tamara were not his caretaker nor was he their caretaker. There is no mutual dependence between Tamara and Walter on the one hand and Daniel on the other. Daniel did not contribute monetarily to Tamara and Walter's household. Tamara and Walter bought him gifts, like a phone or clothes for Christmas or his birthday, but they did not give him allowance. Daniel had no consistent job. He did not pay taxes. He had no more than $10.00 in the bank when he died. He did not have a car. He did chores when requested but did

not volunteer to contribute his efforts to his parents' household.  He was in and out of the house and Tamara and Walter frequently did not know where he was or who he was spending time with. They were not aware of his work schedule or if, indeed, he went to work.  They were in no position to offer comfort and aid because they saw him sporadically.  Walter and Tamara did not know significant details about Daniel's life before or while he lived in their home as an adult.  New Mexico courts have held that it is not foreseeable that an adult man will be living with his parents. Putting emotion aside, the stark facts reveal that Tamara and Walter did not have the type of relationship the law requires for them to pursue a loss of consortium claim against these Defendants based on the death of their forty year old son from the toxic effects of methamphetamine.

### III.    CONCLUSION

For the reasons provided, Walter and Tamara should not be allowed to pursue a loss of consortium claim.  They and Daniel were not sufficiently close to support this claim.

Respectfully submitted,

WIGGINS, WILLIAMS & WIGGINS
A Professional Corporation

*Electronically Filed*

By        */s/ Patricia G. Williams*
            Patricia G. Williams
Attorneys for Defendants
1803 Rio Grande Blvd., N.W. (87104)
P.O. Box 1308
Albuquerque, New Mexico 87103-1308
(505) 764-8400
pwilliams@wwwlaw.us

We hereby certify that on this 15th day of
October, 2020, the foregoing was filed electronically
through the CM/ECF system, which caused all
parties or counsel of record to be served
by electronic means, as more fully reflected on the
Notice of Electronic Filing.

WIGGINS, WILLIAMS & WIGGINS, P.C.

By____*/s/ Patricia G. Williams*_____
        Patricia G. Williams