1:19-cv-00639-RB-JFR
Dennis Murphy, as Personal Representative of the Estate of Daniel Turner, deceased, et al., v. The City of Farmington, et al.

John Stein, M.D.
September 15, 2020

```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW MEXICO
                    NO. 1:19-cv-00639-RB-JFR


    DENNIS MURPHY, as Personal Representative
    of the ESTATE OF DANIEL TURNER, deceased,
    and WALTER and TAMARA TURNER,

              Plaintiffs,

       vs.

    THE CITY OF FARMINGTON, et al.,

              Defendants.
```

## DEPOSITION OF JOHN STEIN, M.D.
### BY ZOOM VIDEO

```
             Tuesday, September 15th, 2020
                      9:00 a.m.
          WIGGINS, WILLIAMS & WIGGINS, P.C.
         1803 Rio Grande Boulevard, Northwest
            Albuquerque, New Mexico  87104




              PURSUANT TO THE FEDERAL RULES OF CIVIL
    PROCEDURE, this deposition was:


    TAKEN BY:     MS. PATRICIA G. WILLIAMS
                  ATTORNEY FOR DEFENDANTS


    REPORTED BY:  MICHELE M. TRUJILLO
                  NEW MEXICO CCR No. 226
                  CUMBRE COURT REPORTING, INC.
                  2019 Galisteo Street, Suite A-1
                  Santa Fe, New Mexico  87505
```

EXHIBIT A

Case 1:19-cv-00639-RB-JFR   Document 50-1   Filed 10/15/20   Page 2 of 7

Page 2 (Pages 2-5)

1:19-cv-00639-RB-JFR
Dennis Murphy, as Personal Representative of the Estate of Daniel Turner, deceased, et al., v. The City of Farmington, et al.

John Stein, M.D.
September 15, 2020

Page 2

```
 1          A P P E A R A N C E S
 2   For the Plaintiffs:
 3       MR. NICHOLAS T. DAVIS (via Zoom)
         DAVIS LAW NEW MEXICO
 4       1000 Lomas Boulevard, Northwest
         Albuquerque, New Mexico  87102
 5       (505) 242-1904
         nick@davislawnm.com
 6
     For the Defendants:
 7
         MS. PATRICIA G. WILLIAMS (via Zoom)
 8       WIGGINS, WILLIAMS & WIGGINS, P.C.
         1803 Rio Grande Boulevard, Northwest
 9       Albuquerque, New Mexico  87104
         (505) 764-8400
10       pwilliams@wwwlaw.us
11
12
              I N D E X
13                                           Page
14   DEPOSITION OF JOHN STEIN, M.D.
15       Examination by Ms. Williams          3
16   SIGNATURE/CORRECTION PAGE              115
17   REPORTER'S CERTIFICATE                 116
18
19          (No exhibits marked)
20
21
22
23
24
25
```

Page 3

```
 1       MS. WILLIAMS:  Nick, do you agree that this
 2   deposition can be taken remotely and that the court
 3   reporter doesn't need to be in the room with
 4   Dr. Stein?
 5       MR. NICK DAVIS:  I do.
 6       MS. WILLIAMS:  Okay.  Dr. Stein, I'm Patti
 7   Williams.  I represent the City of Farmington in this
 8   lawsuit.  So I have a lot of questions for you today,
 9   and Michele will swear you in.
10       THE WITNESS:  Good morning.
11       MS. WILLIAMS:  Good morning.
12           JOHN STEIN, M.D.,
13   having been first duly sworn, testified as
14   follows:
15              EXAMINATION
16   BY MS. WILLIAMS:
17   Q.  Dr. Stein, how many times have you been
18   deposed?
19   A.  Approximately 20.
20   Q.  Okay.  I'm not going to go over the rules,
21   then, because we have limited time today, and we have
22   a lot of ground to cover.  But Michele is writing
23   everything down, and so we just need to get a good
24   record and be aware that that's what we're trying to
25   do today.
```

Page 4

```
 1       I've reviewed your resume, and I wanted to
 2   know how you would describe the focus of your
 3   research activities.
 4   A.  Generally, they involve technology
 5   implementation in the emergency care environment.
 6   Q.  I notice that you have several
 7   presentations on ultrasound and ectopic pregnancy.
 8   Is that a particular interest of yours?
 9   A.  Yes.
10   Q.  I also noticed, looking at your list -- and
11   sometimes the names don't help us laypeople very
12   much, but do you have any publications on cardiac
13   arrest?
14   A.  I don't believe so.  I did work with some
15   cardiologists on a number of studies, but that wasn't
16   really the focus.
17   Q.  Okay.  Do you have -- I saw that you had an
18   albuterol study or two.  Do you have other studies on
19   breathing and ventilation?
20   A.  No.  Those would definitely be the
21   highlights.
22   Q.  Do you have any publications or have you
23   done any research on in-custody deaths?
24   A.  No.
25   Q.  Have you done any research on acidosis?
```

Page 5

```
 1   A.  Not as a -- I'm sure something pertains to
 2   acidosis, but nothing specifically on acidosis, that
 3   I can recall.
 4   Q.  Have you done an evaluation of weight force
 5   impacts on ventilations?
 6   A.  No.
 7   Q.  Okay.  Those are the periods that -- those
 8   are the topics that I was looking at.  Have you done
 9   any continuing medical education in those topics?
10   A.  Well, acidosis is a topic that is virtually
11   ubiquitous within medicine.  So I would have to say
12   that, yes, many topics have arisen regarding
13   acidosis.  I wouldn't say that I've had a specific
14   CME on any of those other fairly narrow topics.
15   Q.  Have you done research in any of those
16   topics, not just publications but research that was
17   unpublished?
18   A.  No.
19   Q.  Okay.  Thanks.
20       Your research has been focused on ER
21   populations, correct?
22   A.  Yes.
23   Q.  Is that a different population than a
24   population in the field, if you know what I mean by
25   that, that law enforcement or EMTs or paramedics
```

Case 1:19-cv-00639-RB-JFR   Document 50-1   Filed 10/15/20   Page 3 of 7

Page 3 (Pages 6-9)

1:19-cv-00639-RB-JFR
Dennis Murphy, as Personal Representative of the Estate of Daniel Turner, deceased, et al., v. The City of Farmington, et al.

John Stein, M.D.
September 15, 2020

Page 6

1  would come across, outside of the hospital context?
2      A.  I'm not sure I completely understand, but
3  every EMS patient becomes my patient.
4      Q.  But have you done the encounters outside of
5  the hospital setting?  What's your experience outside
6  of the hospital setting with those patients?
7      A.  Yeah, I was also an EMT.
8      Q.  For how long?
9      A.  Two to three years.  I can't quite recall.
10 It was at the end of college.
11     Q.  And where was that?
12     A.  That was in Upstate New York.
13     Q.  Were you on a rescue unit?
14     A.  Yes.
15     Q.  Did you have experience working in
16 conjunction with law enforcement officers in that
17 role?
18     A.  Yes.  Law enforcement is a regular part of
19 emergency care.
20     Q.  So have you ever worked in law enforcement?
21     A.  No.
22     Q.  And have you had any training in law
23 enforcement?
24     A.  No.
25     Q.  Have you ever worked with training law

Page 7

1  enforcement officers on first responder care?
2      A.  No.
3      Q.  What's your understanding of the
4  relationship between law enforcement and EMT
5  paramedics at a scene?
6      A.  They are responsible for the police work,
7  and the EMS is responsible for the medical work.
8      Q.  So your training indicates that the police
9  officers are not medically trained professionals,
10 correct?
11         MR. NICK DAVIS:  Form and foundation.
12     A.  I can't say with certainty, but it's my
13 experience that, typically, they require basic
14 life-saving skills, such as CPR certifications,
15 et cetera.
16     Q.  Have you ever trained law enforcement
17 officers on CPR?
18     A.  I may have.  I don't know.  I did some CPR
19 training for a while in medical school, and maybe
20 there were some police officers there.  I don't know
21 for sure.
22     Q.  So a law enforcement officer could have
23 been in a class you offered, but have you ever been
24 retained by a department to train a class of law
25 enforcement officers as part of their continuing

Page 8

1  education?
2      A.  No.
3      Q.  Have you ever trained law enforcement
4  officers in positional asphyxiation?
5      A.  No.
6      Q.  Have you ever trained law enforcement
7  officers in the recovery position?
8      A.  No.
9      Q.  What's your experience with safety
10 protocols for people on a scene like Daniel Turner,
11 whom I'm going to describe as an agitated
12 methamphetamine user during the course of this
13 deposition?  Is that a fair description of his state?
14         MR. NICK DAVIS:  Form.
15     A.  Yes.
16     Q.  What's your experience in the safety
17 protocols for people like that during an EMT call?
18         MR. NICK DAVIS:  Object to the form.
19     A.  If you are asking if I have formed any
20 protocols, I have not been involved in forming any
21 protocols.
22     Q.  I understand that, but what's your
23 experience as an EMT?  Is it your understanding that
24 the EMTs need to subdue and make the scene safe, or
25 is that the law enforcement officers' duty?

Page 9

1          MR. NICK DAVIS:  Object to form.
2      A.  It's the law enforcement --
3          THE WITNESS:  Sorry about that.
4      A.  I would say, typically, that's the law
5  enforcement territory.
6      Q.  What obligations does the law enforcement
7  agency have for scene safety in a first responder
8  call?
9          MR. NICK DAVIS:  Object to the form,
10 foundation.
11     A.  I don't know that I have any awareness of
12 any specifics of their responsibility.
13     Q.  Okay.
14     A.  From a medical provider's perspective, we
15 are relying on the police to assess the safety and to
16 provide ongoing safety for the medical response.
17     Q.  Does that sometimes include the use of
18 restraint?
19     A.  Yes.
20     Q.  How many times have you testified in court,
21 Doctor?
22     A.  I believe, three times.
23     Q.  In each of those cases, were you an expert
24 in the standard of care, or were you qualified as an
25 expert in another area?

Case 1:19-cv-00639-RB-JFR   Document 50-1   Filed 10/15/20   Page 4 of 7

Page 4 (Pages 10-13)

1:19-cv-00639-RB-JFR
Dennis Murphy, as Personal Representative of the Estate of Daniel Turner, deceased, et al., v. The City of Farmington, et al.

John Stein, M.D.
September 15, 2020

Page 10

1  A. I believe I was typically the
2  standard-of-care expert.
3  Q. Did those cases involve an incident in a
4  hospital or an incident in the field?
5  A. Certainly, most of them are in the
6  hospital. Let me just think if there was -- a couple
7  of them have been in jail populations. I don't think
8  I've testified in court about a jail case, but I've
9  done some depositions in that territory.
10 Q. But your courtroom testimony has focused on
11 standard of care in the hospital setting?
12 A. I believe so.
13 Q. Have you developed an opinion in any of the
14 cases you've been retained in on EMTs' standard of
15 care?
16 A. Not that I recall.
17 Q. Have you ever developed opinions in a case
18 that you've been retained to work on on law
19 enforcement officers' standard of care?
20 A. No, certainly not.
21 Q. Is it your opinion that law enforcement
22 officers are bound by a medical provider's standard
23 of care or not?
24 A. Not that I'm aware of.
25 Q. In what states were you testifying as an

Page 11

1  expert in court, Doctor?
2  A. In court, one was California, one was
3  Washington, and one was Virginia.
4  Q. When was the last time you were qualified
5  as an expert in court?
6  A. I believe my estimate would be 2019.
7  Q. Have you ever been qualified by a court to
8  testify against law enforcement officers' conduct or
9  actions before?
10 A. I don't believe so.
11 Q. Do you know Dr. Bilke?
12 A. No.
13 Q. Bilke. I'm sorry. It's Bilke. You don't?
14 A. No, I don't.
15 Q. Have you been on opposite sides of cases
16 before?
17 A. Not that I'm aware of.
18 Q. Have you read his research or publications?
19 A. Yes, some of them.
20 Q. What's your opinion of his work?
21 A. In what regard?
22 Q. The quality of his work compared against
23 others in your field of emergency medicine.
24 A. So, if we are speaking broadly about his
25 research background, he seems to be a leader in the

Page 12

1  field of emergency medicine, and I have no objections
2  with the quality of his research, broadly.
3  Q. Before you were retained in this lawsuit,
4  were you familiar with any of his work?
5  A. Not that I'm aware of.
6  Q. Okay. I'm trying to hurry so that we can
7  get our time in, and Nick knows that's hard for me.
8  A. Okay.
9      MR. NICK DAVIS: I would agree that you're
10 thorough, Patti.
11     MS. WILLIAMS: Thorough, there you go.
12 Q. How did you become acquainted with the
13 Davis law firm, Doctor? How did you make contact
14 with them or they make contact with you?
15 A. I am not aware. They called me. I'm not
16 sure how they got my name.
17 Q. When did they first come in contact with
18 you? Do you have the date in your notes?
19 A. I know that the first time that we spoke
20 was in April. So I would imagine that that was
21 roughly the time that they -- that we were in
22 contact.
23 Q. What were you retained to do?
24 A. I was retained to review a number of files
25 and videos and conversations, I guess, interrogations

Page 13

1  that pertained to Mr. Turner, and to come to an
2  assessment about what were the medical situations
3  that pertained to his care.
4  Q. Did you get an engagement letter or email
5  or something that described the scope of work?
6  A. Not that I recall.
7  Q. Have you ever reviewed cases for the Davis
8  law firm before?
9  A. I know that we discussed one other case by
10 phone on one occasion.
11 Q. What year was that, Doctor?
12 A. If I'm not mistaken, this was after April.
13 Q. So your memory is that this was the first
14 case that you've been retained by that firm to opine
15 in?
16 A. I believe so.
17 Q. What did you ask to review in order to
18 prepare your opinions in this case?
19 A. Well, after we talked on the phone and I
20 understood a little bit of the scope of work, the law
21 firm provided me with an extensive set of files to
22 review.
23 Q. Did you select the information, or was it
24 information that they thought would be helpful to
25 you? Who initiated the first set of document

Case 1:19-cv-00639-RB-JFR   Document 50-1   Filed 10/15/20   Page 5 of 7

Page 5 (Pages 14-17)

1:19-cv-00639-RB-JFR
Dennis Murphy, as Personal Representative of the Estate of Daniel Turner, deceased, et al., v. The City of Farmington, et al.

John Stein, M.D.
September 15, 2020

Page 14

1  exchange?
2     A.  They provided the documents, and they
3  seemed rather exhaustive.  So I felt that I had all
4  of the documents that I needed to review.
5     Q.  So, to date, there's nothing that you
6  wished that you had access to that you didn't have
7  access to in this case in order to make your
8  opinions?
9        MR. NICK DAVIS:  Object to the form.
10    A.  Not that I'm aware of.
11    Q.  And you're not waiting to review anything
12 else, correct?
13    A.  No.  In my experience, things do evolve
14 over time.  So perhaps there will be something else
15 to review, such as other depositions, but at this
16 point in time, I don't -- I'm not aware of anything
17 else that I would need to make my judgments.
18    Q.  Okay.  Thanks.
19       Have you made plans to attend the trial in
20 this case in April of next year?
21    A.  Yes.
22       MR. NICK DAVIS:  Correction.  March.
23       MS. WILLIAMS:  You are right.  March.  It's
24 like when Trump said vote on November 28th.
25    Q.  Sorry.  That's not what I was trying to do,

Page 15

1  Doctor.  I'm not that tricky.
2        Are you working on any other cases in
3  New Mexico, currently?
4     A.  I'm sure that I am.
5     Q.  Can you call them out for me?
6     A.  No, not without some kind of search of my
7  computer.
8     Q.  How many active cases do you have at a
9  time, Doctor, in which you're offering expert
10 testimony?
11    A.  You know, to be honest, it's always a
12 little hard for me to tell which ones are active,
13 because I just wait for the attorneys to call me and
14 request help.  I would estimate that I often have
15 somewhere between five and ten cases that are,
16 quote-unquote, "active."
17    Q.  Do you recall any in New Mexico, currently?
18    A.  I definitely work with other attorneys in
19 New Mexico.
20    Q.  In Albuquerque or in other cities?
21    A.  I would believe that most of them are in
22 Albuquerque.
23    Q.  Do you keep a list of cases that you're
24 currently working on?
25    A.  Not that I'm currently working on.

Page 16

1     Q.  Are all of your active cases cases that
2  involve claims of medical malpractice?
3     A.  That certainly is the majority.
4     Q.  Can you tell me the names of one or two
5  cases in which the issue was not medical malpractice
6  in which you offered opinions?
7     A.  I'd have to take a look at my files, here.
8     Q.  I'm okay if you take that time.
9     A.  Okay.
10       Okay.  Generally speaking, reviewing my
11 list of deposition testimony, they seem to mostly
12 fall into that category.  I'm not sure if I have any
13 that don't.
14    Q.  And you're not finding any outliers,
15 looking at your list?  I know it's a quick review,
16 but --
17    A.  No, not -- no, I don't believe so.
18    Q.  If you think of one during this deposition
19 that did not just involve claims of medical
20 malpractice, will you let me know?
21    A.  Okay.
22    Q.  Because this will probably be the only time
23 we will have a chance to talk.
24    A.  Sure.
25    Q.  I understand that you rate cases during

Page 17

1  your review on a one-to-ten scale.  Is that the case?
2     A.  Sometimes.
3     Q.  Did you rate this case on a one-to-ten?
4     A.  Not that I recall.
5     Q.  If you were rating it today, how would you
6  rate this case on your one-to-ten scale?  And I
7  understand that one is the best -- the worst-case
8  scenario for the plaintiff, and 10 is the best-case
9  scenario for the plaintiff, right?  Or is that
10 opposite?
11    A.  These discussions are always a little bit
12 different from attorney to attorney, but I would rate
13 this as a highly favorable case from the plaintiff's
14 perspective.
15    Q.  And why do you make that rating?
16    A.  Because the medical facts in the case seem
17 fairly straightforward to me.
18    Q.  What are the plaintiff's strengths in this
19 case, from the medical perspective --
20       MR. NICK DAVIS:  Form and foundation.
21    Q.  -- on which you've been retained to opine?
22    A.  So I would say that the medical facts in
23 this case that are strong for the plaintiff are that
24 we had a patient who was very typical for emergency
25 medical practice and in no way, shape, or form

1:19-cv-00639-RB-JFR
Dennis Murphy, as Personal Representative of the Estate of Daniel Turner, deceased, et al., v. The City of Farmington, et al.

John Stein, M.D.
September 15, 2020

Page 42

1 levels, sometimes even faster. But, you know, 10
2 minutes is kind of a reasonable time check,
3 sometimes. So one can fix that fairly quickly.
4 Sometimes it takes much longer, though.
5    Q. Is there any data -- and I don't know if
6 this is in the Hicks article or not -- that shows the
7 pH values of an agitated meth user in the field,
8 where they should be?
9    A. Yes. That Hicks article does reference
10 five cases where they did measure the pH levels.
11    Q. In the field?
12    A. In the field or shortly after arrival to
13 the Emergency Department.
14    Q. Were they above 7.4?
15    A. No. They were well below.
16    Q. Were they below seven?
17    A. Yes. All of them were below seven, I
18 believe.
19    Q. Is there a way in the field to determine
20 what a blood gas pH level is?
21    A. As I said, this is not difficult to guess,
22 what the pH level would be, but one cannot obtain the
23 actual value without measuring the blood.
24    Q. Is an EMT rig set up to allow blood gas
25 tests?

Page 43

1    A. No.
2        MR. NICK DAVIS: Foundation.
3    A. They only have an indirect, where they can
4 measure the end-tidal CO2.
5    Q. And there's a correlation between the CO2
6 and the pH?
7    A. Do you hear somebody else on the --
8    Q. I do. It's not in our top set here, but --
9    A. Is there a correlation? There's not a
10 great correlation, unfortunately. There are some
11 instances where it can be highly effective. This is
12 not one of those situations.
13    Q. Is there any data showing, and I think you
14 just answered this question, what the CO2 value should
15 be in a meth user who is agitated in the field?
16    A. I guess I would say my answer for that is
17 that I don't have a good answer for you there,
18 because the values are always in response to the pH,
19 and so it's the pH that's important. The
20 compensation happens, but because of different levels
21 and different metabolic circumstances, a different
22 level of carbon dioxide can achieve kind of a widely
23 different range of pH levels.
24    Q. Is there any way for a law enforcement
25 officer or other first responder to determine a pH

Page 44

1 level in the field?
2    A. Not if you want to actually have the
3 number.
4    Q. Is there any way for the first responder,
5 including a law enforcement officer, to check the CO2
6 value, which I know, you said, is not a great
7 correlation? But there could be some information
8 gathered in the field?
9    A. In the field, you can use the end-tidal
10 carbon dioxide monitor.
11    Q. But I think you've indicated that that
12 doesn't necessarily give you a good correlation in
13 this situation?
14    A. I don't think it's going to correlate well
15 with the pH. That would be a hard interpretation to
16 make.
17    Q. Okay. Let's talk a little bit about the
18 incident in the Durango Joe's parking lot in
19 Farmington, New Mexico. That incident was before
20 there was any opportunity to triage, medically
21 triage, Daniel Turner, correct?
22    A. Yes.
23        MR. NICK DAVIS: Object to the form.
24    Q. And that incident occurred before any
25 medical history was taken by any medical

Page 45

1 professional, correct?
2    A. By a medical professional, yes.
3    Q. And it was before any medical screening
4 exams could be taken, correct?
5    A. I believe the officer tried to do what I
6 would say was a medical screening exam.
7    Q. Do you know what his training in medical
8 screening exams would have been?
9    A. No, but he tried to obtain some medical
10 data, and so that seems to be a medical screening
11 exam, from my perspective.
12    Q. By asking Daniel -- what questions do you
13 consider to be medical screening?
14    A. Oh, I just remember him asking the family,
15 you know, "What happened?" and, "Is he on any drugs?"
16 and, "Are there health problems?" That kind of
17 thing.
18    Q. In your opinion, is it reasonable for law
19 enforcement first responders to wait, to defer to
20 EMTs or paramedics who are en route to the scene,
21 when possible?
22        MR. NICK DAVIS: Object to the form.
23    A. ==Like I said, I'm not really much of an==
24 ==expert on police activities or procedures, but==
25 ==that's -- it seems like a reasonable statement that==

Case 1:19-cv-00639-RB-JFR   Document 50-1   Filed 10/15/20   Page 7 of 7

Page 13 (Pages 46-49)

1:19-cv-00639-RB-JFR
Dennis Murphy, as Personal Representative of the Estate of Daniel Turner, deceased, et al., v. The City of Farmington, et al.

John Stein, M.D.
September 15, 2020

Page 46

1  they would wait for the medical team to arrive, if
2  that's possible.
3     Q.  Do you agree that the scene in the
4  Durango Joe's parking lot was a rapidly changing
5  situation?
6     A.  When compared to what?
7     Q.  When compared to normal, everyday life.
8     A.  Yes.
9     Q.  And it's your opinion that the scene
10 changed so rapidly that, within minutes,
11 Daniel Turner went from being perfectly healthy to
12 dead, right?
13        MR. NICK DAVIS:  Object to the form.
14    A.  Yeah, I never said he was perfectly
15 healthy, but, yes, the person --
16    Q.  Okay.  I don't mean to put words in your
17 mouth.  How would you describe the situation before
18 his death, in the minutes before his death, after the
19 officer first encountered him through the time that
20 he expired?
21    A.  So, as I mentioned, he's a patient with
22 altered mental status who was agitated.
23    Q.  Do you consider that, when someone has
24 encountered a law enforcement officer, they're a
25 patient?

Page 47

1     A.  I really don't know how law enforcement
2  views that.
3     Q.  Okay.  Because you keep referring to him as
4  a patient, and I don't know that the law
5  enforcement -- you don't consider him to be a patient
6  of the law enforcement officers, do you?
7     A.  Like I said, I don't really know how law
8  enforcement views this, but, to me, they're all
9  patients.
10    Q.  And that's because of your training as a
11 medical professional, correct?
12    A.  Yes.
13    Q.  Is there a way to determine a
14 methamphetamine level in a person presenting like
15 Daniel Turner in the field?
16    A.  No.
17    Q.  Is it your understanding that the law
18 enforcement officers did not have the ability to
19 administer benzodiazepines to Daniel Turner?
20    A.  I can't imagine that they could have.
21    Q.  Does the EMT or paramedic crew have the
22 ability to administer those medications?
23        MR. NICK DAVIS:  Foundation.
24    A.  Oftentimes, yes.
25    Q.  What's your understanding of a law

Page 48

1  enforcement officer's medical training to make an
2  assessment as to whether a person is near death or
3  not?
4     A.  I would say I don't know what the law
5  enforcement training is in that regard.
6     Q.  You agree that the law enforcement officers
7  are laypeople in the medical field, right?
8         MR. NICK DAVIS:  Object to foundation.
9     A.  Generally, I think that's correct.  I mean,
10 they obviously receive more training than most
11 regular laypeople.
12    Q.  But they aren't medical providers, in your
13 opinion, as an emergency room physician, are they?
14    A.  I wouldn't consider them a medical
15 provider, only of basic first aid.
16    Q.  And high school students can get that in a
17 class in school, right?
18        MR. NICK DAVIS:  Foundation.
19    A.  I believe so.
20    Q.  Law enforcement officers have no ability in
21 this case that we're talking about to start treatment
22 for an agitated person in an altered mental state,
23 correct?
24        MR. NICK DAVIS:  Foundation.
25    A.  I guess that depends on what you'd define

Page 49

1  as "treatment."
2     Q.  Well, I don't really have a definition.
3  I'm going back to your definition of the treatment
4  that you described in your emergency room setting,
5  which is restrain and medicate.  If I misunderstood
6  that, please let me know.
7     A.  As well as communicate.  So that's always
8  our first attempt, to communicate and try to calm
9  down verbally.
10    Q.  And even with your attempts to communicate
11 in the emergency room setting, you still find
12 yourself needing to medicate and restrain once a week
13 or so, correct?
14    A.  Yes.
15    Q.  So communication might be the first line of
16 defense, but it's not the line of defense that you
17 stop at, right?
18    A.  I agree.
19    Q.  I know that, for some drugs, you can have a
20 counteracting drug for an overdose.  Is there such a
21 thing for methamphetamine?
22    A.  Not for methamphetamine, no.
23    Q.  So there's no drug that you could give them
24 in an emergency room setting or you could give them
25 in the field that would counteract the effects of the