**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

DENNIS MURPHY, as Personal Representative
of the ESTATE OF DANIEL TURNER, deceased,
and WALTER and TAMARA TURNER,

                    Plaintiffs,

v.                                             No. 1:19-cv-00639-RB-JFR

THE CITY OF FARMINGTON, et al.,

                    Defendants.

## MOTION FOR SUMMARY JUDGMENT ON COUNT I OF THE COMPLAINT

Defendants City of Farmington ("City"), James Prince, Mark Moore, incorrectly named in Plaintiffs' Complaint as James Moore, Zach Wood and Jesse Griggs ("Individual Defendants), (collectively "Defendants") hereby move for summary judgment based on qualified immunity to dismiss Count I of the Complaint based on excessive force.  Defendants are entitled to judgment on Count I, "Fourth Amendment- Excessive Force," of the Complaint because the conduct of Defendants does not violate clearly established statutory or constitutional rights of which they should reasonably have known.  Since the Individual Defendants are entitled to qualified immunity, the City should also be dismissed as a party in Count I.  In accordance with D.N.M. LR-Civ. 7.1(a), concurrence of opposing counsel was sought and denied.

### I.  BACKGROUND AND UNDISPUTED MATERIAL FACTS

These facts are established in the record:

1.     Plaintiff Daniel Turner, deceased, was a resident of Farmington, New Mexico at the time of his death.  Plaintiffs Walter and Tamara Turner were his parents.  Complaint, ¶ 2.[1]

2.     On the night of June 27, 2018, Daniel left the house and ran down North Carlton Street, ending up in the parking lot of a local business.  *Id*. ¶ 13.

3.     Walter Turner, Daniels' father, called Dispatch via 911 for assistance.  *Id*. ¶ 14.

4.     Walter informed Dispatch that his son Daniel was running through the streets, naked and banging his head on the ground.  *Id*. ¶ 15.

5.     What was broadcast to the police officers was that Walter Turner called dispatch and advised "that Daniel was under the influence of something, possibly on meth. And that he was running down the street, I think they -- I think they advised that he was actually naked from Dispatch. That he was running down the street naked, high on meth. And then additional information came as we started responding.  And Walter advised that Daniel was being aggressive and was pushing and pulling him. And there was a lot of yelling, according to Dispatch, in the background from Walter to Daniel. And Walter advised that Daniel was banging his head on the ground, even prior to our arrival. And there was a lot of -- it sounded like there was a lot of commotion, just from the information that Dispatch gave, like there was an active fight going on between Daniel and Walter, and possibly even the mother.  It sounded like he was maybe arguing with the mom or something was going on. He said something to the effect of 'Leave your mom alone.' You know, 'Why are you doing this to me?' That was the information that was given to us."  Exhibit A, relevant excerpts from deposition of Sgt. Jesse Griggs, 40:14 to 41:12.

---

[1]  The Complaint is brought in the name of Daniel Turner's representative of his estate.  Daniel Turner will be referenced in this Motion as Daniel rather than his personal representative.  Walter and Tamara Turner have separate claims for loss of consortium, alleged in Count III of the Complaint, which are the subject of another motion for summary judgment filed concurrently herewith.

6.      Officer Prince's dash camera showed Daniel Turner's parents on either side of him walking with Daniel when Daniel fell backward from a standing position and his head violently struck the asphalt as Officer Prince was approaching.  Exhibit B, relevant portions of deposition of James Prince, 15:9-17.  Off. Prince could hear the sound of Mr. Turner's head hitting the cement or the asphalt inside the Durango Joe's parking lot.  Ex. B 17:18-20 and dashcam video from Officer Prince's police unit at 1 minute, 31 secs.  Exhibit C - dash cam video.

7.      Officer Prince updated Dispatch and ensured medical personnel was responding.  Ex. C starting at 1 minute, 41 secs.

8.      At that point, Officer Prince thought that there was something wrong with Daniel but he did not know if Daniel had stopped breathing at that point.  Exhibit B, 18:2-4.

9.      Officer Prince kneeled down to check on Daniel, when Daniel began banging his head on the ground. Officer Prince testified "He's on his back. And so one of his parents has a towel or a sheet or something, and they -- somebody places it underneath his head while he's trying to bang it. And so at that point I want to make sure that he stays as close to the ground as possible, so that way he's not able to get some momentum or fall again like he just did prior to.  So, I mean, Walter, his dad, and I grab ahold of -- I grab ahold of his left arm and I believe Walter grabs ahold of his right arm." *Id.* 21:14 to 22:2 and Ex. C.

10.     Officer Prince stated: "Regardless if there was a weapon or not, he needed some type of medical assistance at the time."  Exhibit B, 22:21-23.

11.      Daniel continued to bang his head on the ground, while Officer Prince and Walter tried to hold Daniel down until the medics arrived.  *Id.* 24:4-6; 13-14.

12.     At this point, Daniel used his right hand to grab Officer Prince's taser.  *Id.* 24:21 to 25:2.

13.     Officer Prince felt that Daniel was conscious and it appeared to Officer Prince that Daniel was under the influence of a substance and he was not completely alert.  *Id.* 26:1-2; 6-8.

14.     When Daniel continued to resist, Officer Prince used what is called a distraction technique to stop someone from doing something.  According to Officer Prince, he was taught something similar when trying to remove somebody from a car that is refusing to get out of a vehicle.   Officer Prince hit Daniel with a closed fist, more than once because the first one didn't faze Daniel.  While Officer Prince does not recall how many times he hit Daniel, he knows there were at least two strikes because Daniel failed to release his grip on the taser after the first strike.  *Id.* 28:7-12, 21-25.

15.     Soon after that, Sgt. Griggs arrived on the scene and helped Officer Prince turn Daniel over onto his stomach so they could handcuff him.  *Id.* 31:9-13.

16.     At this point, Officer Prince noticed that Daniel was obese, tense, sweating profusely, and his eyes were dilated.  *Id.* 32:2-18.

17.     Officer Mark Moore arrived after Daniel was laying facedown.  Officer Moore was successful in placing handcuffs on Daniel.  Exhibit D, relevant portions of deposition of Mark Moore, 37:14-15, 38:3-9.

18.     Officer Zach Wood arrived and attempted to secure Daniel's legs.  Daniel attempted to kick Officer Wood and was able to lift Officer Wood with his legs.  Exhibit E, relevant portions of deposition of Zach Wood, 34:1-10.

19.     At this point, Officer Prince was concerned because Daniel was banging his head on the ground and Officer Prince was trying to get some type of medical assistance to the scene to take Daniel to the hospital.  Exhibit B, 37:16-22.

20.     Officer Prince remembers hearing Sgt. Griggs say "excited delirium" to which Officer Prince responded: "I think so."  Sergeant Griggs, said, "Let's get him out of cuffs and get him," so Officer Prince turned him over. Ex. B 40:22 to 41:1. The officers immediately took the handcuffs off of Daniel.  *Id.* 47:9-13.

21.     When Daniel was turned onto his back, Officer Prince checked him for breath and did not feel any breathing.  *Id.* 48:16-21.

22.     The following timeline is documented by dash cam video, Exhibit C:

| | |
|---|---|
| 1 min. 28 secs. | Walter yelled at Daniel, "Leave your mother alone." |
| 1 min. 31 secs. | Daniel fell backward from a standing position and his head violently struck the asphalt as Officer Prince approaches the Turners. |
| 1 min. 36 secs. | Officer Prince engaged Daniel as Daniel was smashing his head on the pavement and kicking his feet. |
| 1 min. 41 secs. | Officer Prince updated Dispatch and ensured medical personnel was responding. |
| 1 min. 54 secs. | Daniel rolls onto his stomach with the assistance of his parents and continues to bang his head on the pavement. |
| 2 min. 4 secs. | Daniel struggles with his parents and tries to get up.  Daniel ends up with his back on the pavement. |
| 2 min. 5 secs. | Officer Prince engages Daniel, introduces himself and asks Daniel if he is OK. |
| 2 min. 27 secs. | Officer Prince kneels beside Daniel, assures Daniel, and tells Daniel he is there to help him. |

| | |
|---|---|
| 2 min. 37 secs. | Daniel grabbed at Officer Prince's taser. |
| 2 min. 38 secs. | Officer Prince strikes Daniel. |
| 2 min. 42 secs | Officer Prince told Walter, "He grabbed my fucking taser, man." |
| 2 min. 43 secs | Walter said "Oh!" and yelled, "Stop it Daniel!" |
| 2 min. 48 secs | Sgt. Griggs arrives. |
| 2 min. 56 secs | Officer Moore arrives. |
| 3 min. 3 secs | Daniel is rolled onto his stomach. |
| 3 min. 25 secs | Daniel is handcuffed. |
| 3 min. 26 secs | Officers wait for Daniel to stop fighting. |
| 3 min. 35 secs | Walter puts the towel under Daniel's face. |
| 4 min. 15 secs | Officer Wood arrived and was instructed by Office Prince to hold Daniel's feet up, but Daniel kicked out of Wood's grasp. |
| 4 min. 26 secs | Sgt. Griggs placed his right knee on Daniel's left arm, Officer Prince placed his right knee on Daniel's right tricep, Officer Wood places his knee on Daniel's hamstring. |
| 4 min. 34 secs. | Officers tell Daniel it is OK, to just breathe and paramedics are coming to help him. |
| 4 min. 35 secs. | Officer Moore assisted in restraining Daniel by placing weight on Daniel's left hamstring.  Daniel continued to bang his head. |
| 4 min. 50 secs. | Officers ask Daniel if he can breathe. |
| 5 min. 6 sec. | Sgt. Griggs attempted to communicate with Daniel. |
| 5 min. 21 sec. | Daniel stopped moving. |
| 5 min. 25 sec. | Sgt. Griggs requested an expedited response from medical personnel. |

| 5 min. 40 sec. | Sgt. Griggs lifted Daniel's head up and said, "keep breathing man" and instructed officers to take any pressure off Daniel. |
| 6 min. 38 sec. | Handcuffs were taken off Daniel. |
| 6 min. 45 sec. | Daniel was rolled onto his back. |
| 7 min. 3 sec. | Officer Prince began CPR. |
| 7 min. 13 sec. | Officer Wood assisted in opening Daniel's airway. |
| 7 min. 26 sec. | Officer Moore assisted in opening Daniel's airway. |
| 8 min. 17 sec. | Farmington Fire Department paramedics arrive on scene. |
| 9 min. 16 sec. | Fire Department personnel requested Officer Moore continue CPR. |
| 9 min. 30 sec. | Fire Department personnel take over life saving measures. |

23.    According to the Office of the Medical Investigator's ("OMI") Death Investigation Summary Report, Exhibit F ("OMI Report"), p. 4:

Toxicology testing of blood revealed the presence of methamphetamine. No alcohol was present.

Methamphetamine use is a risk factor for experiencing life-threatening, abnormal heart rhythms, particularly in the setting of other cardiac risk factors such as an enlarged heart. The physical restraint applied by police officers, and the decedent's prone position (face down; limits one's ability to adequately breath) while being restrained would have contributed to the decedent's physiologic stress and are listed as contributory conditions; therefore, the manner of death is best described as homicide.

The OMI determined Daniel's cause of death to be 'toxic effects of methamphetamine." *Id.*, p. 1.

24.    The OMI Report states Daniel "had a past medical history of alcohol and drug abuse, obesity and sleep apnea." *Id.*, p. 4.

25.     Both of his parents described Daniel as an alcoholic.  [Doc. 48-1, p. 7 and Doc. 48-2, p. 11].

26.     The OMI report listed Daniel's height as 177.0 cm (5' 9.6 ") and weight as 117 kgs. (258 lbs.), with a body mass index ("BMI") of 37.35.  Ex. F., p. 5.  A person with a BMI over 30 is categorized as obese.

27.     Dr. Vilke, Defendants' expert, provided the following relevant conclusions, supported in the body of his expert report submitted to the Court as Doc. 33-3, p. 2:

A. The actions of the officers to control and restrain Mr. Turner did not cause or contribute to his cardiac arrest.

B. I disagree with plaintiff's use of force expert Roger Clark when he opines that the weight of the officers "could significantly contribute to a positional asphyxia condition."

C. Mr. Turner was exhibiting clinical signs of methamphetamine intoxication and untreated or undertreated schizophrenia during his encounter with the officers, which is consistent with the results of his medical history and toxicology screen.

D. I agree with the medical examiner that the cause of death of Mr. Turner was a sudden cardiac arrest due to an enlarged heart along with the effects of methamphetamine and physiologic stress.

E. Placing Mr. Turner in a "recovery position" would not have prevented his sudden cardiac arrest and death.

## II.  POINTS AND AUTHORITIES

### A.     Standards for summary judgment.

"Summary judgment is appropriate 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law.'"  Fed. R. Civ. P. 56(c).  The non-moving party

may not "rely solely on its pleadings," to defeat summary judgment, <u>Mincin v. Vail Holdings, Inc.</u>,

308 F.3d 1105, 1108 (10th Cir. 2002), but rather must "present facts such that a reasonable jury

could find in [its] favor," <u>Carpenter v. Boeing Co.</u>, 456 F.3d 1183, 1192 (10th Cir. 2006).   In

applying this standard, the court must "examine the factual record and reasonable inferences

therefrom in the light most favorable to the party opposing summary judgment."  <u>Sigmon v.</u>

<u>CommunityCare HMO, Inc.</u>, 234 F.3d 1121, 1124-25 (10th Cir. 2007) (*quotations omitted*).  The

party moving for summary judgment bears the burden of establishing that there is no genuine issue

of material fact for trial.  *See* <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).  Once the movant

meets its burden, the burden shifts to the non-movant to demonstrate a genuine issue for trial on a

material matter.  *See* <u>Bacchus Indus., Inc. v. Arvin Indus., Inc.</u>, 939 F.2d. 887, 891 (10th Cir. 1991).

<u>Celotex</u>, 477 U.S. at 324.  The party opposing a motion for summary judgment must "set forth

specific facts showing that there is a genuine issue for trial as to those dispositive matters for which

it carries the burden of proof."  <u>Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.</u>, 912 F.2d

1238, 1241 (10th Cir. 1990).  "However, 'once a properly supported summary judgment motion

is made, the opposing party may not rest on the allegations contained in his complaint, but must

respond with specific facts showing the existence of a genuine factual issue to be tried.'"  <u>Otteson</u>

<u>v. United States</u>, 622 F.2d 516, 519 (10th Cir. 1980) (*citation omitted*).   Nor can a party "avoid

summary judgment by repeating conclusory opinions, allegations unsupported by specific facts,

or speculation."  <u>Colony Nat'l Ins. Co. v. Omer</u>, No. 07–2123, 2008 WL 2309005, at *11 (D. Kan.

June 2, 2008) (*citing* Fed. R. Civ .P. 56(e)).  "In responding to a motion for summary judgment, 'a

party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape

summary judgment in the mere hope that something will turn up at trial.'" <u>Colony Nat'l Ins. Co. v. Omer</u>, 2008 WL 2309005, at *1 (*quoting* <u>Conaway v. Smith</u>, 853 F.2d 789, 794 (10th Cir.1988)). If the non-movant cannot make such a showing, summary judgment is appropriate. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 326 (1986).

This Motion should be granted dismissing Defendants from this action. Defendants' actions were reasonable in the situation described in the Complaint and Daniel's constitutional rights were not violated.

**B.      Defendants are Entitled to Qualified Immunity for their Actions regarding Daniel.**

**1.      Standards for Qualified Immunity.**

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of *which a reasonable person would have known."*

<u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, (1982). Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Id.* at 807. "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" <u>Roybal v. City of Albuquerque</u>, No. 08-0181, 2009 WL 1329834, at *10 (D.N.M. April 28, 2009) (*quoting* <u>Siegert v. Gilley</u>, 500 U.S. 226, 232 (1991)). To ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties," <u>Anderson v. Creighton</u>, 483 U.S. 635, 638 (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, the officials are shielded from personal liability, <u>Harlow</u> at 818. That means a court can often avoid ruling on the plaintiff's claim that a particular right exists. If prior case law has not

clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.  Camreta v. Greene, 563 U.S. 692, 705 (2011).

Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law.  Saucier v. Katz, 533 U.S. 194, 205 (2001).  When a defendant asserts qualified immunity, the plaintiff must demonstrate that the defendant's actions violated his or her constitutional or statutory rights; and that the right was clearly established at the time of the alleged misconduct.  See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee would understand that what he or she did violated a right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007). "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colo. Dep't of Corr., 429 Fed.Appx. 707, 710 (10th Cir. 2011) (unpublished) (quoting Zweibon v. Mitchell, 720 F.2d 162, 172–73 (D.C. Cir. 1983)).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d at 923 (10th Cir. 2001).  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that

what he is doing violates that right.'" <u>Holland ex rel. Overdorff v. Harrington</u>, 268 F.3d 1179, 1186 (10th Cir. 2001) (alteration in original) (*quoting* <u>Saucier v. Katz</u>, 533 U.S. at 202, 121 S.Ct. 2151).  A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." <u>Pierce v. Gilchrist</u>, 359 F.3d 1279, 1298 (10th Cir. 2004).  "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" <u>Mullenix v. Luna</u>, 577 U.S. ___ (2015), 136 S. Ct. 305, 308 (2015) (*quoting* <u>Reichle v. Howards</u>, 566 U.S. 658, 664 (2012)).  While the case law "'do[es] not require a case directly on point'" for a right to be clearly established, "'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.,* at ___, 136 S. Ct., at 308.  In other words, immunity protects "'all but the plainly incompetent or those who knowingly violate the law.'" *Ibid.*

The Supreme Court has clarified that qualified immunity's clearly established prong is a very high burden for a plaintiff.  "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." <u>Ashcroft v. al–Kidd</u>, 563 U.S. 731, 741 (2011).  As the United States Supreme Court explained decades ago, "the clearly established law must be 'particularized' to the facts of the case." <u>Anderson v. Creighton</u>, 483 U.S. 635, 640, (1987).  The facts of this case demonstrate that there is no violation of Daniel's constitutional rights and if there was such a violation, there is no clearly established which would have placed the officers on notice that their actions were improper.

2.     **The Acts of the Individual Defendants did Not Violate the Constitutional Rights of Daniel.**

An excessive force claim "must ... be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard." Graham, 490 U.S. 386, 394 (1989). The Supreme Court has held that all claims of excessive force in the context of an arrest or detention should be analyzed under the Fourth Amendment's reasonableness standard. *See Id.* at 395. The Supreme Court recognizes that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 397. Consequently, "the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective." Saucier v. Katz, 533 U.S. 194, 205 (2001).

Graham provides three factors that a court must consider in determining whether an officer's actions were objectively reasonable: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, *supra*, 490 U.S. at 396. *See* Weigel v. Broad, 544 F.3d 1143, 1151–52 (10th Cir. 2008).

A court assesses "objective reasonableness based on whether the totality of the circumstances justified the use of force, and [must] pay careful attention to the facts and circumstances of the particular case." Estate of Larsen ex. rel Sturdivan v. Murr, 511 F.3d 1255, 1260 (10th Cir. 2008) (*internal quotation marks omitted*). "The excessive force inquiry evaluates the force used in a given arrest or detention against the force reasonably necessary to effect a lawful arrest or detention under the circumstances of the case." Cortez v. McCauley, 478 F.3d at 1126. "If the plaintiff can prove that the officers used greater force than would have been reasonably

13

necessary to effect a lawful arrest, he is entitled to damages resulting from that excessive force."
*Id*. at 1127.  Additionally, "[t]he 'reasonableness' of a particular use of force must be judged from
the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."
Graham, *supra*, 490 U.S. at 396.

"To avoid a 'Monday morning quarterback' approach, the Fourth Amendment does not
require the use of the least, or even a less, forceful or intrusive alternative to effect custody, so
long as the use of force is reasonable under Graham."  James v. Chavez, 830 F.Supp.2d 1208, 1236
(D.N.M. 2011).  The Fourth Amendment requires only that the defendant officers choose a
"reasonable" method to end the threat that the plaintiff poses to the officers in a force situation,
regardless of the availability of less intrusive alternatives.  Graham, *supra*, 490 U.S. at 397.  In
United States v. Sokolow, 490 U.S. 1, 11, (1989), the Supreme Court held: "the reasonableness of
the officer's decision to stop a suspect does not turn on the availability of less intrusive
investigatory techniques. Such a rule would unduly hamper the police's ability to make swift, on-
the-spot decisions ... and require courts to indulge in unrealistic second guessing." (*Internal
quotations and citations omitted*).  The actions of the Individual Defendants in this case were
reasonable and constitutional.

Officer Prince was the first to arrive on the scene.  Sgt. Griggs arrived next, then Offs.
Moore and Wood.  Statement of Material Facts ("SMF") 22.   The video shows that as Officer
Prince was approaching, Daniel fell over backwards and struck his head on the asphalt. *Id.*  Seeing
this fall, Officer Prince called for medical assistance.  Officer Prince did not approach Daniel until
he assisted Daniel's father, Walter, to prevent any further injury to Daniel.  Daniel grabbed at

Officer Prince's taser as Officer Prince was kneeling next to Daniel.  Officer Prince hit Daniel in the face to try to control him.[2]

Sgt. Griggs and Officer Prince repeatedly told Daniel to stop resisting and calm down and breathe.  *See*  Exhibit C.  They turned Daniel onto his stomach to handcuff him to prevent further injury and for officer safety.  *Id., 3 min. 3 secs.*  Officer Moore placed the handcuffs on Daniel and Daniel briefly stopped resisting.  After several seconds, the resisting began again with Daniel rolling on the ground and attempting to hit his head on the pavement again.  At this point, Daniel could and was raising his head off the ground.  *Id., 4 min. 35 secs.*  Officer Wood attempted to control Daniel's legs; Daniel attempted to kick Officer Wood and lifted Officer Wood off the ground.  No officer placed his knee across Daniel's back and applied his full weight on Daniel. Sgt. Griggs tells the officers to take the handcuffs off, roll Daniel over, and begin CPR about three minutes after Daniel was handcuffed.

According to Dr. Vilke, Defendants' expert, the process of restraining and keeping Daniel restrained was not enough time to limit his breath ventilations; thus there is no evidence to support the conclusion that position, restraint or body weight caused or contributed to his cardiac arrest. The weight being applied by the officers was to Daniel's legs and arms, not his torso which did not impact his breathing.  Report of Dr. Vilke, Doc. 33-3, p. 4.  There is no evidence that the officer knew or should have known that restraining and keeping Daniel restrained for less than three minutes would result in Daniel's death.

---

[2]  The Complaint alleges that Off. Prince hit Daniel three times.  The Complaint, however, does not assert and there is no proof that these punches contributed to or resulted in Daniel's death.

Daniel was reported to be using methamphetamines on the night of his death, which is verified in the OMI Report.  SMF 5.  Likewise, OMI pointed out contributing factors to Daniel's death were his abnormal heart rhythms and an enlarged heart.  Daniel's obesity, profuse sweating, erratic behavior and obvious agitation supports the OMI's conclusion and Dr. Vilke's opinion that methamphetamine use along with the exertion and enlarged heart was the cause of Daniel's death.

The officers were confronted with a choice between preventing Daniel from beating his head against the pavement, attempting to restrain him or permitting him to go unchecked. Allowing Daniel to proceed unchecked would result in unknown injury to Daniel and others.  The officers, consistent with their training, attempted to handcuff Daniel, and subdue him.  They called for medical assistance.  They were careful not to put their entire weight on Daniel's torso which is evident from the video and facts in Dr. Vilke's report.  It was no fault of theirs that Daniel had several underlying conditions, some of which were not obvious to them.  For example, the officers suspected that Daniel was under the influence of meth which could him to act uncooperative, but they had no way to know that he had an enlarged heart which contributed to his death.

Applying the test articulated in Graham, 490 U.S. at 396, Daniel was not suspected of a crime until dispatchers heard he was pushing his parents and a domestic violence situation was suspected.  Once Daniel grabbed Officer Prince's taser there was an immediate threat to the safety of officers, himself and others.  These factors make the use of force reasonable and acceptable. The test does not require that the officers anticipate any unforeseen consequence, as occurred here.

The force used was reasonable.  Daniel died less than three minutes after the officers encountered him.  In those three minutes, the officers were required to make split second decisions with the information available to them.  As seen in the video, Daniel persisted in resisting and

being uncooperative up to the minute of his death.  The officers continually talked to him and attempted to communicate; he continued to be noncompliant.  There is no evidence that if the officers had abandoned him after putting him on the ground, he would have survived this episode. There were no constitutional violations in the actions of Defendants.  The force they used was necessary and warranted.

     **3.**     **Assuming Arguendo, there was a Constitutional Violation, there was No Clearly Established Law which would have put Defendants on Notice that their Actions were Illegal.**

In the Complaint, Plaintiff identified two cases, <u>Cruz v. City of Laramie</u>, 239 F.3d 1183 (10th Cir. 2001), and <u>Weigel v. Broad</u>, 544 F.3d 143 (l0th Cir. 2008) which he contends provides the clearly established law which would have placed the Individual Defendants on notice that their actions were improper and unconstitutional.  These cases do not provide clearly established law, applicable to this case.

In <u>Cruz</u>, the officers "hogtied" the suspect:  "The conduct at issue involves the tying of the decedent's arms behind his back, binding his ankles together, securing his ankles to his wrists, and then placing him face down on the ground."  239 F.3d at 1188.  The Court did "not reach the question whether all hog-tie restraints constitute a constitutional violation per se, but hold that officers may not apply this technique when an individual's diminished capacity is apparent."  *Id*. This case discussed the use of the hogtie and reviewed cases from other jurisdictions.  The Court, however, held that the defendants were entitled to qualified immunity in the case, because "a rule prohibiting such a restraint in this situation was 'clearly established' at the time of this unfortunate incident."  *Id.* at 1189.  Clearly, in this case, Daniel was not hogtied.  This case does not provide any clearly established law that officers trying to handcuff an individual who is suspected of hitting

his mother, is injuring himself and has grabbed for an officer's weapon by placing minimal body weight on the subject's extremities violated clearly established law.

The other case cited in the Complaint, Weigel v. Broad, is likewise inapposite. Weigel, concerned an officer placing a subject in a chokehold: "In the midst of the melee, Trooper Henderson put Mr. Weigel in a choke hold." 544 F.3d 1148. The Court explained the incident: "[Mr.] Weigel was in custody at the time of his death. [Mr.] Weigel's death arguably came as a result of the pressure that was applied to his upper torso after he was subdued, and no longer a threat. He was in a prone position, and handcuffed. Indeed some evidence suggests that his legs were bound together." Id. at 1152. In contrast here, the video shows there was no pressure applied to Daniel's upper torso and he was not subdued at that point and was still a threat. His legs were not bound. He was not choked. Further, "there is evidence that Mr. Weigel was subjected to such pressure for a significant period after it was clear that the pressure was unnecessary to restrain him." There was no such evidence that Daniel was subject to such pressure for a significant period of time after it was clear he was subdued. The total amount of time elapsed from the beginning of the encounter to Daniel's death was about three minutes during which time the officers tried to control the use of Daniel's extremities, not placing weight on his back, neck or head.

No case has been found in which police officers were faced with a subject who has reportedly hit his mother, is harming himself in front of the officers and has grabbed an officer's taser, who has all of Daniel's contributing factors to his death, including his obesity, use of methamphetamines, and underlying heart issues. Daniel was not hogtied. He was restrained for under three minutes. There was no weight placed on his back. The cases addressing positional asphyxiation are not relevant: Dr. Vilke stated that Daniel's death was not the result of positional

asphyxiation, but rather due to an enlarged heart and methamphetamine use.  *See* Doc. 33-3, p. 1. There are no cases in the Tenth Circuit or in any other circuit which has held that a death caused by methamphetamine toxicity, an enlarged heart, obesity, and asphyxia resulting in death could make a police officer liable for that death.

Neither of the cases cited by Plaintiff provide the clearly established authority which would have placed Defendants on notice that their actions were improper.  The Defendants are entitled to qualified immunity. They did not violate Daniel's constitutional rights by attempting to prevent him from beating his head against the pavement and taking a weapon from an officer's belt. Daniel's enlarged heart combined with his methamphetamine use caused him so suffer cardiac arrest, resulting in his death, during the three minutes the officers attempted to get him into control. Daniel's death was not caused by the officers.  The officers engaged Daniel, attempted to shield his head while he was self- harming, struck Daniel to keep him from taking a taser, handcuffed him for safety reasons and, after noting he stopped breathing, trying to resuscitate him until the paramedics arrived.  There is no clearly established law which dictates that this series of events violated any of Daniel's constitutional rights.   If there is no constitutional violation, the Department cannot be found liable.

**C.     Because the Individual Defendants Should be Dismissed, the Claims
         Against the City Should Also be Dismissed.**

If the Individual Defendants are found to be entitled to qualified immunity, the City should also be dismissed.  In Martinez v. Beggs, 563 F.3d 1082, 1091 (10th Cir. 2009), the Court stated:

> A county or sheriff in his official capacity cannot be held "liable for constitutional
> violations when there was no underlying constitutional violation by any of its
> officers." Olsen v. Layton Hills Mall, 312 F.3d 1304, 1317-18 (10th Cir.2002)
> (*internal quotations marks and brackets omitted*). "[E]ven if," as Martinez argues,
> the "policies, training, and supervision [of the individual county defendants] were

19

unconstitutional, the [county] cannot be held liable where, as here, the officers did not commit a constitutional violation." Trigalet v. City of Tulsa, 239 F.3d 1150, 1155-56 (10th Cir.2001); see also City of Los Angeles v. Heller, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point.").

There are no policy violations alleged in the Complaint.  It is too late to amend the Complaint to add such allegations.  Because the Individual Defendants did not violate the constitutional rights of Daniel, Count I of the Complaint should also be dismissed against the City.

### III.  CONCLUSION

For the foregoing reasons, Count I should be dismissed in its entirety.  The Individual Defendants are entitled to qualified immunity.  If the officers are granted qualified immunity, Count I must also be dismissed against the City.

Respectfully submitted,

WIGGINS, WILLIAMS & WIGGINS
A Professional Corporation

*Electronically Filed*

By_____*/s/ Patricia G. Williams*_____
        Patricia G. Williams
Attorneys for Defendants
1803 Rio Grande Blvd., N.W. (87104)
P.O. Box 1308
Albuquerque, New Mexico 87103-1308
(505) 764-8400
pwilliams@wwwlaw.us

We hereby certify that on this 15th day of
October, 2020, the foregoing was filed electronically
through the CM/ECF system, which caused all
parties or counsel of record to be served
by electronic means, as more fully reflected on the
Notice of Electronic Filing.

WIGGINS, WILLIAMS & WIGGINS, P.C.

By____*/s/ Patricia G. Williams*_____
       Patricia G. Williams