IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

DENNIS MURPHY, as Personal Representative
of the ESTATE OF DANIEL TURNER, deceased,
and WALTER and TAMARA TURNER,

    Plaintiffs,

v.                                                                                 No. CIV 19-639 RB/JFR

THE CITY OF FARMINGTON, and
JAMES PRINCE, JAMES MOORE,
ZACK WOOD and JESSE GRIGGS,
In their individual capacities,

    Defendants.

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON COUNT III OF THE COMPLAINT

Plaintiffs Walter and Tamara Turner, through their attorneys and pursuant to Fed. R. Civ. P. 056, submit this Response in opposition to Defendants' Motion for Summary Judgment on Count III of the Complaint ("Motion"), regarding Plaintiffs' claim for loss of consortium. The Court should deny the Defendants' Motion because:

1.     Binding New Mexico state case law dictates that the parents of an adult child have a potentially viable claim for loss of consortium, provided that they can demonstrate a "mutually dependent" relationship; and,

2.     A reasonable jury could determine based on disputed material facts that Plaintiffs Walter and Tamara Turner had a sufficiently "mutually dependent" relationship with their son Daniel that was damaged as a result of Defendants' acts and omissions, to allow for an award for loss of consortium.

### I.    PLAINTIFFS' RESPONSE TO DEFENDANTS' MATERIAL FACTS

1.     Admit.

2.     Admit.

3. Admit.

4. Admit.

5. Deny. This mischaracterizes testimony and plainly ignores the immediately previous testimony in the cited deposition to the contrary. *See* [Doc. 48-1], at 61:1-20.

6. Admit.

7. Admit that cooking in the Turner household was a shared task, and that depending on schedules, was done by Daniel or others. Plaintiffs dispute Defendants' characterization of testimony and the limitation in this Fact by the word "sometimes."

8. Admit that Daniel would do tasks if asked and deny any implication by Defendants that Daniel *only* did tasks if asked, rather than having the duties testified to by the Plaintiffs. *See* Plaintiffs' Statement of Material Facts ("PSMF"), *infra*, ¶¶ 37-53.

9. Admit that Daniel had chores and duties that he did around the house, deny "sometimes" and any negative implication Defendants seek to infer therefrom. *See* Plaintiffs' Response to Defendants' Material Facts ("PRDMF") No. 7, *supra*.

10. Admit that Daniel and his father enjoyed fishing together, deny Defendants' characterization as "sometimes." PSMF, ¶¶ 64, 82, and PRDMF, No. 7, *supra*.

11. Admit.

12. Admit.

13. Admit insofar as that is what the cited portion of one parent's deposition states.

14. Admit that Tamara had not read the medical records of her adult son from a hospital in another state during a time in which he was not living at home, deny any unfounded implication that Tamara had access to or should have read the medical records.

15. Admit that Daniel did not have a driver's license, deny the characterization of the remainder of this paragraph as based on hearsay and lack of foundation.

16. Admit.

17. Deny. Defendants' Statement of Material Facts provides no record evidence to support this purported fact, which must be denied by the Court accordingly.

18. Admit.

19. Admit.

20. Admit.

21. Admit

22. Admit.

23. Admit.

24. Admit.

25. Admit.

26. Admit.

27. Deny.

28. Deny. Defendants' Statement of Material Facts provides no record evidence to support this purported fact, which must be denied by the Court accordingly.

29. Admit that until this incident, Walter and Tamara did not believe that Daniel used drugs. Deny the implication that Daniel had any other documented drug use than the incident in question.

30. Admit the first sentence. Deny as to the second sentence, as Defendants' Statement of Material Facts provides no record evidence to support this purported fact, which must be denied by the Court accordingly

31. Deny that any blood tests were done at the scene or on the day that Daniel died; admit that toxicology from the OMI showed minute levels of each substance. *See* [Doc. 48-3].

32. Admit.

33. Deny. Defendants' Statement of Material Facts provides no record evidence to support this purported fact, which must be denied by the Court accordingly.

34. Admit.

35. Deny, as the double negative suggests that the Turners were previously aware of the condition of Daniel's heart prior to his death, which they were not. Further deny as there is no indication that Daniel or anyone else had that knowledge prior to Daniel's death. Even if true, this fact is immaterial.

36. Deny, as such a condition would have likely happened at or near death and would not have been a condition therefore of which they would have had prior knowledge.

## II. **PLAINTIFFS' STATEMENT OF MATERIAL FACTS**

### A. **Plaintiffs Walter and Tamara Turner Jointly Ran the Household with Their Son, Daniel Turner.**

37. "He did everything we asked him to. ... if I asked him to take out the trash, he just took out the trash. I didn't have to really ask. He just had duties and he did them." *See,* Transcript of the Deposition of Tamara Turner ("Tamara Turner Depo."), attached hereto as **Exhibit 1**, at 16:15-20.

38. "He can do everything in construction." *Id.*, at 18:5-6.

39. Daniel made a living by doing construction, landscaping, odd jobs. *Id.*, at 41:10-14.

40. Daniel had a varied work schedule, but he worked every day at private residences. *Id.*, at 48:1-8.

41. Daniel regularly cooked meals and barbequed for the family. *Id.*, at 50:24-51:2.

42. Daniel cooked dinner for the family a few days a week. *Id.*, at 57:9-10.

43. Daniel shopped for household items. *Id.*, at 52:21-53:2.

44. Daniel did not pay rent, but did contribute various amounts of money for utilities when he could and helped with all things like landscaping and moving dirt. *Id.*, at 53:3-13.

45. Daniel helped with cleaning, cooking, and did shopping for himself. *Id.*, at 96:16-22.

46. Daniel would "sweep, vacuum, anything I had asked him to do." *Id.*, at 61:19-20.

47. Daniel took out the trash and cleaned the bathroom he used on a daily basis. *Id.*, at 61:7-11.

48. Daniel cleaned his room without being told to do so. *Id.*, at 93:8-9; 13-15.

49. Daniel helped feed the dogs. *Id.*, at 61:1-6.

50. Daniel did yard work and lifting and any other housework, if he was asked. *Id.*, at 96:23-97:3.

51. Daniel, Walter and Tamara regularly watched TV shows, movies, and the news together, but not every night. *Id.*, at 58:16-59:7.

52. Walter and Daniel would sit together for hours to binge watch old movies, the Walking Dead, and Black Sails, sometimes for 3-4 days at a time. *See,* Transcript of the Deposition of Walter Turner ("Walter Turner Depo."), attached hereto as **Exhibit 2**, at 39:9-14.

### B. Walter and Tamara and Daniel Were Deeply involved in and Shared the Goings-on of Each Other's Everyday Lives.

53. Daniel, Tamara and Walter ate dinner together nightly. Exhibit 1 (Tamara Turner Depo.") at 56:20-22.

54. Daniel shared meals with his mother every day. *Id.*, at 50:20-23.

55. Daniel regularly ate breakfast with his mother. *Id.*, at 51:4; 17-25.

56. Daniel loved food and loved to barbeque. *Id.*, at 50:25-51:1.

57. "We would talk about our day. If it was hot out there, he'd ask me about how my day was. We'd talk about his TV programs. We'd talk about our animals." *Id.*, at 57:14-17.

58. Daniel would talk about how the people "liked the work he was doing for them ... the walkways, pots he made, clay pots, putting in grass." *Id.*, at 57:22-24.

59. "He did landscaping, concrete. ... He just did odd jobs." *Id.*, at 17:6, 9.

60. On their days off, Daniel, Tamara and Walter would hike together and go shopping together. *Id.*, at 64:3-16.

61. Daniel took a trip to Telluride in 2016 for a few days with his parents, to hike and enjoy the experience. *Id.*, at 88:5-12.

62. In 2017, Daniel participated in the family reunion at the Blue Lou Ranch bed and breakfast in Colorado. *Id.*, at 89:6-25.

63. Walter and Daniel went on a fishing trip with Walter's grandson just a few months before his death and they caught "so many fish." Exhibit 2 (Walter Turner Depo.), at 37:8-10.

64. Daniel's hobbies were sketching, comic book collecting, landscaping, sculpting, and rock collecting. Exhibit 1 (Tamara Turner Depo.), at 98:7-12.

65. Walter and Daniel liked many of the same things – comic books, movies, fishing, hiking. Exhibit 2 (Walter Turner Depo.), at 37:3-6. Walter and Daniel collected comic books and anime movies together. Walter still has their collection in his possession. *Id.*, at (39:1-6).

66. Walter and Daniel would sit for hours to debate/discuss various artists' artwork and comic books, stories in the "DC universe," and discuss and watch new movies in the DC universe and the "Marvel Universe." *Id.*, at 38:13-21.

67. "[H]e loved the old movies. He liked the Walking Dead. He liked Black Sails." Walter and Daniel watched them together. *Id.*, at 39:10-14.

68. Daniel liked to buy comic books and clothes. Exhibit 1 (Tamara Turner Depo.), at 64:20-21; 64:25-65:2.

69. Daniel played varsity football in high school. *Id.*, at 94:9-15. Daniel's favorite teams were the Chicago Bears and the San Diego/Los Angeles Chargers. *Id.*, at 93:24-94:5.

70. Daniel liked to bike, hike, and walk for regular exercise. *Id.*, at 84:8-12. Daniel rode his mountain bike daily. *Id.*, at 84:13-16. Daniel's favorite trailhead was Twin Peaks. *Id.*, at 85:13-14.

71. Tamara found Daniel to be well-groomed and that he was a "healthy overweight man." He took showers/shaved on a regular basis and his nails were trimmed. *Id.*, at 92:24-93:7.

72. Tamara Turner did discuss with Daniel her concerns over his drinking habits. *Id.*, at 69:14-70:4; 71:24-72:9.

73. Walter described Daniel as "my whole life." Exhibit 2 (Walter Turner Depo.), at 36:22-23.

74. Walter and Daniel had a very close relationship. *Id.*, at 37:4.

75. Walter would regularly inquire into Daniel's life, but also respected that he was an adult and did not push too far: "[H]e would never deal in specifics ... He just said, 'That's my business, and I'm taking care of it, Dad.'" *Id.*, at 51:22-25. "He said he took care of what he needed to do. He was a man." *Id.*, at 53:13-14.

76. "I didn't scrutinize everything he did, all the time." *Id.*, at 72:9-10.

77. "I tried to stay away from Daniel's friends ... [b]ecause they're his business. He's a grown man." *Id.*, at 105:16-20.

7

78. "He was a grown man. ... he didn't tell us everything all the time." *Id.*, at 154:2-3.

79. Walter was not aware of Daniel's medical issues. "That's his. That's his private [information]." *Id.*, at 170:21-22.

80. Daniel was Walter's "buddy to do stuff with" when he was home. *Id.*, at 103:23-104:3.

C. **Walter, Tamara and Daniel Made Long Term Plans With One Another.**

81. Before his death, Daniel and Walter had planned to take another fishing trip to Pagosa Springs, Durango, and up to Vallecito Lake. *Id.*, at 37:18-19.

82. Daniel and Walter also had had plans to go to the next San Diego Comic-Con together. *Id.*, at 37:21-22; 38:3-4.

83. "[H]e wanted to go to college. ... he wanted to do his own thing." Exhibit 1 (Tamara Turner Depo.), at 19:4-6.

84. Daniel attended the Art Institute of Pennsylvania for about a year and a half after high school. Exhibit 2 (Walter Turner Depo.), at 39:23-40:8.

85. "[H]e wanted to be an artist. He wanted to write. ... He did all types of art, art of comic heros [sic], of landscapes, of people. ... he drew, sketched." Exhibit 1 (Tamara Turner Depo.), at 20:15-22.

86. Daniel was saving money to start a landscaping business. Exhibit 2 (Walter Turner Depo.), at 37:20-21.

III. **STANDARD OF REVIEW**

Summary judgment may be granted only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also, Fuerschbach v. Southwest Airlines Co.*, 439 F.3d 1197, 1207 (10th Cir. 2006) (finding that

summary judgment is appropriate "only where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law") (internal quotations omitted). When applying this standard, the court examines the record and makes all reasonable inferences in the light most favorable to the non-moving party. *Id.* Where different ultimate issues may properly be drawn, summary judgment is inappropriate. *See, Seamons v. Snow*, 206 F.3d 1021, 1026 (10th Cir. 2000).

## IV. ARGUMENT

### A. The Standard for a Loss of Consortium Claim Under the New Mexico Common Law.

Since 1994, New Mexico has recognized a common law cause of action for loss of consortium ("LOC"). *See, Romero v. Byers*, 1994-NMSC-031, ¶¶ 7-13, 117 N.M. 422, 872 P.2d 840. This cause of action contemplates recovery for the "emotional distress" that accompanies the loss of the "normal company" of a loved one upon whom a physical injury has been inflicted. *Id.* Since the *Romero* decision, the scope of relationships for which a person can recover for loss of consortium has consistently expanded. *See e.g., Lozoya v. Sanchez*, 2003-NMSC-009, ¶¶ 17, 20, 126 N.M. 263, 66 P.3d 948 (purpose behind LOC is "to recover for damage to a relational interest, not a legal interest" and concluding that an LOC claim may be brought for an "unmarried cohabitant" relationship); *Fernandez v. Walgreen Hastings Co.*, 1998-NMSC-039, ¶ 31, 126 N.M. 263, 968 P.2d 774 (concluding that a loss of consortium claim may be brought based on minor child/caretaker relationship); *State Farm Mut. Auto. Ins. Co. v. Luebbers*, 2005-NMCA-112, ¶¶ 37, 43, 138 N.M. 289, 119 P.3d 169 (concluding that a "born and surviving" fetus may bring a loss of consortium claim for "the death of a parent"); *Fitzjerrell v. City of Gallup*, 2003-NMCA-125, ¶¶ 1, 14, 134 N.M. 492, 79 P.3d 836 (concluding that loss of consortium claim may be brought by

parents and/or adult siblings based on an injury sustained by an adult child/sibling). This expansion can be attributed to New Mexico's public policy in favor of holding tortfeasors *fully* accountable for the entirety of the damages caused by their tortious acts and/or omissions, including accountability for any "injury" to a close, familial relationship that one person "shared with the injured or deceased person." *See, Fitzjerrell*, 2003-NMCA-125, ¶ 12.

On law of loss of consortium claims in New Mexico, Defendants quote from *Silva* for the factors, [Doc. 48] at 8, but that quote is lifted from the New Mexico Supreme Court's decision in *Wachocki v. Bernalillo Co. Sheriff's Dep't*, 2011-NMSC-039, 150 N.M. 650, 265 P.3d 701. The *Wachocki* Court laid out the following as the guide:

> *[W]e conclude that mutual dependence is the key element.* The unmarried cohabitants in *Lozoya* were certainly mutually dependent—they jointly ran a household, made life decisions together and had made a long-term commitment to one another. *See id.* ¶¶ 9-10, 29. Similarly, in *Fernandez v. Walgreen Hastings Co.*, a grandparent claiming loss of consortium shared a household with the granddaughter she lost and acted as the child's caretaker. 1998-NMSC-039, ¶¶ 4, 32, 126 N.M. 263, 968 P.2d 774. In both of these situations, *the parties relied on the relationship and could not enjoy life in the same way once the relationship was severed.* Under such circumstances, the claimant and injured party are mutually dependent, and therefore the relationship was sufficiently close to permit recovery for loss of consortium.

*Wachocki*, 2011-NMSC-039, ¶ 10 (emphasis added).

The question for the Court at this point in the proceedings is whether any genuine issue of material fact exists as to whether Plaintiffs Walter and Tamara Turner "relied on the[ir] relationship [with their son Daniel] and could not enjoy life in the same way once the relationship was severed," and thus had a "mutually dependent" relationship with him. *Id.* In *Lozoya*, that analysis centered around the unmarried cohabitants who (1) jointly ran a household, (2) made life decisions together, and/or (3) made a long-term commitment to one another. 2003-NMSC-009, ¶¶ 9-10, 29. In *Fernandez*, it was a grandmother who lost a grandchild who lived with her and for

whom the grandmother was her caretaker. 1998-NMSC-039, ¶¶ 4, 32. In *Fitzjerrell*, the court held that facts could support a loss of consortium claim by parents for the death of their adult son at the hands of law enforcement because the record established that they had met *Lozoya's* factors of,

> mutual dependence" [] includ[ing], in our view, emotional, physical, and financial support and dependence. *Lozoya* makes clear that a relationship that creates a compensable interest is one that is intimate, protective, interdependent, and intertwined in functional (the way the people in the relationship meet day-to-day situations together), financially interdependent, and temporal ways (spending time together at least to the extent of living together in the same household).

2003-NMCA-125, ¶ 12. Based on the New Mexico cases, the inquiry regarding "mutual dependance" is fact intensive. Multiple material facts that are genuinely in dispute exist in this case as to those factors, barring summary judgment and making an ultimate determination by the jury necessary.

## V. GENUINE ISSUES OF MATERIAL FACT EXIST REGARDING "MUTUAL DEPENDENCE" THAT CAN ONLY BE RESOLVED BY THE JURY AT TRIAL.

The procedural approach that the New Mexico Supreme Court has adopted with respect to loss of consortium claims involves two distinct steps. *See, Lozoya*, 2003-NMSC-009, ¶¶ 21, 31. First, the District Court must determine, as a matter of law, that the existence of the relationship at issue was both foreseeable to the tortfeasor and close enough for public policy to allow for the possibility of an award of damages to compensate for the damage done to the relationship. *Id.* Once the District Court is satisfied that the first step has been met and that the claimant "may" be able to "present a cognizable claim," (*id., at* ¶ 31), the second step requires the submission of the issue to the fact-finder for a valuation of the damage that was done to the relationship. *Id.* at ¶¶ 21, 31. As the *Lozoya* Court noted, the reality of this approach is that questions of law and questions of fact inevitably overlap. *Id.*, at ¶ 21. For that reason, the District Court must take extra precaution not to invade too much on the province of the fact-finder, deferring to the fact-finder

"to determine, with proper guidance from the court, whether a plaintiff had a sufficient enough relational interest with the victim of a tort to recover for loss of consortium." *Id.*

### A. The Turners Engaged in Running the Household Together, and Daniel Largely Depended on Walter and Tamara.

The first *Wachocki* "mutual dependence" factor is jointly running a household. There can be no dispute that Walter and Tamara Turner were the father and mother of Daniel Turner, and that they all lived together before the June 2018 incident with the Farmington Police Department that ended Daniel's life and gave rise to this lawsuit. The Turners all shared in the general household duties—such as cleaning, cooking, transportation, yard work and shopping—and Walter and Tamara supported Daniel financially. Plaintiffs' Material Facts ("PMF"), ¶¶ 36-52. Further, while Daniel helped out financially when he could, he was largely dependent on his parents who paid for the house and most of the utilities. PMF, ¶ 7. Unlike the brothers in *Wochocki*, who split the finances down the middle, Daniel helped out where he could with labor around the house, cooking, cleaning and some money towards utilities, but he relied on his parents who provided his housing, food and motor vehicle transportation.

### B. The Turners Not Only Lived Together, They Shared the Day-To-Day Aspects of Their Lives Together.

The Turners ate dinner together every day and discussed amongst themselves their days, how they went, and what they did. Tamara and Daniel regularly ate their breakfasts together, preparing for the day before Tamara would often drive Daniel to his day's work. Daniel and Walter shared a passion for all things comics, waiting to watch certain shows together, debating the actors, and even traveling across the country to attend comic conventions in San Diego. They enjoyed watching movies together, and fishing and hiking on family camping trips that they took together.

Even though Daniel kept some things to himself, his parents also felt emotionally connected enough to bring up difficult subjects with Daniel, such as his drinking. PMF, ¶¶ 53-80.

The Turners spent time with their son every single day. They spoke every single day. They asked about how his day was and he asked about theirs every single day. Until their connection with him was severed by his untimely death, they had an expectation that Daniel would continue to be at dinner with them, continue to watch TV shows and movies with them, continue to collect comic books and debate the comic book characters and go to comic conventions with his father, and go with his parents on family trips and fishing and hiking. That expectation abruptly ended when Daniel died and Walter and Tamara's lives changed fundamentally and forever.

The Turners not only lived with Daniel, and had an expectation of enjoying future activities and other things like the movies together with him, they also shared hopes for Daniel's future. They supported his dream to get more schooling, and to use that to begin his own business in landscape design. They planned to do family trips to fish, to be together, and to attend more comic conventions. PMF, ¶¶ 81-86. That support each day, as well as their emotional and financial support for Daniel, present and future, is what parents do with – and for – their children. It is part of the physically and emotionally intertwined nature of the parent-child relationship, even when that child is an adult, and even more so when that adult child lives with them, and they share their lives together on a daily basis.

The Turners meet the standard set forth in *Lozoya* for a "mutually dependent" relationship with their son Daniel that was a "intimate, protective, interdependent, and intertwined in functional (the way the people in the relationship meet day-to- day situations together), financially interdependent, and temporal ways (spending time together at least to the extent of living together in the same household)." *Fitzjerrell, supra*. The extent and depth of their mutually dependent

relationship with Daniel establishes materially disputed facts that require a fact finder to decide their LOC claims.

### C. That Walter and Tamara Turner Did Not Know Certain Facts About Daniel's Life Does Not Diminish the Fact of Their Mutually Interdependent Familial Relationship.

Walter and Tamara Turner lived with Daniel, ate with him, talked with him about all of their lives, kept up the household together with him, traveled with him, recreated with him, discussed his day-to-day goings on but also his hopes of the future, and shared hobbies with him. They maintained a physically and emotionally intertwined life with their son. Defendants seek to cast their relationship in a negative light, that it was imperfect and that there were things that Walter and Tamara did not know about their son. But that is true of every relationship, even those between or among persons who would unquestionably have a loss of consortium claim.

Walter and Tamara frankly and candidly admitted and addressed the aspects of their son as to which they had limited knowledge, because they were trying to give him autonomy, while at the same time trying to express their concerns for him and to him, while also working to maintain the healthy relationship of family members who all live under the same roof. This does not diminish their relationship; it merely colors it. Walter and Tamara Turner loved their son deeply. The record bears out sufficient facts to meet the standard put forth in *Fitzjerrell*, which found that the parents of an adult child may bring a loss of consortium claim. At the very least, the record before this Court of the extensive, intertwined "mutually dependent" relationship between Daniel and his parents that was severed by his untimely death, creates issues of disputed fact that only a jury can decide.

### D. Foreseeability is a Fact Question for the Jury, Does Not Go to the Defendants' Duty, and is Clear in This Case.

Recognizing the difficulty around foreseeability determinations, the New Mexico Supreme Court, in a decision dated after every single case cited by Defendants in their brief but also long enough ago that its holding cannot be a surprise to them, did away with the foreseeability analysis as a factor relevant to the question of duty under negligence law. "In this opinion we clarify and *expressly hold that foreseeability is not a factor for courts to consider when determining the existence of a duty* . . . and require courts to articulate specific policy reasons, unrelated to foreseeability considerations, if deciding that a defendant does not have a duty or that an existing duty should be limited." *See, Rodriguez v. Del Sol Shopping Ctr. Assoc.*, 2014-NMSC-014, ¶ 1, 326 P.3d 465 (emphasis added). "Foreseeability and breach are questions that a jury considers when it decides whether a defendant acted reasonably under the circumstances of a case or legally caused injury to a particular plaintiff." *Id.*, at ¶ 4 (internal citation omitted). "Foreseeability does not require that the particular consequence should have been anticipated, but rather that some general harm or consequence be foreseeable." *Id.* (internal citation omitted).

Defendants' argument that they could never have foreseen that "a forty year old man would be living with his parents at the time of his death," [Doc. 48] at 11, is not a relevant inquiry after *Rodriguez*. To support their "foreseeability" argument, Defendants must claim that law enforcement officers in using force that results in the death of an individual can never have foreseen any "general harm or consequence" to a third party. This they cannot do. Officers simply cannot know this ahead of time. And this is exactly the reason *Rodriguez* court held as it did, doing away with foreseeability as a policy argument. 2014-NMSC-014, ¶ 1 ("What may not be foreseeable under one set of facts may be foreseeable under a slightly different set of facts. Therefore, foreseeability cannot be a policy argument because foreseeability is not susceptible to

a categorical analysis."). What that particular individual's situation is at the time an officer uses force is not a question that bears on Defendants' duty, but is a fact question for the jury to consider.

## CONCLUSION

For the reasons set forth herein, Defendants' Motion for Summary Judgment on Plaintiffs' Count III of the Complaint is not well taken and should be denied.

Respectfully submitted,

DAVIS LAW NEW MEXICO

*/s/ Nicholas T. Davis*
Philip B. Davis
Nicholas T. Davis
1000 Lomas Blvd. NW
Albuquerque, NM 87102
(505) 242-1904
(505) 242-1864 facsimile
phil@davislawnm.com
nick@davislawnm.com

*Counsel for Plaintiffs*

I hereby certify that the foregoing was
served on all counsel of record by email
and was electronically filed with the Court
via the CM/ECF system on this 2nd day
of November, 2020.


*/s/ Nicholas T. Davis*
Nicholas T. Davis