## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

DENNIS MURPHY, as Personal Representative
of the ESTATE OF DANIEL TURNER, deceased,
and WALTER and TAMARA TURNER,

     **Plaintiffs,**

v.                                  No.  CIV 19-639 RB/JFR

THE CITY OF FARMINGTON, and
JAMES PRINCE, JAMES MOORE,
ZACK WOOD and JESSE GRIGGS,
In their individual capacities,

     **Defendants.**

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERT WITNESS DR. STEIN

Plaintiffs, through counsel, submit this Response to Defendants' Motion to Exclude Plaintiffs' Expert Witness Dr. Stein ("Motion") [Doc. 51]. Defendants' Motion misstates Dr. Stein's applicable expertise and how Dr. Stein's expertise is applicable in this case. Dr. Stein's testimony does not address the officers' standard of care, as they are not medical providers, and he is not a law enforcement expert. Dr. Stein's testimony addresses the assessment of Defendants' expert medical witness, Dr. Vilke, that the officers' actions played no part in the death of Daniel Turner. Dr. Stein disagrees with Dr. Vilke's opinion and will testify to the contrary, that the officers' actions in fact did play a part in Daniel's death, not based on whether their acts and omissions were right or wrong from a law enforcement perspective, but because what they did had an adverse, ultimately fatal medical effect on Daniel. Dr. Stein's rebuttal testimony includes his expert medical explanation as to why that is so.

Dr. Stein's expertise based on his education, training and experience is clearly established in the record and as a result, his testimony on the medical questions involved in this case are both reliable and relevant. Finally, Dr. Stein offers an opinion that the studies on which Dr. Vilke relies in reaching his opinions are not properly applicable to the facts of this case – his training and experience as a Master's level clinical research scientist, as well as being a board certified emergency physician, qualify him to offer that opinion.

Dr. Stein's testimony is properly subject to the crucible of cross-examination at trial, but should not be excluded. Defendants' motion should be denied.

## I.     RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS

1.     Admit.

2.     Deny. This "fact" plainly mischaracterizes Dr. Stein's expertise, and in fact simply reflects Dr. Stein's answer to opposing counsel's question as to what the focus of his research has been. *See* Defts. Motion, Exhibit A [Doc. 50-1], at 4:1-3. Dr. Stein's expertise includes more than 20 years as an emergency department physician, during which time he has seen patients such as Daniel on average, weekly; his experience with patients like Daniel is "extensive." *See,* Stein Depo., attached as **Exhibit 1** hereto, at 22:2-6; 24:7-10. *See also* Stein Declaration ("Stein Decl."), filed in this Court's record [Doc. 33-4], and his CV attached as Appendix A to that pleading, evidencing *inter alia* that Dr. Stein is a board-certified emergency medicine physician, who held a faculty position at the University of California, San Francisco for 12 years, and has since served as the Chairman and Medical Director of the Department of Emergency Medicine at Sutter Santa Rosa Regional Hospital and Sutter Lakeside Hospital in California. *Id.*, ¶ 1 and CV, at 1-2. Dr. Stein also holds a Master's degree in clinical research. *Id.*, CV at 1. *See also*, Rule 26 Report of John Stein, M.D. ("Stein R. 26 Rpt."), attached as **Exhibit 2** hereto, at 1, 10. Dr. Stein's listing of honors and

awards in his CV, at 3, evidences that his peer professional community has regularly and consistently recognized his excellence, both as a physician and an educator.[1]

3.　　Admit.

4.　　Admit.

5.　　Admit, but neglects to inform the Court that prior to becoming a physician, Dr. Stein worked in the field as an EMT and coordinated with law enforcement officers for the safety and health of patients while responding to emergencies and providing emergency care to persons with injuries outside the hospital setting. Exhibit 1 (Stein Depo.), at 6:4-19.

6.　　Admit, but neglects to inform the Court that Dr. Stein has worked as a forensic medical expert in cases involving the provision of medical care outside a hospital setting, *e.g.*, in jail settings. [Doc. 50-1], at 10:3-9.

7.　　Admit, but Dr. Stein is not offered in this case as an expert on police practices and procedures; Dr. Stein has expressly disavowed any such expertise in that area. Stein Decl. [Doc. 33-4], at 3 ¶ 17; Exhibit 2 (Stein R. 26 Rpt.), at 9.

8.　　Admit.

9.　　Admit.

10.　　Deny. Again, this "fact" mischaracterizes both Dr. Stein's areas of expertise, which are emergency medicine and clinical research, and his actual testimony, in which he stated that he has testified in court about cases involving hospital settings, but also has given depositions in other cases involving jail settings. [Doc. 50-1], at 10:3-9.

11.　　Admit that the Complaint states this. Deny that the physical location where Daniel Turner died is material.

---

[1] Dr. Stein's CV, with the portions relevant to this Response highlighted, is attached hereto as **Exhibit 3**.

12.     Admit that the Complaint states this.

13.     Deny. Both Defendants' expert witness, Dr. Vilke, in his Rule 26 Report, Ex. 3 to Plaintiff's Motion to Extend Time *Nunc Pro Tunc* to Disclose a Rebuttal Expert Witness (7/30/20) [Doc. 33-3], and the Defendants here, have mischaracterized the OMI report by omission; theirs is an incomplete, and therefore inaccurate, depiction of the OMI's finding, which was, in full, that:

> *"[t]he physical restraint applied by police officers, and the decedent's prone position (face down; limits one's ability to adequately breath) while being restrained would have contributed to the decedent's physiologic stress and are listed as contributory conditions*; therefore, the manner of death is best described as homicide."

*See,* OMI Report, attached as **Exhibit 4** hereto, at 2 (emphasis added). *See also, id.,* Death Investigation Report, page 1 of 24 (identifying as "Other Significant Contributory Conditions" to Daniel's death, "Physical restraint"); Stein Decl. [Doc. 33-4], ¶ 10; Exhibit 2 (Stein R. 26 Rpt.), at 7.

## II.     PLAINTIFFS' FURTHER MATERIAL FACTS

14.     Dr. Stein has extensive experience treating patients who are in an agitated state, such as Daniel was in this case. *See,* Pls' Resp. to Defts' Facts, *supra,* No. 2. Dr. Stein testified that Daniel's symptomology was "very typical for emergency medical practice and in no way, shape or form, appeared to me to be in a lethal condition … ." Exhibit 1 (Stein Depo.), at 17:24-18:1. *See also,* Exhibit 2 (Stein R. 26 Rpt.), at 5 ("Countless patients present to Emergency Departments exhibiting similar characteristics [to Daniel's], so this is a population that every ER doctor is familiar with."), 6 (reporting his experience to include "having seen hundreds of cases of methamphetamine intoxication").

15.     Dr. Stein's opinions are based on science. His extensive medical training in the systems he discusses allows him to make life-or-death decisions about the medical care of his

patients in the Emergency Department on a daily basis. His education, training and experience are relevant to the opinions he offers in this case. Exhibit 1 (Stein Depo.), at 24:3-20 (identifying "extensive personal experience in the Emergency Department with similar patients" to respond to questions regarding Daniel's pH levels).

16.    Dr. Stein holds a Master's degree in clinical research that enabled him to review and opine on the relevance of current literature in the field, including Dr. Vilke's own research. Exhibit 2 (Stein R. 26 Rpt.), at 4, 10; Exhibit 1 (Stein Depo.), at 24:3-20 (identifying relevant "published literature" to respond to questions regarding Daniel's pH levels).

17.    Dr. Stein's opinions rebut Dr. Vilke's in two key areas:

    a.    As a matter of reasonable medical probability, what caused Daniel Turner's cardiac arrest and consequent death; and,

    b.    What role the actions of the defendant officers at the scene played in Daniel Turner's death.

18.    Dr. Stein's opinions are offered to rebut some but not all of Dr. Vilke's opinions. Dr. Stein agrees with some of them, declines to comment on police practices, and disagrees with the two critical opinions Dr. Vilke has offered on the points set forth in the immediately preceding paragraph. *See* Stein Decl. [Doc. 33-4], at 2-3 ¶¶ 7-10, 15-17; Exhibit 2 (Stein R. 26 Rpt.), at 6-9.

19.    Dr. Stein further opined that, based on his experience and training as a clinical research scientist and on their methodology, Dr. Vilke's own studies and the other studies on which Dr. Vilke relies in making his opinions in this case, are inapplicable to incidents like the one at issue in this lawsuit. Exhibit 1 (Stein Depo.), at 79:11-82:19; 102:16-103:12.

### III. LEGAL STANDARDS FOR A MOTION TO EXCLUDE UNDER FED. R. EVID. 702

Under Fed. R. Evid. 702, an expert witness' opinions must be reliable and relevant. This Court has previously articulated further the standards for a court's determination of the admissibility of expert testimony under Rule 702:

> In order to determine that an expert's opinions are admissible, the court must conduct a two-part analysis: first, the court must determine that the witness is qualified by "knowledge, skill, experience, training, or education" to render the opinions; and second, the court must determine "whether the witness' opinions are 'reliable' under the principles set forth" in Daubert and Kumho Tire.

*Kraus v. NRPC*, No. CIV 06-1157 RB/DJS, Mem. Op. and Order (6/26/08) [Doc. 70], at 6 (*quoting Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001)).

> To qualify as an expert, the expert must possess such "knowledge, skill, experience, training, or education" in the particular field as to make it appear that his or her opinion would rest on substantial foundation and would tend to aid the trier of fact in its search for the truth. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004). In *Daubert*, the Supreme Court identified four nonexclusive factors that a trial court may consider to assist in the assessment of reliability: (1) whether the theory at issue can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards controlling the methodology's operation; and (4) whether the theory has been accepted in the relevant scientific community. *Daubert*, 509 U.S. at 593-94.

> In *Kumho Tire*, the Supreme Court underscored that these four factors are not a "definitive checklist or test" and that a court's inquiry into reliability must be "tied to the facts of a particular case." *Kumho Tire*, 526 U.S. at 150. Notably, in some cases, "the relevant reliability concerns may focus upon personal knowledge or experience," rather than the Daubert factors and scientific foundations. *Id.*

*Kraus, supra*, at 7.

The Rule 702 inquiry is "flexible." *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594 (1993). The district court has broad discretion "to determine reliability in light of the particular facts and circumstances of the particular case." *Kumho Tire Co. v. Carmichael*, 526 U.S.

137, 158 (1999). Not only are the *Daubert* factors not exclusive, the district court has "considerable

leeway in deciding in a particular case how to go about determining whether particular expert

testimony is reliable." *Id.*, 526 U.S. at 152.

> In certain circumstances, the *Daubert* reliability factors may be inapposite for
> assessing reliability, depending on the nature of the issue, the expert's particular
> expertise, and the subject of his testimony. In those cases where the *Daubert*
> reliability factors are ill-fitting, the Court may certify witnesses as experts even if
> they fail to meet any of the four *Daubert* reliability factors, as long as the Court
> determines through other methods that the witness's testimony is sufficiently
> reliable.

*United States v. Milne*, No. CR 17-1923 RB, 2017 WL 4864591, at *2 (D.N.M. Oct. 24, 2017)

(*citing and quoting from United States v. Garza*, 566 F.3d 1194, 1199 (10th Cir. 2009) (internal

quote marks omitted)). In this regard, Defendants' quote from a New Mexico federal district court

opinion addressing "experiential expert testimony" is wholly apposite here and bears repeating:

> Experiential expert testimony, on the other hand, does not "rely on anything like a
> scientific method." But this does not lead to a conclusion that "experience alone --
> or experience in conjunction with other knowledge, skill, training or education --
> may not provide a sufficient foundation for expert testimony. To the contrary, the
> text of Rule 702 expressly contemplates that an expert may be qualified on the basis
> of experience." While a district court's task in examining the reliability of
> experiential expert testimony is therefore somewhat more opaque, the district court
> must nonetheless require an experiential witness to "explain how [his] experience
> leads to the conclusion reached, why [his] experience is a sufficient basis for the
> opinion, and how [his] experience is reliably applied to the facts.

Motion [Doc. 50], at 7-8 (*quoting United States v. Goxcon-Chagel*, 886 F. Supp. 2d 1222, 1245

(D.N.M. 2012), *quoting in turn, United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007)

(alterations in original)).

> "The Federal Rules encourage the admission of expert testimony[,]" and there is a
> presumption under the Rules "'that expert testimony is admissible.'" *McCluskey*,
> 954 F. Supp. 2d at 1238 (*quoting* 4 Jack B. Weinstein & Margaret A. Berger,
> WEINSTEIN'S FEDERAL EVIDENCE § 702.02[1], at 702-5 (Joseph M. McLaughlin,
> ed., Matthew Bender 2d ed. 2012)). Rather than excluding expert testimony, the
> Supreme Court encourages "[v]igorous cross-examination, presentation of contrary

> evidence, and careful instruction on the burden of proof" to attack "shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted).

*United States v. Trejo*, No. CR 18-1243 RB, Mem. Op. and Order (09/28/2018) [Doc. 77], at 6.

> Defendant is free to point out the gaps in the experts' testimony on cross-examination, and the jury may decide how much weight to give the opinions. *See McCluskey*, 954 F. Supp. 2d at 1254, 1255 (noting that *Daubert's* direction to attack "shaky but admissible evidence" by "[v]igorous cross-examination . . . strongly suggests that the jury is to decide many issues of reliability").

*Id.*, at 20. "The rejection of expert testimony is the exception, rather than the rule." *Kraus, supra*, at 6 (*citing* Fed. R. Evid. 702 advisory committee notes).

## IV.    ARGUMENT

### A.    Dr. Stein's Testimony is Reliable.

Dr. Stein is a board-certified emergency physician with more than 20 years' experience. He holds a Master's degree in clinical research. He is a hospital director and an experienced educator. As a trained physician who is board-certified in emergency medicine, Dr. Stein has a thorough, scientific knowledge of the human body and its systems that, along with his extensive medical training, continuing medical education and review of medical literature, allows him to diagnose and treat a wide variety of ailments in the patients who arrive in the emergency departments where he works, as well as to direct the physicians under his supervision in those departments. He has testified to his vast experience dealing with – and keeping alive – persons who are in an agitated state and under the influence of illicit drugs such as the small amount of methamphetamine found at autopsy in Daniel's body. Dr. Stein will be called to testify at trial in rebuttal to the testimony of Defendants' expert medical witness, Dr. Vilke. Like Dr. Stein, Dr. Vilke is a board-certified emergency physician.

Defendants' motion to exclude Dr. Stein sets out for the Court neither Dr. Vilke's opinions nor those of Dr. Stein in rebuttal to them. The motion merely recites, without foundation, that Dr.

Stein for some alleged reason lacks the experience and training "in the issues the jury must decide," without identifying those "issues" for the Court either. Motion, at 7. To the contrary, Plaintiffs have established through Dr. Stein's Declaration, his Rule 26 Report and his deposition testimony, that he indeed has the necessary "experiential" qualifications to offer expert opinions in response to Dr. Vilke's on how and why Daniel Turner died. Dr. Stein is a proper and necessary rebuttal expert to Dr. Vilke.

Defendants' Motion mischaracterizes Dr. Stein's area of expertise, claiming it is limited to "the standard of care in a hospital setting" of emergency medicine doctors. Motion [Doc. 50], at 7. It further seeks to mislead the Court by suggesting that Dr. Stein's opinions relate to "evaluating the situation the defendant law enforcement offices encountered with Daniel in the middle of the night in a parking lot ... ." *Id.* Dr. Stein's opinions relate to the medicine and science of the human body, especially the body of "an agitated meth user," Exhibit 1 (Stein Depo.), at 39:13-40:2, and the physiological effects that occur when that already compromised body is restrained in a face down prone position.

By misstating the "relevant areas of inquiry," Defendants' Motion takes the Court in the wrong direction. Defendants acknowledge that Dr. Stein is offered as an "experiential expert." Motion, at 7-8. His substantial scientific and medical expertise and experience cannot be disputed. He has explained that in his work, he sees people like Daniel regularly, and he establishes in his written and oral testimony that he has an expert understanding of the effects of physical restraint on the physiology of a person in a face down prone position.

Defendants have identified Dr. Vilke as a rebuttal expert in response to Plaintiffs' police practice and procedures expert, Roger Clark. *See,* Williams Email to Davis (7/13/20), Ex. 1 to Plaintiff's Reply in Support of Motion to Extend Time *Nunc Pro Tunc* to Disclose a Rebuttal

Expert Witness (8/18/20) [Doc. 35-1]. Dr. Vilke has no sufficiently relevant police training or experience that will allow him to testify as an expert in response to Mr. Clark's opinions; Dr. Vilke's opinions are in fact medical in nature, and are not police-related. He has opined "to a reasonable degree of medical certainty that Mr. Turner's cardiac arrest was not caused by the actions of the officers but rather was caused by a sudden cardiac arrest due to the toxic effects of methamphetamine, ... ." Vilke Rule 26 Report [Doc. 33-3], at 1. Dr. Stein is offered as a medical expert to rebut this medical opinion. Dr. Stein's testimony is reliable and relevant. It is necessary and will be helpful in assisting the fact finder to understand the complete picture regarding the medicine and science that explain Daniel's death.

Dr. Stein addressed in his Declaration and his Rule 26 Report the five opinions Dr. Vilke set out in his Report [Doc. 33-3], at 4. He does not disagree with the third and fourth of Dr. Vilke's opinions, Stein Decl. [Doc. 33-4], at 2 ¶¶ 8-9, which as a result need not be addressed further here. Leaving aside the circular reasoning in Dr. Vilke's statement that "Mr. Turner's cardiac arrest ... was caused by a sudden cardiac arrest," the import of his first and fifth opinions for purposes of trial is that "[t]he actions of the officers to control and restrain Mr. Turner did not cause or contribute to his cardiac arrest," and thus the actions of the officers were not a factor in causing Mr. Turner's death, and that "[p]lacing Mr. Turner in a 'recovery position' would not have prevented his sudden cardiac arrest and death." Vilke Report [Doc. 33-3], at 4 ¶¶ 1, 5.

Dr. Stein disagrees with those two opinions as well as with Dr. Vilke's mischaracterization in his fourth opinion of the OMI's conclusion. Vilke Report [Doc. 33-3], at 2. The OMI Report, which Dr. Vilke incompletely summarizes, reads on this point:

> *The physical restraint applied by police officers, and the decedent's prone position (face down; limits one's ability to adequately breath) while being restrained would have contributed to the decedent's physiologic stress and are listed as contributory conditions*; therefore, the manner of death is best described as homicide.

Exhibit 4 (OMI Report), at 2 (emphasis added).

> I disagree with [Dr. Vilke's] partial summarization of the OMI findings and thus his attempt to create a partial conclusion regarding the cause of Mr. Turner's death by omitting what the OMI report clearly included as a contributing factor to his death, that is, the actions of the officers. I agree with the full OMI findings and disagree with Dr. Vilke's opinion insofar as he excludes as a contributing cause of death the actions of the officers. I disagree with Dr. Vilke's conclusion in Point 1 of his report, that 'the actions of the officers to control and restrain Mr. Turner did not cause or contribute to his cardiac arrest.' I believe that the officers' actions *did* contribute to Mr. Turner's sudden death.

Stein Decl. [Doc. 33-4], at 2 ¶ 10 (emphasis in original). *See also*, Exhibit 2 (Stein R. 26 Rpt.), at 7.

Dr. Stein proffers his expert medical opinion that Mr. Turner's cardiac arrest was brought on by a medical phenomenon known as acidosis. Acidosis occurs when lactic acid builds up from muscle exertion and for whatever reason, the body cannot properly dispel it and as a result the pH level in the body becomes imbalanced. The body balances its pH by exhaling carbon dioxide. If a sufficient pH imbalance occurs in the body, that pH imbalance disrupts the proper electrical signals to the heart and cardiac arrest will result. Dr. Stein opines that by keeping Daniel handcuffed in a face down prone position, the officers' actions prevented Daniel from exhaling carbon dioxide which in turn, along with other factors Dr. Stein readily admits to – his agitated state, his obesity, drug use, an enlarged heart – resulted in the pH imbalance that caused the cardiac arrest from which he died. Stein Decl. [Doc. 33-4], at 1-3 ¶¶ 4-6, 13-16, 18; Exhibit 2 (Stein R. 26 Rpt.), at 1-2, 6-9. Dr. Vilke agrees that Daniel's agitated state caused "increased blood acidosis." Vilke Rpt. [Doc. 33-3], at 11. The parties' expert doctors disagree as to both whether and if so, how the defendant officers' actions affected the pH levels in Daniel's blood, and to what extent Daniel's blood acidosis increased. It is to address this medical disagreement on which Dr. Stein's testimony is not only reliable and relevant, but necessary and helpful in assisting the jury.

Defendants claim that Dr. Stein is not qualified to testify as an expert witness in this case because *inter alia* he "has never studied, written or trained in cardiac arrest or acidosis ... ." Motion [Doc. 50], at 8. First, to suggest that a physician who is board-certified in emergency medicine and has more than twenty years' experience, who served for 12 years on a University of California medical school faculty, and now serves as the Medical Director of the Emergency Departments in two regional hospitals in California, "has never studied ... or trained in cardiac arrest" is simply ridiculous. Second, Dr. Stein spoke to his experience with acidosis: "[A]cidosis is a topic that is virtually ubiquitous within medicine. So I would have to say that, yes, many topics [in my continuing medical education] have arisen regarding acidosis." Exhibit 1 (Stein Depo.), at 5:10-13. *See also, Id.*, at 38:24-39:5; 39:13-19; 42:5-18; 83:22-85:23; 99:25-101:3. Dr. Stein testified further that he could count on one hand the number of patients whom he has treated with symptomology like Daniel's who have died in his care in his more than 20 years of practice. *Id.*, at 62:12-19.

Dr. Stein addressed the issue of "weight force" mentioned in Defendants' Motion [Doc. 50], at 8. He testified that although weight on Daniel's body would be a factor in his ability to ventilate, and thus in how and why he died, it was not a substantial factor because regardless whether there was weight on him or not, what caused him to die was the Defendant Officers' actions in placing Daniel in – and leaving him in – a face down prone position in which he was "unable to exhale sufficiently and maximally to offset the severe acid production in his body." Exhibit 1 (Stein Depo.), at 75:22-78:1. *See also, Id.*, at 90:18-91:11.[2]

---

[2] Dr. Stein referenced in his deposition several studies that he had reviewed and found to be sound, which address the impact of weight on the ability of restrained individuals to ventilate and contradict Dr. Vilke's opinions. Exhibit 1 (Stein Depo.), at 77:2-78:1.

Dr. Stein's Declaration and Rule 26 Report explain in exhaustive detail why he concludes as he does that Daniel Turner died due to his "inability to manage the acid build up in his body by constricting his ability to exhale CO2," Stein Decl. [Doc. 33-4], at 2-3 ¶ 14. He describes the medical science involved in the ultimately fatal acidotic build up in Daniel's body. *Id.*, at 1-2 ¶¶ 5-6; Exhibit 2 (Stein R. 26 Rpt.), at 4-6. *See also*, Exhibit 1 (Stein Depo.), at 65:23-66:25; 91:21-94:6; 97:14-22 (describing physiological progression that led to Daniel's death). His explanation is logical and tethered to the science of the body and the chemical reactions that occur in the body in circumstances relevant to those in this case, an agitated and obese man under the influence of illicit drugs placed in a face down prone position and handcuffed:

> It is my medical opinion to a reasonable degree of medical probability that the officers' involvement had a direct effect on the medical issues that Mr. Turner was experiencing.

> It is my medical opinion to a reasonable degree of medical probability that whether the officers merely held Mr. Turner in place, face down, so that the weight of his body restricted his own breathing, or applied any further force and weight on his body in addition, their actions contributed to Mr. Turner's inability to manage the acid build up in his body by constricting his ability to exhale CO2, and that he succumbed because of it.

> …

> While it is possible that when the police first encountered Mr. Turner, his pH balance was compromised to the point that simply placing him face down into a prone position on his stomach and either pinning him or applying additional weight to him in order to handcuff him was enough to push Mr. Turner beyond his body's ability to rebalance his pH, it is my opinion, to a reasonable degree of medical probability, that that is unlikely. Looking again to the video, I see Mr. Turner moving for over a minute after he is handcuffed. This indicates to me that his body is still partially compensating for the pH imbalance. It is my opinion, to a reasonable degree of medical probability, that his efforts were insufficient to overcome the increasing pH imbalance, leading to lethality. It is my medical opinion, to a reasonable degree of medical probability, that had Mr. Turner been turned to his side, on to his back or had he been sat up, there is a high likelihood he would either have regained the pH balance his body was seeking by being able to exhale CO2, or at least he would have survived long enough for the proper

medications available to first responders who arrived on scene or to doctors at the hospital to be administered.

> [I][t is my opinion, to a reasonable degree of medical probability, that the conduct of the officers I observed in the video contributed to Mr. Turner's inability to manage his pH levels through the exhalation of CO2, and thus played a part in his resultant death.

Stein Decl. [Doc. 33-4], at 2-3 ¶¶ 13, 14, 16, 18. *See also*, Exhibit 2 (Stein R. 26 Rpt.), at 4-6, 6-9; Exhibit 1 (Stein Depo.), at 26:20-27:22; 28:13-29:9; 35:20-37:5.

Experiential expert testimony is reliable when the experiential witness has "explain[ed] how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts." *Goxcon-Chagel*, 886 F. Supp. 2d at 1245 (citation and internal quote marks omitted). Dr. Stein has done that here. His opinions are not a product of guesswork or speculation. They evidence the considered judgment of a trained, skilled and experienced physician explaining the medicine and science of Daniel Turner's death based on, as he describes it, "Mr. Turner's inability to manage his pH levels through the exhalation of CO2," because the officers placed and kept Daniel face down and prone, which, he opines, "played a part in his resultant death."

Dr. Stein's criticism of the studies on which Dr. Vilke relies is equally supported by his experience, both as an emergency medicine doctor with more than 20 years' experience and as a Master's level clinical research scientist. His experience and training further support his clinical research-related explanation why the studies relied upon by Dr. Vilke and which he criticizes are inapposite to the facts of this case.

Dr. Stein's opinions are reliable as that term has meaning under Rule 702.

## B. Dr. Stein's Testimony is Relevant.

Dr. Stein's opinions directly address the toxic and fatal medical effect to which the Defendant Officers' actions contributed in causing Daniel Turner's death. The officers placed Daniel – and kept him – face down in a prone position, rather than to get him up off his belly, which in Dr. Stein's expert medical opinion, played a part in "Mr. Turner's inability to manage his pH levels through the exhalation of $CO_2$," and which in turn caused his death.[3] Dr. Stein's opinion, then, is directly relevant to a central issue in this case – whether the Defendant Officers' actions contributed to or were a cause of Daniel Turner's death.

If the Defendant Officers' actions did not contribute to his death, Plaintiffs' action fails. If their actions did contribute to his death, the jury will be tasked with addressing the next relevant question in deciding the Defendants' liability, whether their actions which contributed to Daniel's death constituted an objectively unreasonable use of excessive or unnecessary force that violated his Fourth Amendment right to be free from an unlawful seizure and constituted a tort under state law. That issue is a police practice and procedure issue and is admittedly outside the scope of Dr. Stein's expertise. Dr. Stein acknowledged as much in his Declaration [Doc. 33-4], at 3 ¶ 17, and thus is not before this Court on the instant motion.[4]

---

[3] It should not be lost on this Court that a reading of the entire conclusion of the OMI, rather than the abbreviated portion of it provided by Defendants in their Motion [Doc. 50], which parroted the abbreviated portion of it relied upon by Dr. Vilke in his report, establishes that Dr. Stein's opinion squares with that of the OMI, that the officers' actions played a part in Daniel's death. *Compare*, Stein Decl. [Doc. 33-4], at 2, ¶ 10, *and* Exhibit 2 (Stein R. 26 Rpt.), at 7, *with*, Exhibit 4 (OMI Report), at 2.

[4] Plaintiffs will argue elsewhere that this police practice and procedure issue is outside Dr. Vilke's expertise as well. The objection to the admissibility of an expert's opinion based on foundation, that is, the witness' lack of experience or training, may be addressed by a court not only in a *Daubert* motion but also "when asked to rule on a motion in limine, [or] on an objection during trial … ." *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000) (citation omitted).

Nor is there any question before the Court as to whether the nature of Dr. Stein's expert testimony is within "the jurors' common knowledge and experience," or "whether the expert's testimony may usurp the jury's primary role as the evaluator of the evidence." Motion [Doc. 50], at 5. While Defendants made these statements in their recitation of the boilerplate law on the admissibility of expert testimony, they do not argue anywhere in their Motion that either of these issues is in play here. Nor could they be. Dr. Stein's expert testimony, like Dr. Vilke's, is expert medical testimony and therefore not within "the jurors' common knowledge and experience." And as set forth above, Dr. Stein's testimony addresses whether, as a matter of medicine and science, the Defendant Officers' actions in placing and keeping Daniel in a face down prone position played a role in his death. Dr. Stein offers no opinion on the ultimate fact for the jury, whether the Defendant Officers' alleged failure to timely get Daniel off his belly and out of a prone position, *i.e.*, into a "recovery position," constituted a violation of Daniel's Fourth Amendment rights under federal law and a tort under state law.

## CONCLUSION

Dr. Stein is qualified by his demonstrated training and experience in the field of emergency medicine to offer the opinions he does. His opinions are both reliable and relevant. They will assist the jury on medical and scientific issues that are outside "the jurors' common knowledge and experience." Dr. Stein has established the scientific and medical foundation for those opinions and has properly linked them to the facts of this case such that they are tethered and not speculation or guesswork. Particularly when viewed through the well settled law under Rule 702, both that expert testimony is presumed to be admissible and that the rejection of expert testimony is the exception rather than the rule, Dr. Stein's expert witness testimony is admissible.

Defendants' Motion to Exclude the Expert Testimony of Dr. Stein is not well taken and should be denied.

Respectfully submitted,

DAVIS LAW NEW MEXICO

*/s/ Nicholas T. Davis*
Philip B. Davis
Nicholas T. Davis
1000 Lomas Blvd. NW
Albuquerque, NM 87102
(505) 242-1904
(505) 242-1864 facsimile
phil@davislawnm.com
nick@davislawnm.com

*Counsel for Plaintiffs*

I hereby certify that the foregoing was served on all counsel of record by email and was electronically filed with the Court via the CM/ECF system on this 2nd day of November, 2020.

*/s/ Nicholas T. Davis*
Nicholas T. Davis

*i*