IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

DENNIS MURPHY, as Personal Representative
of the Estate of DANIEL TURNER, deceased,
and WALTER and TAMARA TURNER,

        Plaintiffs,

v.                                                                                                                                  No. CIV 19-0639 RB/JFR

THE CITY OF FARMINGTON, and JAMES
PRINCE, JAMES MOORE, ZACK WOOD, and
JESSE GRIGGS, in their individual capacities,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

      This matter is before the Court on Defendants' Motion to Exclude Plaintiffs' Expert Witness Dr. Stein, filed October 15, 2020. (Doc. 50.) Having considered the parties' arguments and the relevant law, the Court will deny the motion.

**I.    Background**

      Daniel Turner died while being restrained by Farmington Police Department law enforcement officers. (*See* Doc. 1.) His estate and parents bring a claim for excessive force under 42 U.S.C. § 1983 and the Fourth Amendment and for wrongful death and loss of consortium under the New Mexico Tort Claims Act. (*See id.*) Defendants disclosed emergency department physician Gary M. Vilke, M.D., FACEP, FAAEM, "to testify concerning positional or restraint asphyxia[1] related to the death of Mr. Turner and his cause of death . . . ." (*See* Doc. 34 at 2; *see also* Doc. 33-3 at 1.) Specifically, Dr. Vilke will opine that Mr. Turner died as the result of "a sudden cardiac

---

[1] Dr. Stein defines "positional asphyxia" as "the legal terminology" describing cases in which "the position of the victim did not allow for sufficient respiratory function, eventually causing death. Definitions of asphyxia in layperson's terms typically discuss a deprivation of oxygen as the cause." (Doc. 61-2 at 4.)

arrest due to an enlarged heart along with the effects of methamphetamine and physiologic stress." (*See* Doc. 61-2 at 7 (quoting Doc. 33-3 at 4).) Dr. Vilke will also opine that "the actions of the offers to control and restrain Mr. Turner did not cause or contribute to his cardiac arrest." (*See id.* (quoting Doc. 33-3 at 4).)

Plaintiffs disclosed emergency department physician John Stein, M.D. to rebut some of Dr. Vilke's opinions. (*See* Doc. 61 at 5.) Dr. Stein "believe[s] that the officers' actions *did* contribute to Mr. Turner's sudden death." (Doc. 61-2 at 7.) He will opine that by holding Mr. Turner on the ground, face down, Mr. Turner was unable "to manage the lactic acid build up in his body by constricting his ability to exhale [carbon dioxide], and that he succumbed because of it." (*Id.* at 8.) Dr. Stein refers to this build-up of lactic acid as "acidosis."[2] (*See* Doc. 61-2 at 5.) Dr. Stein believes that regardless of whether the officers applied weight to Mr. Turner's body, the way that they positioned him led to the acidosis Mr. Turner experienced, which caused the cardiac arrest. (*See id.* at 7–8.) Defendants now seek to exclude Dr. Stein on the basis that he "does not have the relevant or applicable expertise to render [his] opinions . . . ." (Doc. 50 at 1.)

**II.   Legal Standard**

Federal Rule of Evidence 702 governs whether expert testimony is admissible. It provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

---

[2] He explains that "[c]arbon dioxide is . . . an acid when circulating in the bloodstream." (Doc. 61-2 at 5.) When "acid levels rise in the body, the respiratory system kicks into action, and the lungs eliminate carbon dioxide at a higher rate from the body, by maximizing the ventilatory drive, and thus balancing the acid level back towards normal." (*Id.*) An individual experiencing "acute acidosis rel[ies] on their ability to drive the acid level back towards normal by increasing their breathing and exhaling carbon dioxide. If the ability to maintain that balance is compromised, it can . . . lead to cardiac arrest . . . ." (*Id.* at 6.)

2

> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

"Rule 702 incorporates the principles of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co., Ltd v. Carmichael*, 526 U.S. 137 (1999), to ensure that proffered expert testimony is both relevant and reliable." *Tom v. S.B. Inc.*, No. CIV. 10-1257 LH/WPL, 2013 WL 3179108, at *1 (D.N.M. Mar. 22, 2013) (citing Fed. R. Evid. 702, 2000 Amendments).

The Court performs a two-part analysis to determine admissibility: "1) the court must determine whether the expert is qualified by knowledge, skill, experience, training, or education to render an opinion; and 2) if the expert is so qualified, the court must determine whether the expert's opinion is reliable and helpful under the principles set forth in *Daubert*." *Id.* (citing *103 Invs. I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006)). "*Daubert*'s general holding setting forth the judge's gate-keeping obligation applies not only to testimony based on scientific knowledge, but also to testimony based on technical or other specialized knowledge." *Joe-Cruz v. United States*, No. CV 16-258 JCH/JHR, 2018 WL 1322139, at *2 (D.N.M. Mar. 14, 2018) (citing *Kumho Tire*, 526 U.S. at 141). The Court enjoys broad discretion in determining admissibility and reliability. *See Tom*, 2013 WL 3179108, at *2; *United States v. Velarde*, 214 F.3d 1204, 1208 (10th Cir. 2000).

Here, Defendants largely contest only the first element—Dr. Stein's qualifications. "An expert must 'stay[ ] within the reasonable confines of his subject area.'" *Joe-Cruz*, 2018 WL 1322139, at *2 (quoting *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001)); (citing *Graves v. Mazda Motor Corp.*, 675 F. Supp. 2d 1082, 1093 (W.D. Okla. 2009) ("[T]he expert's qualifications must be both (i) adequate in a general, qualitative sense (i.e.,

'knowledge, skill, experience, training or education' as required by Rule 702) and (ii) specific to the matters he proposes to address as an expert.")). "[M]erely possessing a medical degree is not sufficient to permit a physician to testify concerning any medical-related issue." *Id.* (quoting *Ralston*, 275 F.3d at 970).

"The Federal Rules encourage the admission of expert testimony." *Id.* at *3 (citing 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 702.02[1], at 702-5 (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. 2012)). "As the Court in *Daubert* stated: 'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id.* (quoting Fed. R. Evid. 702 Advisory Committee's note to 2000 amendment (quoting *Daubert*, 509 U.S. at 596)).

Defendants challenge Dr. Stein's qualifications to offer an expert opinion "as to whether the mechanics of physical restraint caused [Mr. Turner's] death[,]" because "[h]e is not an expert on law enforcement officers dealing with subjects in the field and the physiologic responses of police control and restraint techniques." (Doc. 75 at 4–5.) The parties have submitted and relied on expert reports and portions of deposition transcripts, and the Court finds a hearing is unnecessary. *Joe-Cruz*, 2018 1322139, at *3 (citing *Ho v. Michelin N. Am., Inc.*, 520 F. App'x. 658, 664 (10th Cir. Mar. 29, 2013) (concluding court permissibly exercised its discretion in ruling on *Daubert* motion without hearing where it had before it several expert reports, expert deposition transcripts, and other evidence to accompany parties' arguments)).

**III.   Analysis**

Plaintiffs have offered the testimony of Dr. Stein to rebut Dr. Vilke's testimony and to help establish their theory regarding Mr. Turner's cause of death. Plaintiffs contend, and Dr. Stein will

4

opine, that the arresting officers' actions contributed to Mr. Turner's death. (*See, e.g.*, Doc. 61-2.) Defendants do not contest Dr. Stein's expertise as an emergency medicine physician. (Doc. 75 at 5 ("Dr. Stein is an expert emergency medicine physician.").) Instead, they argue that his "expertise in responding as a physician to a medical emergency in an emergency room or jail clinic setting" is inapplicable under the factual circumstances of this case. (*Id.*)

At the outset, the Court agrees with Defendants that Dr. Stein's CV, testimony, and Rule 26 report show that he is qualified to express medical opinions concerning treatment of individuals in emergency department and jail settings. (*See* Doc. 75 at 5 (noting that "Dr. Stein has expertise in responding as a physician to a medical emergency in an emergency room or jail clinic setting").) Dr. Stein is currently the Chairman and Medical Director of Emergency Medicine at Sutter Santa Rosa Regional Hospital and Sutter Lakeside Hospital in California. (*See* Doc. 61-3 at 1.) He has practiced medicine since 1997 and has been board-certified as an emergency medicine physician since 2002. (*See id.*; *see also* Doc. 61-2 at 1.) In 2000, he was certified by both the American Heart Association for Advanced Cardiac Life Support and by the American College of Surgeons for Advanced Trauma Life Support. (*See* Doc. 61-3 at 1.) Dr. Stein "was a faculty member and Vice Chair of the Department of Emergency Medicine at the University of California San Francisco for 12 years . . . ." (*See* Docs. 61-2 at 1; 61-3 at 1.) Before attending medical school, he worked for two to three years as an EMT and has "experience working in conjunction with law enforcement officers in that role[.]" (Doc. 61-1 at 6:4–19.)

Before turning to Dr. Stein's specific opinions, it is helpful to review the opinions of Defendant's expert, Dr. Vilke, who summarizes his opinions into five points:

1. The actions of the officers to control and restrain Mr. Turner did not cause or contribute to his cardiac arrest.

2.     I disagree with plaintiff's use of force expert Roger Clark when he opines that the weight of the officers "could significantly contribute to a positional asphyxia condition."
3.     Mr. Turner was exhibiting clinical signs of methamphetamine intoxication and untreated or undertreated schizophrenia during his encounter with the officers which is consistent with the results of his medical history and toxicology screen.
4.     I agree with the medical examiner that the cause of death of Mr. Turner was a sudden cardiac arrest due to an enlarged heart along with the effects of methamphetamine and physiologic stress.
5.     Placing Mr. Turner in a "recovery position" would not have prevented his sudden cardiac arrest and death.

(Doc. 33-3 at 2.) Dr. Stein ties his opinions directly to these five points, albeit in a different order. (*See* Doc. 61-2.) For ease of reference, the Court's analysis will track Dr. Stein's opinion.

    **A.**     **Points Three and Four**

Dr. Stein agrees with point three, "that Mr. Turner was exhibiting clinical signs of methamphetamine usage, and possibly other mental health issues." (Doc. 61-2 at 6.) Defendants do not make any argument regarding Dr. Stein's qualifications to offer an opinion on whether Mr. Turner exhibited signs of methamphetamine use or schizophrenia. (*See* Docs. 50; 75.)

Dr. Stein agrees with point four, that Mr. Turner died as a result of "a sudden cardiac arrest due to an enlarged heart along with the effects of methamphetamine and physiologic stress." (Doc. 61-2 at 7.) He disagrees, however, to the extent that Dr. Vilke's opinion is a "partial summarization of the OMI findings and thus [an] attempt to create a partial conclusion regarding the cause of Mr. Turner's death by omitting what the OMI report clearly included as a contributing factor to his death, that is, the actions of the officers." (*Id.*) Again, Defendants do not argue that Dr. Stein is unqualified to render this opinion, or that his opinion on point four is somehow unreliable. (*See* Docs. 50; 75.) In response to Plaintiffs' contention that Dr. Vilke and Defendants

"mischaracterized the OMI report by omission" (Doc. 61 at 4), Defendants "agree that the facts in the [OMI] report . . . are the best evidence of what [the] OMI found" (Doc. 75 at 2).

The Court finds that Dr. Stein is qualified to opine on these matters. Dr. Stein testified that he has "seen hundreds of cases of methamphetamine intoxication" (Doc. 61-2 at 6), and he has "extensive personal experience in the Emergency Department with similar patients" (Doc. 61-1 at 24:8–10). Dr. Stein bases his opinion with respect to point three "on the conduct [he] observed in the [officers' video footage of the incident], the reports of Mr. Turner's conduct in the OMI report, and the toxicology on Mr. Turner." (Doc. 61-2 at 6.) Based on his experience and the evidence, he opined that "Mr. Turner, prior to his encounter with the officers, was displaying the signs and symptoms of methamphetamine ingestion, including increased movement, agitation, inability to sit still, inability to focus[,] and erratic behavior." (*Id.* at 6–7.) Regarding point four, Dr. Stein relied exclusively on the language of the OMI report, which Defendants agree is the best evidence. The Court finds that Dr. Stein's relevant experience is sufficiently related to his opinions, has been reliably applied to the facts here, and would be helpful to the jury.

B. **Points One, Two, and Five**

Dr. Stein disagrees with Dr. Vilke's opinion in point one, that the officers' actions "did not cause or contribute to [Mr. Turner's] cardiac arrest." (Docs. 33-3 at 2; 61-2 at 7.) Instead, Dr. Stein believes "that the officers' involvement had a direct effect on the medical issues that Mr. Turner was experiencing." (Doc. 61-2 at 8.) Dr. Stein opines that by holding "Mr. Turner in place, face down, so that the weight of his body restricted his own breathing," the officers—regardless of whether they put additional weight on Mr. Turner's body—"contributed to Mr. Turner's inability to manage the lactic acid build up in his body by constricting his ability to exhale [carbon dioxide], and that he succumbed because of it." (*Id.*) Relatedly, Dr. Stein largely declines to opine on point

7

two, as police practice and procedures are outside of his area of expertise. (*Id.* at 9.) He goes on to opine that "from a medical standpoint," he "agree[s] with the conclusion drawn by Mr. Clark, that the conduct of the officers [he] observed in the video contributed to Mr. Turner's inability to manage his acidosis by restricting the exhalation of carbon dioxide, and thus played a part in his resultant death." (*Id.*) Finally, regarding point five, Dr. Stein disagrees with Dr. Vilke and opines that "had Mr. Turner been turned to his side, on to his back or had he been sat up, there is a very high likelihood that he would either have regained the ability to balance his acidosis, or at least he would have survived long enough for the proper interventions available to first responders . . . ." (*Id.*)

Defendants contend that Dr. Stein is not qualified to opine on Mr. Turner's cause of death or to respond to Dr. Vilke's related opinions. First, they argue that he has done no independent research into the relevant areas—*i.e.*, acidosis, cardiac arrest, or the impact of weight on breathing. (*See* Doc. 50 at 2.) Yet, Plaintiffs have established that Dr. Stein has "extensive personal experience" with patients who present in the emergency room with acidosis and cardiac arrest. (*See* Docs. 61-1 at 24:8–10; 33-4 at 1.) He also has personal experience as an emergency physician with patients who have gone into cardiac arrest due to acidosis (*see* Doc. 61-2 at 8; *see also id.* at 6 (stating that "[m]any . . . emergency physicians have caused or nearly caused patients to go into cardiac arrest in the process of attempting to take over the ventilatory function of someone with severe acidosis, and [are] . . . aware of how rapidly the clinical situation can deteriorate when acidosis becomes severe")), and personal knowledge regarding how weight or pressure may reduce lung function (*see id.* at 6, 8). Moreover, Dr. Stein reviewed medical literature relevant to Dr. Vilke's medical opinions and [his] own" on these topics, including one entitled "The role of

8

restraint in fatal excited delirium: a research synthesis and pooled analysis"[3] (*see id.* at 4), another detailing a study on acidosis in "restrained patients who are agitated and high on stimulants"[4] (*see, e.g.*, Doc. 61-1 at 24:11–20, 84:2–85:23), and other studies on how weight or pressure on restrained individuals can affect lung function[5] (*see* Doc. 61-2 at 2, 4, 6). Notably, Defendants have lodged no criticisms of the medical literature Dr. Stein reviewed. That Dr. Stein reviewed, rather than conducted, these studies, may be explored on cross-examination and will go to the weight of his testimony.

Next, Defendants contend that Dr. Stein is not qualified because he has not trained officers in the topic areas and/or he is not an expert on the relevant police procedure or standard of care (*See, e.g.*, Docs. 50 at 2, 7; 75 at 5, 8–9.) But Defendants confuse the issues. Plaintiffs do not offer Dr. Stein's testimony to help the jury decide whether the officers' actions violated any officer standard of care or police procedure, but only to help the jury decide whether the officers' actions contributed to Mr. Turner's death. This inquiry involves Dr. Stein's medical opinion, based on his own knowledge, experience, review of medical literature, and review of the exhibits in this case, regarding Mr. Turner's cause of death. Dr. Stein need not—nor may he—comment on the propriety of the officers' actions, but he may opine on whether Mr. Turner's condition and/or death was impacted by the officers' actions.

---

[3] Strommer, Leith, Zeegers, Freeman, *The role of restraint in fatal excited delirium: a research synthesis and pooled analysis*, Forensic Science, Medicine & Pathology (July 2020).

[4] *See* Hick, Smith, Lynch, *Metabolic acidosis in restraint-associated cardiac arrest: a case series*, Academic Emergency Medicine (March 1999).

[5] Barnett, Stirling, Pandayan, *A review of the scientific literature related to the adverse impact of physical restraint: gaining a clearer understanding of the physiological factors involved in cases of restraint-related death*, Medicine, Science, and the Law (July 2012); Barnett, Stirling, Hanson, Pandayan, *Physiological impact of upper limb position on prone restraint*, Medicine, Science, and the Law (July 2013).

Finally, Defendants argue that "Dr. Stein has no expertise in the use of restraint physiology, which involves restraining a person who is intent [on] causing harm to himself or others or is attempting to abscond." (Doc. 75 at 5.) They assert that he is not qualified to opine on this issue as has he has not performed research into "restraint physiology or studied restraints as used in [] real life out of hospital situations." (*Id.*) Dr. Stein testified, however, that he is personally involved in restraining patients on a weekly basis. (*See* Doc. 61-1 at 21:15–22:6.) He offered testimony regarding how restraint in the hospital or the field affects cardiac functioning and the patient's blood pH levels based on his own experience and on a review of relevant medical literature. (*Id.* at 22:19–25:21.) Dr. Stein "may have less experience" regarding the effects of restraint than some physicians, "but [he] does—as a medical doctor—have knowledge, experience, education and training with which [he] can consider the circumstances with more expertise than a layperson. Thus, the attack on [his] qualifications goes more to the weight of [his] expertise than it goes to [his] qualifications." *See Nicholson v. Evangelical Lutheran Good Samaritan Soc'y, Inc.*, No. CV 16-0164 JB/KK, 2017 WL 3127799, at *35 (D.N.M. July 21, 2017) (citation omitted).

Plaintiffs offer Dr. Stein as an experiential expert. (*See* Doc. 61 at 7.)

> Experiential expert testimony . . . does not rely on anything like a scientific method. But this does not lead to a conclusion that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. While a district court's task in examining the reliability of experiential expert testimony is therefore somewhat more opaque, the district court must nonetheless require an experiential witness to explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts.

*United States v. Goxcon-Chagal*, 886 F. Supp. 2d 1222, 1244 (D.N.M. 2012), *aff'd sub nom. United States v. Medina-Copete*, 757 F.3d 1092 (10th Cir. 2014) (quoting *United States v. Wilson*,

484 F.3d 267, 274 (4th Cir. 2007) (quotation marks omitted)). Here, Plaintiffs have met their burden to show that Dr. Stein, as a practicing physician who is board-certified in emergency medicine and who has ample experience treating patients with comparable symptoms, is qualified by education, training, and experience to opine on Mr. Turner's cause of death and on whether the officers' actions had any effect on Mr. Turner's death. Defendants have presented no authority that would persuade the Court that Dr. Stein's lack of independent research or inexperience with police procedures or restraint outside of the hospital disqualify him from rendering his opinions. Instead, Defendants may explore these issues on cross-examination, as their arguments go to the weight, rather than to the admissibility, of his opinions. *See Joe-Cruz*, 2018 WL 1322139, at *4.

**THEREFORE,**

**IT IS ORDERED** that Defendants' Motion to Exclude Plaintiffs' Expert Witness Dr. Stein (Doc. 50) is **DENIED**.

_____
ROBERT C. BRACK
SENIOR U.S. DISTRICT JUDGE