DENNIS MURPHY, as Personal Representative
of the Estate of DANIEL TURNER, deceased,
and WALTER and TAMARA TURNER,

       Plaintiffs,

v.                                       No. CIV 19-0639 RB/JFR

THE CITY OF FARMINGTON, and JAMES
PRINCE, JAMES MOORE, ZACK WOOD, and
JESSE GRIGGS, in their individual capacities,

       Defendants.

## MEMORANDUM OPINION AND ORDER

Late one night in 2018, dispatch for the Farmington, New Mexico Police Department (FPD) broadcast a call for medical assistance. The subject, Daniel Turner, was suspected to be under the influence of drugs, acting in an aggressive manner to his parents, and engaging in self-harming behavior. Officers James Prince, Zack Wood, Mark Moore,[1] and Sergeant Jesse Griggs responded to the call. Dash camera video evidence shows that the officers handcuffed Daniel on his stomach 3 minutes and 25 seconds into the incident. Shortly thereafter, Griggs stated that the officers had control of the situation. When Daniel continued to struggle in this prone position, however, the officers put pressure on his extremities for another three minutes. Approximately one minute after Daniel stopped moving, the officers discovered that he had stopped breathing and began to unhandcuff him, turn him over, and check for a pulse. Officers began CPR, and paramedics continued lifesaving measures when they arrived, but they were unsuccessful.

Daniel's parents and his personal representative, Dennis Murphy, have brought federal and

---

[1] Moore is incorrectly identified in the Complaint as James Moore. (*See* Doc. 51 at 1.)

state claims against the officers and the City of Farmington. The officers move for summary judgment on qualified immunity grounds on Count I: the claim for excessive force under the Fourth Amendment. Plaintiffs have not shown that clearly established law put officers on notice that it would violate an individual's constitutional rights if officers kept a person handcuffed in a prone position for at least three minutes, under circumstances where the person may be under the influence of drugs and is actively struggling or resisting but does not pose an obvious threat to others. Accordingly, the Court finds the officers are entitled to qualified immunity and will grant the motion.

## I.      Statement of Facts[2]

### A.      Defendants' Encounter with Daniel

On June 27, 2018, Walter Turner called 911 to get help for his son, Daniel. (*See* Doc. 1 (Compl.) ¶¶ 14–15; *see also* Doc. 63-11 at 1.) "Walter informed dispatch that . . . Daniel was running through the streets and banging his head on the ground." (Compl. ¶ 15.) FPD officers were dispatched to an address "in reference to an [Emergency Medical Services (EMS)] assist." (Doc. 63-5 at 1; *see also* Doc. 63-2 at 14:25–15:2.) In an EMS assist or "medical assist" call, officers respond "to ensure the safety of fire and medic personnel and to make sure that [the] scene is secure for them." (Doc. 63-7 at 39:1–5.) Prince was the first to arrive on scene and understood that Daniel may have been fighting or struggling with Walter, was possibly on methamphetamines, and might "need to go to the hospital." (Docs. 63-2 at 14:25–15:2; 63-9 at 1.)

Prince's dash and lapel cameras both recorded the incident.[3] (*See* Docs. 51-C; 63-3.) When

---

[2] In accordance with summary judgment standards, the Court recites all admissible facts in a light most favorable to Plaintiffs. Fed. R. Civ. P. 56; *see also Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). The facts are undisputed unless noted.

[3] The Court finds that the dash camera video provides a clearer picture of the incident. (*See* Doc. 51-C.)

Prince arrived, Daniel's parents were on either side of him. (*See* Doc. 51-C at 1:16.) Walter was on the phone, and it appears that the Turners were helping Daniel get up. (*See id.*) Prince got out of the car. (*Id.* at 1:26.) Daniel appears to push or grab his mother (Tamara), and Walter said, "Stop! Leave your mom alone." (*Id.* at 1:27–29.) Daniel fell straight backward, landing hard on the pavement. (*Id.* at 1:31.) Daniel began to bang his head on the ground. (*Id.* at 1:37.) Prince informed dispatch that Daniel was hitting his head on the ground and confirmed that medical personnel were responding. (*Id.* at 1:41.) The Turners told Daniel to stop and placed a towel under his head. (*Id.* at 1:42–48.) Prince approached to get more information. (*See* Doc. 63-2 at 18:2–15.)

Prince knelt next to Daniel and introduced himself. (Doc. 51-C at 1:52–2:05.) Daniel struggled and flailed his arms and legs; his mother repeatedly asked him to stop. (*Id.*) Daniel lifted his head and upper torso off the ground and began to bang them onto the pavement. (*Id.* at 2:11.) Daniel grabbed at Walter and Walter responded, "don't grab my foot." (*Id.* at 2:16.)

The Turners and Prince tried to control Daniel's movements. (*Id.* at 2:19.) Prince's intent was "to make sure [Daniel] stay[ed] as close to the ground as possible," so he could not injure his head from banging it or falling again. (*See* Doc. 63:2 at 21:14–24.) Walter was on Daniel's right side, Tamara was at Daniel's feet, and Prince was on his left side with his back to the dash camera. (Doc. 51-C at 2:25.) Daniel was on his back, scooting and struggling in apparent resistance. (*Id.*) Prince said, "I'm here to help you," and "it's ok, bud." (*Id.* at 2:34–36.) Prince tried to get hold of Daniel's right arm, but Daniel flailed and his arm moved quickly toward Prince's mid-section. (*Id.* at 2:36–37.) As a result, Prince leaned or was pushed backward, then Prince hit Daniel three times in or around his head in quick succession. (*Id.* at 2:36–39.) Walter yells, "stop, stop, stop!" (*Id.* at

2:38.) Prince said, "don't grab that man—he grabbed my fucking taser, man."[4] (*Id.* at 2:40–42.) Walter responded, "don't punch him in the face!" (*Id.* at 2:48.) Prince later described these hits as "a distraction technique[,]" which is used "to distract somebody so that they stop doing something." (Doc. 63-2 at 28:7–9.) Prince testified that although Daniel was conscious at this time, it appeared that Daniel was under the influence of a substance and was not completely alert. (*Id.* at 26:1–8.)

Griggs, who was the supervisor on duty that night, ran onto the scene immediately after Prince administered the distraction technique. (Doc. 51-C at 2:47; *see also* Doc. 63-7 at 40:10–13.) Griggs testified that he understood from dispatch that "Daniel was under the influence of something, possibly on meth." (Doc. 63-7 at 40:14–17.) Griggs also recalls dispatch conveyed additional information "that Daniel was being aggressive and was pushing and pulling [Walter]." (*Id.* at 40:21–24.) Griggs had the impression that "there was a lot of commotion, . . . like there was an active fight going on between Daniel and Walter, and possibly even the mother." (*Id.* at 41:4–7.) He also testified that he heard Prince say that Daniel grabbed at his taser. (*See id.* at 52:6–10.)

Griggs stepped in to assist Prince and the Turners. (Doc. 51-C at 2:50.) Moore arrived on scene. (*Id.* at 2:55.) Moore heard from dispatch that there was a struggle between Daniel and Walter "and that Daniel was attempting self-harm by hitting his head on the ground." (Doc. 63-8 at 38:23–39:1.) The three officers and the Turners rolled Daniel onto his stomach. (Doc. 51-C at 3:02.) The officers maneuvered Daniel's arms, and Moore started to handcuff him. (*Id.* at 3:07–21.) At some point, Griggs "positioned [his] right knee diagonally across Daniel's right shoulder toward his lower back, applying minimal weight." (Doc. 63-5 at 2.) Daniel struggled while he was

---

[4] Plaintiffs purport to deny that Mr. Turner grabbed Prince's taser (*see* Doc. 63 at 2), but they agree that Mr. Turner flailed his arms (*see id.* (citing Doc. 51-3 at 1:06–13)) and do not deny that Prince had the impression that Mr. Turner grabbed his taser (*see id.*).

being handcuffed, and one of the officers said, "stop man, just relax for a second, ok?" (Doc. 51-C at 3:14.) Daniel, now in a prone, facedown position, kicked his feet, audibly hitting them against the pavement. (*Id.* at 3:20.) Moore finished handcuffing Daniel. (*Id.* at 3:25.) Daniel's struggles decreased but did not stop completely. (*See id.* at 3:25–48.) Moore and Griggs stood up.[5] (*Id.* at 3:25–35.) Griggs briefly spoke to the Turners, and they moved away. (*Id.* at 3:38–46.) Prince tried to pin Daniel's right leg up toward his buttock for up to 11 seconds, and Daniel's struggles noticeably increased. (*Id.* at 3:49–4:00.) The officers tried to calm him, saying, "Daniel, hey bud, just breathe. Hold on man, hold on." (*Id.* at 3:51–53.) Daniel struggled more, and Prince and Moore held either arm to restrict his movement. (*Id.* at 4:01–10.) Daniel audibly banged his head on the pavement again. (*Id.* at 4:11.)

Wood arrived on the scene. (*Id.* at 4:14.) Wood had information from dispatch that Daniel "was starting to get violent with [Walter]" and had run from him. (Doc. 63-4 at 23:2–10.) Prince asked Wood to hold Daniel's feet up. (Doc. 51-C at 4:14–15.) Wood briefly tried to get control of Daniel's legs, but Daniel kicked and flailed and Wood was unable to control his legs in that manner. (*Id.* at 4:17–21; *see also* Doc. 63-10 at 1.) Griggs testified that he directed Wood to "just let him kick, . . . he's not gonna hurt anybody. We have control." (Doc. 63-7 at 68:11–13.) The four officers applied downward pressure to Daniel's extremities: Prince had a shin across Daniel's right arm; Griggs put his right knee on Daniel's left arm; Wood put his shin across Daniel's right leg; and Moore held Daniel's left leg. (*See* Docs. 51-C at 4:30; 63-2 at 34:2-3; 63-10 at 1; 63-8 at 41:2–8.) Prince testified that he did not need to put body weight on Daniel, as there were four officers there to control him. (Doc. 63-2 at 43:2–17.) Each officer described Daniel's struggles as "resistance to" or "trying to get free" from their attempts to subdue him. (*See* Docs. 63-2 at 38:22–

---

[5] Griggs remained in a standing position, not touching Daniel, until about 4:26. (*See* Doc. 51-C.)

39:3 (Prince); 63-7 at 69:4–7 (Griggs); 63-8 at 40:14–18 (Moore); 63-10 at 1 (Wood).)

Officers reassured Daniel that "Hey bud, it's ok, just breathe. Breathe, ok? We've got paramedics coming to help you, ok?" (Doc. 51-C at 4:31–36.) Daniel continued to occasionally move his body and hit his head on the ground. (*See, e.g.*, 4:36–51.) One or two officers had a hand near Daniel's head and/or shoulders, presumably to prevent him from hitting his head too hard. (*See id.*) Officers reassured him, saying, "Daniel, keep breathing, ok? Just relax." (*Id.* at 4:45–50.) An officer asked, "can you breathe?" (*Id.* at 4:50.) Daniel repeatedly lifted his head and shoulders off the ground but brought his head down with less and less force. (*Id.* at 4:50–5:15.) Griggs asked Daniel, "Daniel, hey man, did you take something or what's going on? Can you talk?" (*Id.* at 5:05–12.) Daniel ceased all movement. (*Id.* at 5:21.) Griggs requested an expedited response from the medics, stating "he is having a manic episode." (*Id.* at 5:25–32.) Griggs said, "take pressure off of him, see if we can let him breathe," and the officers immediately leaned back from Daniel. (*Id.* at 5:36–38.) Griggs raised Daniel's left arm and shoulder, and someone said, "keep breathing, man, hey, keep on breathing, ok?" (*Id.* at 5:39–44.)

The officers conversed and attempted to communicate with Daniel, and Griggs shone his flashlight into Daniel's face. (*Id.* at 5:50–6:19.) The following statements are clear from the video: "Excited delirium?"[6] (*Id.* at 5:58.) "Oh yeah." (*Id.* at 5:59.) "Daniel, Daniel." (*Id.* at 6:08.) "Should we turn him?" (*Id.* at 6:09.) "Turn him over." (*Id.* at 6:11.) "Stay with us Daniel." (*Id.* at 6:14.) "Is he still breathing?" (*Id.* at 6:18.) "Get him out of cuffs." (*Id.* at 6:19.)

Once the officers suspected Daniel had stopped breathing, they immediately worked to

---

[6] Prince testified that he felt Daniel "fight with us and fight with us, . . . like resisting us[,]" then there was a "sudden stoppage of everything"; Prince felt "a brief . . . relief for us because he had stopped fighting with us." (*See* Doc. 63-2 at 46:17–47:13.) Once Griggs said, "excited delirium," the officers "realized . . . what's going on" and removed the handcuffs. (*Id.* at 47:9–12.)

remove the handcuffs. (*Id.* at 6:20–38.) Someone said: "Just make sure we've got control of his arms." (*Id.* at 6:27–28.) Dispatch confirmed that Daniel had stopped breathing. (*Id.* at 6:37–38.) The officers turned Daniel over to his back. (*Id.* at 6:45–49.) Griggs shone his light at Daniel and the officers confirmed that his lips had turned blue. (*Id.* at 6:53–57.) Prince began chest compressions. (*Id.* at 7:03.) Wood and Moore tried to open Daniel's airway. (*Id.* at 7:13–30.) The officers checked to see if Daniel had started breathing and repositioned Daniel's head. (*Id.* at 7:43–57.) Prince and later Moore continued chest compressions. (*Id.* at 7:58.) Paramedics and fire department personnel eventually took over life saving measures. (*Id.* at 9:35.) Daniel was pronounced dead at the scene. (*See, e.g.*, *id.* at 33:00.) The parties' experts agree that Daniel died as the result of a cardiac arrest. (*See, e.g.*, Docs. 33-3 at 2; 61-2 at 7.)

There is no evidence that any officer suspected Daniel of having a weapon during the relevant timeframe. (*See, e.g.*, Docs. 63-2 at 22:21–23:25 (Prince); 63-4 at 40:22–41:1 (Wood); 63-7 at 58:21–23 (Griggs); 63-8 at 51:16–19 (Moore).) All four officers testified that they noticed Daniel was obese. (*See* Docs. 63-2 at 32:2–18 (Prince); 63-4 at 37:5–7 (Wood); 63-7 at 68:21–23 (Griggs); 63-8 at 42:6–10 (Moore).) Prince and Griggs also noticed Daniel was sweating profusely and had dilated eyes. (*See, e.g.*, Docs. 63-2 at 32:2–18 (Prince); 63-7 at 66:13–27 (Griggs).)

## B.    The OMI Report and Expert Testimony

The Office of the Medical Investigator (OMI) issued a Death Investigation Summary Report. (*See* Doc. 51-F.) The OMI Report states that Daniel "had a past medical history of alcohol and drug abuse, obesity, and sleep apnea." (*Id.* at 2.)

> Other autopsy findings included an enlarged heart (commonly associated with high blood pressure and/or methamphetamine abuse), and fatty changes of the liver (commonly associated with alcohol abuse).

> Toxicology testing of blood revealed the presence of methamphetamine. No

alcohol was present.

Methamphetamine use is a risk factor for experiencing life-threatening, abnormal heart rhythms, particularly in the setting of other cardiac risk factors such as an enlarged heart. The physical restraint applied by police officers, and the decedent's prone position (face down; limits one's ability to adequately breath[e]) while being restrained would have contributed to the decedent's physiologic stress and are listed as contributory conditions; therefore, the manner of death is best described as homicide.

(*Id.*) The OMI Report concluded:

Cause of Death
     Toxic effects of methamphetamine

Other significant Contributory Conditions
     Physical Restraint

Manner of Death
     Homicide

(*Id.* at 1.)

The parties have submitted dueling expert reports. Defendants' expert, Gary M. Vilke, M.D., opines that the officers' actions in attempting "to control and restrain [Daniel] did not cause or contribute to his cardiac arrest." (Doc. 33-3 at 2.) He further opines that "[p]lacing [Daniel] in a 'recovery position' would not have prevented his sudden cardiac arrest and death." (*Id.*) Finally, Dr. Vilke does not believe "that the weight of the officers could significantly contribute to a positional asphyxia condition." (*Id.* (quotation marks omitted).)

Plaintiffs disagree with Dr. Vilke's opinions and submit the opinions of expert witness John Stein, M.D. (*See* Doc. 63-6.) Dr. Stein opines that the officers' actions did contribute to Daniel's death: by holding him in a prone position, Daniel was unable to adequately exhale carbon dioxide, leading to "excessive lactic acid production and . . . acidosis in his bloodstream[,]" which eventually caused the cardiac arrest. (*See id.* at 66:6–17.) Dr. Stein opines that, "but for the minutes

of restraint, Daniel would not have died" (*id.* at 66:22–25), regardless of whether the officers put additional weight on him (*see* Doc. 61-2 at 8). Dr. Stein also believes that if Daniel had "been turned to his side, on to his back or had he been sat up, there is a very high likelihood he would either have regained the ability to balance his acidosis, or at least he would have survived long enough for" paramedics to provide medical interventions. (*Id.* at 9.)

### C.  Officer Training

Farmington police officers are trained regarding "recovery positions." (*See* Doc. 63-12 at 15:11–15.) When a subject must be put into a prone position while being handcuffed due to resistance, officers are trained to move them to a recovery position once they have stopped resisting and it is safe to do so. (*Id.* at 17:12–18:18.) Training does not "specifically delineate" what it means to "stop resisting," as it depends on the totality of the circumstances. (*See id.* at 19:1–7.) Sergeant Nicholas Bloomfield, who testified regarding FPD training, stated that the involved officer decides when a subject has stopped resisting based on his or her subjective knowledge of the situation. (*Id.* at 19:7–15.) Bloomfield testified that training does not dictate "what exact techniques [officers] can or cannot do" in a situation where a subject is actively resisting. (*See id.* at 22:2–8.)

All four officers were aware of the concerns of positional asphyxia, and particularly the risks involved in restraining a subject in a facedown position for an extended period of time. (*See* Docs. 63-2 at 6:8–18 (Prince: "being "facedown for an extended period of time . . . could [cause] potential issues"); 63-4 at 7:20–9:2 (Wood: acknowledging that in positional asphyxia training, the facedown position is discussed); 63-7 at 18:21–25 (Griggs: "positional asphyxiation is something . . . to be concerned about as far as the position that somebody is place that would restrain their ability to breathe"); 63-8 at 14:9–15 (Moore: relating that officers are trained not to keep subjects in a facedown stabilization "position for an extended amount of time").) Griggs also

knew that an overweight individual may be more likely "to suffer from positional asphyxia . . . ." (Doc. 63-7 at 20:24–21:5; *see also* Doc. 63-6 (Stein Depo.) at 68:20–25 (noting that "obesity also adds additional stress when placed in the prone position")).) Still, Griggs testified that he might apply pressure to a subject in a prone position if the person is "tensing up, pulling their hand away," or otherwise actively resisting. (*See* Docs. 63-7 at 27:7–12.) Moore testified that he'd been trained not to keep a subject in a facedown stabilization "position for an extended amount of time[,]" but instead "to roll someone onto their side or . . . back . . . when the scene is secure" or when "[it is] safe enough to do so . . . ." (Doc. 63-8 at 14:9–15:1.)

FPD officers receive minimal training on excited delirium twice a year. (*See, e.g.*, Docs. 63-2 at 8:10–12; 63-7 at 33:21–25; *see also* Doc. 63-11 at 3.) Sergeant Guy Postlewait completed the Use of Force review for the Internal Affairs report and "recommended refresher training . . . related to excited delirium." (Doc. 63-11 at 3.) Postlewait noticed that the face down stabilization method taught to FPD officers "provides the most tactically advantageous and safest way to reduce the likelihood for injury to officers and/or subjects." (*Id.*) He "recommended instructing officers to transition all subjects from the face down stabilization position into a recovery position once handcuffs have been applied, and when it is safe to do so." (*Id.*)

## II.     Legal Standards

### A.     Standard for Motions for Summary Judgment

"Summary judgment is proper if, viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Halley v. Huckaby*, 902 F.3d 2236, 1143 (10th Cir. 2018) (citing *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018)). "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" *Tanner*

*v. San Juan Cty. Sheriff's Office*, 864 F. Supp. 2d 1090, 1106 (D.N.M. 2012) (quoting *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991)) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Once the movant meets this burden, rule 56 requires the non-moving party to designate specific facts showing that there is a genuine issue for trial." *Id.* (citing *Celotex*, 477 U.S. at 324; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). A party cannot "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." *Id.* (quotation and citations omitted). Instead, the non-moving party must come forward with "sufficient evidence on which the factfinder could reasonably find" in their favor. *Id.* (citations omitted). Evidence that is "merely colorable," *Anderson*, 477 U.S. at 249, or consists only of "[u]nsubstantiated allegations[,]" *McCoy*, 887 F.3d at 1044, is insufficient.

### B.    Qualified Immunity Standard

The Court reviews summary judgment motions based on a qualified immunity defense somewhat differently. *See Halley*, 902 F.3d at 1144. "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Id.* (quoting *Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011)). "A constitutional right is clearly established if it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Id.* (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). "A Supreme Court or Tenth Circuit decision on point or the weight of authority from other courts can clearly establish a right." *Id.* (citation omitted). "Generally, 'existing precedent must have placed the statutory or constitutional question beyond debate' to clearly establish a right." *Id.* (quoting *Redmond v. Crowther*, 882 F.3d 927, 935 (10th Cir. 2018)). "The question is not whether a 'broad general proposition' was clearly established, but 'whether the violative nature of particular conduct

[was] clearly established.'" *Id.* (quoting *Redmond*, 882 F.3d at 935) (internal quotation marks omitted).

"If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment . . . ." *Id.* (quoting *Koch*, 660 F.3d at 1238). And while the "Court must construe the facts in the light most favorable to the plaintiff as the nonmoving party, 'a plaintiff's version of the facts must find support in the record.'" *Koch*, 660 F.3d at 1238 (quoting *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1312 (10th Cir. 2009)). If the plaintiff's "version of the facts is 'blatantly contradicted by the record, so that no reasonable jury could believe it,' then [the Court] 'should not adopt that version of the facts.'" *Halley*, 902 F.3d at 1144 (quoting *Thomson*, 584 F.3d at 1312).

The Court may address the qualified immunity analysis in any order. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). In fact, where a court is "firmly convinced the law is not clearly established" and the "constitutional violation question is so factbound that the decision provides little guidance for future cases[,]" it is prudent to proceed directly to the clearly established prong of the analysis. *See Tanner*, 864 F. Supp. 2d at 1108 (quoting *Kerns v. Bader*, 663 F.3d 1173, 1180–81 (10th Cir. 2011) (quotation marks omitted)).

## III.    Analysis

Plaintiffs bring a Fourth Amendment claim against the four officers for excessive force. (Doc. 1 ¶¶ 60–71.) Plaintiffs argue that Daniel's death was preventable and was "caused by [the officers'] unreasonable seizure of Daniel based on their use of a face-down positional restraint technique as they placed Daniel in handcuffs and on his stomach and then applied pressure to his

upper and lower body parts . . . ."[7] (*Id.* ¶ 63.) Plaintiffs also assert that Griggs, "as the ranking supervisor on scene[,]" had a duty to prevent the other officers from unreasonably seizing Daniel.[8] (*Id.* ¶ 64.) The officers move for summary judgment on Count I and argue that they are entitled to qualified immunity. (*See* Doc. 51.) They assert that their seizure of Daniel was objectively reasonable, and even if there was a constitutional violation, no clearly established law put them on notice that their conduct was illegal. (*Id.* at 13–19.)

Plaintiffs do not argue that Prince's "distraction strikes" or the officers' initial restraint of Daniel was excessive. (*See* Doc. 63 at 27.) Instead, they contend that the officers' "continued use of force after [Daniel] was handcuffed and thus subdued, i.e., the post-restraint use of force, while he remained pinned face down in a prone position," violated Daniel's constitutional rights. (*See id.*) Plaintiffs argue that once the officers put Daniel in a prone position and handcuffed him, he "was effectively subdued . . . ." (*Id.* at 25.) They assert that the officers kept Daniel subdued in this prone position for "3 minutes and 42 seconds, until" Griggs noticed that Daniel was not breathing. (*See id.*) Daniel clearly posed a threat to himself or others before he was handcuffed, and the Court finds that no officer used excessive force before this point. Daniel was harming himself, there was information that he had been aggressive toward his parents, and Prince was under the impression that Daniel had grabbed for Prince's taser. Further, Daniel actively resisted the officers' attempts to subdue and handcuff him.

Once Moore handcuffed Daniel, however, there is a 23 second stretch from 3:25–48 in which Daniel had calmed down enough that both Griggs and Moore stood up, and Griggs spoke

---

[7] Viewing the evidence in a light most favorable to Plaintiffs, the Court will assume throughout this opinion that the prone restraint contributed to Daniel's death.

[8] Plaintiffs do not, however, bring a claim against Griggs in his supervisory capacity. (*See* Compl. at 1; ¶¶ 60–71.) They also acknowledge that Count I is only brought against the individual officers and not the City. (Doc. 51 at 36.)

to Daniel's parents, who moved away from the group. At 3:49, although Daniel was not actively kicking, Prince tried to pin his right leg to his buttock, and Daniel's struggles noticeably increased. Prince and Moore put pressure on Daniel's arms. Griggs stood and observed. Wood arrived on scene and tried to pin Daniel's legs, but Griggs directed him to "just let [Daniel] kick . . . he's not gonna hurt anybody. We have control." Daniel continued to bang his head and struggle. Griggs watched until approximately 4:26, when the four officers moved in to pin Daniel's extremities. They spoke calmly and reassured Daniel. Daniel's struggles lessened until he stopped moving completely at 5:21. Over the next 58 seconds, the officers talked to each other, tried to communicate with Daniel, and realized Daniel was not breathing before one of them said, "Get him out of cuffs." For purposes of this Opinion, the Court focuses its inquiry from 3:25 onward. In the end, the Court determines that there was no clearly established law that would have put the officers on notice that their conduct violated Daniel's constitutional rights and finds that the officers are entitled to qualified immunity.

### A.    The right at issue was not clearly established.

Plaintiffs must demonstrate that Daniel's Fourth Amendment right was clearly established at the time of the arrest. "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Weigel v. Broad*, 544 F.3d 1143, 1153 (10th Cir. 2008) (quotation omitted). "The plaintiff is not required to show, however, that the very act in question previously was held unlawful in order to establish an absence of qualified immunity." *Id.* (quotation omitted). Here, the Court must determine whether a reasonable officer would have known that keeping a handcuffed person in a prone position for at least three minutes, under circumstances where the person may be under the influence of drugs

and is actively struggling or resisting but does not pose an obvious threat to others, would violate that person's constitutional rights.

### 1. Existing caselaw is distinguishable.

Plaintiffs argue that existing precedent regarding "post-restraint uses of force," while not directly on point, was sufficient to put the officers on notice that their conduct was unconstitutional, particularly because the officers knew that Daniel was likely on drugs. (*See* Doc. 63 at 18–36.) Before turning to the relevant authority, however, the Court finds it helpful to look at the facts of this case under the *Graham* reasonableness balancing test. *See Graham v. Connor*, 490 U.S. 386, 388 (1989).

<u>*Graham v. Connor*</u>

Courts analyze "claims of excessive force in the context of arrests . . . under the Fourth Amendment's 'objective reasonableness' standard . . . ." *Saucier v. Katz*, 533 U.S. 194, 204–05 (2001), *receded from on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009) (quotation omitted). "A 'court assesses the reasonableness of an officer's conduct from the perspective of a reasonable officer on the scene, acknowledging that the officer may be forced to make split-second judgments in certain difficult circumstances.'" *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1220 (10th Cir. 2005) (quoting *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1314 (10th Cir. 2002)). The Supreme Court in *Graham* articulated factors that courts must "consider in assessing whether the force used was reasonable[, which] include: the alleged crime's severity, the degree of potential threat that the suspect poses to an officer's safety and to others' safety, and the suspect's efforts to resist or evade arrest." *Marquez*, 399 F.3d at 1220 (citation omitted).

**<u>Severity of Crime</u>**: All four officers were aware that Daniel was acting in an "aggressive" or "violent" manner and may have been involved in a physical altercation with one or both of his

parents. Plaintiffs assert that if Daniel was to be arrested, the charge would have been, at most, a misdemeanor.[9] (*See* Doc. 63 at 24–25.) The Court agrees. Defendants do not assert that they considered felony charges. (*See* Doc. 81 at 17.) Instead, they only intended to take Daniel "into protective custody for medical evaluation and treatment since he was hurting himself." (*Id.*) The Tenth Circuit noted in *Lee v. Tucker* that "the first *Graham* factor may weigh against the use of significant force if the crime at issue is a misdemeanor." 904 F.3d 1145, 1149–50 (10th Cir. 2018) (citations omitted) (finding that officer used excessive force where he "repeatedly appl[ied] a Taser without warning, despite the fact that Lee was not resisting officers and had not been advised that he was being detained").

Plaintiffs acknowledge that at the beginning of the incident, Prince perceived that Daniel grabbed at Prince's taser. (*See* Doc. 63 at 27.) Plaintiffs argue that, viewing the facts in a light most favorable to them, "Daniel was not grabbing for the officer's weapon, but flailing his arms to readjust his body because he was trying to breathe." (*Id.*) This argument is unpersuasive for two reasons. First, Daniel was still on his back when Prince perceived that Daniel grabbed at his taser, and Plaintiffs do not offer evidence to show that Daniel had problems breathing while lying on his back. Second, while the Court agrees that it is more likely that Daniel was flailing rather than trying to grab the taser, Plaintiffs have not denied that it was Prince's *impression* that Daniel attempted to grab the taser. (*See* Doc. 63 at 2; *see also supra* at 3 n.4.) Consequently, because both Prince and Griggs may have understood that Daniel grabbed for Prince's taser, at least two of the four officers had knowledge that elevated the situation beyond a possible misdemeanor domestic

---

[9] In New Mexico, assault against a household member is a petty misdemeanor, *see* N.M. Stat. Ann. § 30-3-12, and battery against a household member is a misdemeanor, *see id.* § 30-3-15. The Court agrees that Defendants have not established facts to support a finding that Daniel could have been arrested for felony domestic assault or battery. *See, e.g.*, N.M. Stat. Ann. §§ 30-3-13–14, 30-3-16.

violence charge. *See, e.g.*, *Gianetti v. City of Stillwater*, 216 F. App'x 756, 758–63 (10th Cir. 2007) (where officers arrested subject for attempting to allude police after a minor traffic offense, Tenth Circuit observed that it was appropriate to consider both "the minor nature of Ms. Giannetti's original offense" together with the fact that she later hit an officer during the jail's intake process, which resulted in the officers' increased use of force).

**Degree of Threat**: The second *Graham* factor examines "whether the suspect pose[d] an immediate threat to the safety of the officers or others," *Pauly v. White*, 874 F.3d 1197, 1215 (10th Cir. 2017) (quotation and emphasis omitted), and "is undoubtedly the most important and fact intensive factor in determining the objective reasonableness of an officer's use of force," *id.* at 1216 (quotation marks and citation omitted). Here, the Court agrees that Daniel posed a sufficient threat such that the officers' use of force up to the point when he was handcuffed was objectively reasonable.

Plaintiffs argue, though, that after he was handcuffed, Daniel was "effectively subdued" and "no longer anything more than a 'minimal safety threat' to the officers." (Doc. 63 at 28.) They point to Griggs's direction to Wood to "let [Daniel] kick . . . . We have control."[10] (*See id.*) Construing the evidence in a light most favorable to Plaintiffs, a jury could find that the officers' concerns about any threat to themselves or others had largely subsided after Daniel was handcuffed. Griggs and Moore stood up, and Griggs continued to stand for approximately one minute. Griggs told Wood to let Daniel kick because the officers were in control. Even when the officers pinned Daniel's extremities, they continued to talk in calm, soothing voices, their concern focused on Daniel's well-being.

---

[10] The Court notes, however, that it was not entirely clear to the officers that Daniel was completely subdued even after he'd stopped moving. After they decided to remove the handcuffs someone said, "[j]ust make sure we've got control of his arms." (Doc. 51-C at 6:27–28.)

**Active Resistance or Attempts to Flee**: Under the third factor, the Court considers whether the suspect resisted arrest or attempted to flee. *McCoy*, 887 F.3d at 1051. The Tenth Circuit has "consistently concluded that a suspect's initial resistance does not justify the continuation of force once the resistance ceases." *Id.* (gathering cases). Plaintiffs argue that Daniel was not resisting but was struggling to breathe. (*See* Doc. 63 at 30–31.) All four officers were trained on the risks of positional asphyxia, particularly the danger of asphyxia to a suspect placed in a prone position for an extended period of time. At least Griggs knew that obesity is also a risk factor.

They also assert, but do not fully develop an argument, that the officers knew Daniel was suffering from a diminished capacity, which has also been shown to be a risk factor for positional asphyxia in some circumstances.[11] (*See id.* at 23–24, 30–31.) *See also Cruz v. City of Laramie*, 239 F.3d 1182, 1189 (10th Cir. 2001) (discussing research into "breathing problems created by pressure on the back and placement in a prone position, especially when an individual is in a state of 'excited delirium'"). It is true that Prince and Griggs had information that Daniel may have been on drugs. Even with the benefit of repeated, attentive viewing of the video evidence, however, the Court is hard-pressed to differentiate between Daniel's earlier resistance to being handcuffed and his later struggles to breathe.

FPD officers are further trained to move a subject from a prone position to a recovery position once the subject has stopped resisting and it is safe to do so. As their training does not specify what it means for a subject to "stop resisting," a reasonable officer may or may not have turned Daniel under these circumstances.

---

[11] It does not appear from the evidence submitted here that FPD officers are specifically trained to recognize that excited delirium may increase the risk of positional asphyxiation. (*See, e.g.*, Doc. 63-12 at 23:6–25:8.) Instead, officers are simply trained to summon medical personnel in cases of excited delirium. (*See id.*)

On balance, the *Graham* factors do not strongly point to a finding that the officers did or did not violate Daniel's constitutional right to be free from excessive force. The Court turns now to the authority on which Plaintiffs rely.

<u>*McCoy v. Meyers*</u>

In *McCoy*, officers seized a suspect in an armed hostage situation, knocked him unconscious, handcuffed his arms, and zip-tied his legs. *See* 887 F.3d at 1038. When the suspect "regained consciousness, the officers resumed striking him and" restrained him such that he was rendered "unconscious a second time." *Id.* The Tenth Circuit utilized the *Graham* factors and found that because McCoy posed no threat and had stopped resisting arrest, there were facts sufficient to show a Fourth Amendment violation. *See id.* at 1050–51. Moreover, the court determined that clearly established law would have put the officers on notice that their post-restraint use of force on a subdued arrestee was unconstitutional. *Id.* at 1052–53.

The officers here did not employ such violent force against Daniel, and they did not zip-tie his legs. Further, there was no evidence that McCoy continued struggling or ever engaged in self-harmful behavior, as was the case here. *See id.* at 1040–42. For these reasons, *McCoy* does not provide clearly established law under these circumstances.

<u>*McCowan v. Morales*</u>

In *McCowan*, an obviously inebriated suspect (McCowan) told the arresting officer that he had a neck and shoulder injury that would impair his ability to pass a sobriety test. 945 F.3d 1276, 1280 (10th Cir. 2019). McCowan failed the test and the officer arrested him, handcuffed him, and put him in the back of his police car. *Id.* The officer did not buckle McCowan into the car and took him on a "rough ride" to the police station, injuring him. *Id.* The *McCowan* court relied on *McCoy* in analyzing the facts, finding that the officer employed a "gratuitous use of force against . . . a

fully compliant and subdued misdemeanant arrestee . . . who posed no threat to anyone." *Id.* at 1283–84. Again, the facts in this incident are distinguishable, as Daniel was never fully subdued. *McCowan* would provide notice to the officers here.

<u>*Weigel v. Broad*</u>

In *Weigel v. Broad*, two troopers and a bystander used force to restrain Weigel, who "fought vigorously" and repeatedly tried to "take the troopers' weapons and evade handcuffing." *See* 544 F.3d at 1148. Eventually, one trooper left the scene to warm his hands at his car, after he determined that Weigel no longer posed a safety risk. *Id.* at 1149, 1152. Although "Weigel was under control," the second trooper and the bystander continued to put weight on Weigel's back and legs for three more minutes. *Id.* at 1152–53. Weigel suffered positional asphyxia and died. *Id.* at 1149. The Tenth Circuit found that the use of force after Weigel was handcuffed was unreasonable. *Id.* at 1152–53. It observed that the troopers did not "claim that once Mr. Weigel was handcuffed and his legs were bound, he still would pose a threat to the officers, the public, or himself unless he was maintained on his stomach with pressure imposed on his upper back." *Id.* at 1152. *Weigel*, too, is inapposite, as the officers here did not bind Daniel's legs or put pressure on his back, which was of primary concern there. *See id.* (finding that "Weigel was subjected to such pressure for a significant period after it was clear that the pressure was unnecessary to restrain him").

<u>*Emmett v. Armstrong*</u>

The officer in *Emmett v. Armstrong* responded to a call regarding a fight involving Emmett. 973 F.3d 1127, 1131 (10th Cir. 2020). When the officer saw Emmett leaving the scene, he commanded him to stop, and Emmett ran. *Id.* The officer chased Emmett and tackled him. *Id.* Emmett, on his back on the ground, "became visibly relaxed, and he made no further movements

indicating an attempt to run or fight back." *Id.* The officer told Emmett to roll over. *Id.* Emmett laughed and did not comply. *Id.* The officer "said, 'You're going to get TASE'd!' and immediately tased Emmett in the abdomen for a single, five-second taser cycle.'" *Id.* "Approximately ten seconds had elapsed from the time [the officer] tackled Emmett to the time he tased Emmett." *Id.* In analyzing the second *Graham* factor, the Tenth Circuit looked at whether the officer was "in danger at the precise moment that [he] used force." *Id.* at 1136. By tackling Emmett, the officer "had effectively neutralized any safety concerns arising from Emmett's flight." *Id.* "Thus, the only 'immediate threat' to safety was that arising from Emmett himself." *Id.*

The circumstances here are different, both in the type of force used and in the resistance of the subjects. Here, of course, the officers did not tase a relaxed, laughing suspect; they pinned a suspect who had been aggressive and who continued to try to harm himself throughout the encounter. Moreover, Daniel, unlike Emmett, was still struggling and arguably actively resisting the officers' attempts to subdue him.

## Casey v. City of Federal Heights

Similarly, in *Casey*, where officers tackled, tased, and beat an individual who had taken a file out of a courthouse, the Tenth Circuit "held that it was unreasonable for an officer to use force against a non-violent misdemeanant suspect who was not resisting, fleeing, or dangerous." *See McCowan*, 945 F.3d at 1288 (discussing *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1279–83 (10th Cir. 2007)). As discussed above, Daniel had been aggressive and self-harming and struggled throughout the incident; thus *Casey* is distinguishable.

## Cruz v. City of Laramie, Wyoming

Finally, Plaintiffs rely on *Cruz* to argue that the law was clearly established that officers must use "less restrictive means for physical restraint" if they have knowledge that the arrestee has

diminished capacity.[12] (Doc. 63 at 22 (quoting *Cruz*, 239 F.3d at 1188).) In *Cruz*, officers encountered Cruz running naked, yelling, and kicking. 239 F.3d at 1186. Cruz tried to get past the officers, and they wrestled him to the ground and handcuffed him in a prone position. *Id.* Another officer tied Cruz's ankles together to stop him from kicking, and there was evidence that the officers then fastened his ankles to his wrists, effectively "hog-tying" him. *Id.* The Tenth Circuit, noting the "known dangers of the hog-tie restraint[,] . . . especially in instances involving individuals of diminished capacity[,]" found that the officers used excessive force. *Id.* at 1188–89. Thus, when the Tenth Circuit determined that officers must use "less restrictive means for physical restraint[,]" *id.* at 1188, it was referring specifically to the hog-tie technique, which was not used here.

Plaintiffs assert that when the officers bent Daniel's legs toward his buttocks "for a period of time," he was hog-tied. (Doc. 63 at 29.) The Court disagrees. Prince pinned Daniel's right leg to his buttock for, at most, 11 seconds. Wood never succeeded in pinning Daniel's feet to his buttocks. Plaintiffs offer no authority to support a finding that pinning one foot up for up to 11 seconds is equivalent to using a hog-tie restraint. Moreover, the research that the Tenth Circuit discussed in *Cruz* "detail[ed] the breathing problems created by *pressure on the back* and placement in a prone position, especially when an individual is in a state of 'excited delirium.'" 239 F.3d at 1189 (emphasis added). Plaintiffs do not argue that the officers put excessive pressure on Daniel's back after he was handcuffed. (*See* Doc. 63.) *Cruz* does not, therefore, provide the

---

[12] Plaintiffs filed a notice to alert the Court of a case from the Fifth Circuit that is similar to *Cruz*. (*See* Doc. 94.) In *Aguirre v. City of San Antonio*, No. 17-51031, 2021 WL 1574046, at *1, 13 (5th Cir. Apr. 22, 2021), the Fifth Circuit found that officers were not entitled to qualified immunity where they essentially hog-tied a suspect who "was not resisting, posed no immediate safety threat, and" may have been on drugs. Officers also applied pressure to the suspect's back, neck, and legs while he was bound. *See id.* at *3, 6. *Aguirre* is distinguishable for the same reasons that *Cruz* is.

"clearly established" law that Plaintiffs had hoped. *Cf. Sarnella v. Kuhns*, No. 18-CV-00779-PAB-NYW, 2019 WL 1112388, at *1–3 (D. Colo. Mar. 8, 2019) (finding that where deputies knew suspect suffered from mental health condition and forcefully handcuffed him in prone position, resulting in suspect's death, *Cruz* and *Weigel* were "insufficiently analogous" to supply clearly established law because the deputies in *Sarnella* neither hog-tied the suspect nor put pressure on his back).

In sum, Plaintiffs fail to offer authority[13] that would put officers on notice that their conduct under these circumstances violated Daniel's constitutional right to be free from excessive force.

### 2.  A "salient facts" analysis does not change the Court's decision.

Plaintiffs urge the Court to employ a "salient facts" analysis—to identify the "specific essential facts" that will align with existing caselaw to put officers on notice of clearly established law. (*See* Doc. 63 at 19–20 (discussing *McCowan*, 945 F.3d at 1283–84).) In *McCowan*, the Tenth Circuit noted the following essential facts: "(1) the gratuitous use of force against (2) a fully compliant and subdued misdemeanant arrestee (3) who posed no threat to anyone." 945 F.3d at 1284. Plaintiffs assert that the salient facts here are:

1) Daniel was at most a misdemeanant.
2) Daniel was unarmed.
3) The officers were aware of Daniel's diminished capacity.
4) The officers had training on excited delirium and positional asphyxia, of which Daniel exhibited the classic signs, . . . which counseled them to get him off his belly as soon as he was no longer a threat.
5) Daniel was handcuffed behind his back, and after being handcuffed, he was kept secured by the four Defendant Officers at his shoulders and legs, either being held in place or pinned with weight from all of the officers, in a face-down prone stabilization position.

---

[13] Plaintiffs rely on several cases—*McCoy*, *McCowan*, *Emmett*, and *Aguirre* among them—that were decided after the events occurred here. Plaintiffs argue that these cases and others are on point because they rely on preexisting law to find that the officers had notice that their conduct would violate the suspects' constitutional rights. (*See* Doc. 96 at 2.) The Court finds that the authority Plaintiffs rely on is sufficiently dissimilar that it cannot serve as "clearly established law," whether it was decided before or after this incident.

6) After Daniel was handcuffed, he was no longer a sufficient threat, or at some point after he was handcuffed he became no longer a threat, to the officers or to anybody else that justified the continued use of force holding or pinning him face down to the ground.

(Doc. 63 at 35 (citations omitted).) The Court finds, however, that these facts are not enough to put a reasonable officer on notice that actions taken here would violate Daniel's constitutional rights. The cases Plaintiffs rely on are too dissimilar to provide clearly established law where the officers neither hog-tied Daniel nor put pressure on his back, and where Daniel continued to struggle/resist for most of the encounter. The officers are entitled to qualified immunity. *See McCoy*, 887 F.3d at 1048 (choosing, in its discretion, to "skip prong one of the qualified immunity analysis because" plaintiff failed "to show clearly established law" on the issue of the constitutional violation) (citation omitted).

**B.  Because the Court dismisses Plaintiffs' constitutional claim, it declines to exercise supplemental jurisdiction over the remaining claims and will dismiss the lawsuit.**

Plaintiffs brought claims under the New Mexico Tort Claims Act for wrongful death and loss of consortium against Defendants. (*See* Compl.) "Under 28 U.S.C. § 1367(c)(3), '[t]he district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction.'" *Sabeerin v. Fassler*, No. 1:16-CV-00497 JCH-LF, 2021 WL 1227726, at *8 (D.N.M. Apr. 1, 2021). "If federal claims are dismissed before trial, leaving only issues of state law, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." *Id.* (quoting *Bauchman for Bauchman v. W. High Sch.*, 132 F.3d 542, 549 (10th Cir. 1997)) (citing *Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998) ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state

claims.")). Because the Court grants summary judgment to the officers and dismisses the only federal claim at issue and the remaining claims are based entirely on state law, dismissal of Plaintiffs' claims for wrongful death and loss of consortium is proper. *See id.* "Plaintiffs will not be prejudiced by the dismissal of their state-law claims because 28 U.S.C. 1367(d) tolls the statute of limitations on those claims during the pendency of the federal proceeding plus 30 days beyond the dismissal." *See id.*

THEREFORE,

IT IS ORDERED that Defendants' Motion for Summary Judgment on Count I of the Complaint (Doc. 51) is GRANTED. The officers are entitled to summary judgment on the basis of qualified immunity on Count I (Excessive Force under the Fourth Amendment) and this claim is dismissed;

IT IS FURTHER ORDERED that the Motion for Hearing (Doc. 83), Motion to Strike (Doc. 89), and Motion to Strike (Doc. 95) are DENIED AS MOOT;

IT IS FURTHER ORDERED that because the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims, Defendants' Motion for Summary Judgment on Count III of the Complaint (Doc. 48) is DENIED AS MOOT and Plaintiffs' remaining claims (Count II and Count III) are DISMISSED WITHOUT PREJUDICE.

_____
ROBERT C. BRACK
SENIOR U.S. DISTRICT JUDGE